JOHN J. SHAEFFER (SBN 138331)
  JShaeffer@FoxRothschild.com
MATTHEW FOLLETT (SBN 325481)
  MFollett@FoxRothschild.com
BENJAMIN MCCOY (*PRO HAC VICE FORTHCOMING*)
  BMcCoy@FoxRothschild.com
ALBERTO LONGO (*PRO HAC VICE FORTHCOMING*)
  Alongo@FoxRothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Plaintiffs,
AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF
CALIFORNIA, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF CALIFORNIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATHAN SAMUEL YOUNG a/k/a PABLO LOPEZ; DAVID YOUNG a/k/a SANCHO LOPEZ; JOSE RICARDO TOSCANO MALDONADO; ALI BEHESHTI; MARC ADLER; ANI MIRZAVAN; ZEALIE LLC; HELPING HANDS REHABILITATION CLINIC, INC; JOSER FOREVER LLC; GET REAL RECOVERY LLC; REVIVE PREMIER TREATMENT CENTER, INC.; HEALING PATH DETOX LLC; OCEAN VALLEY BEHAVIORAL HEALTH, LLC; RODEO RECOVERY LLC; SUNSET REHAB LLC; NATURAL REST HOUSE, INC; AND JOHN DOES 1 THROUGH 50, AND ABC CORPS. 1-50 <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> **(1) FRAUD** <br><br> **(2) NEGLIGENT MISREPRESENTATION** <br><br> **(3) INTENTIONAL INTERFERENCE WITH ECONOMIC CONTRACTUAL RELATIONSHIPS** <br><br> **(4) RICO, 18 U.S.C. § 1962(c)** <br><br> **(5) RICO CONSPIRACY, 18 U.S.C. § 1962(d)** <br><br> **(6) VIOLATIONS OF BUSINESS AND PROFESSIONAL CODE § 17200** <br><br> **(7) UNJUST ENRICHMENT** |

Plaintiffs Aetna Life Insurance Company and Aetna Health of California, Inc. (collectively, "Aetna"[1]) by way of this Complaint against Defendants Nathan Samuel Young, also known as Pablo Lopez; David Young, also known as Sancho Lopez; Jose Ricardo Toscano Maldonado; Ali Beheshti; Marc Adler; Ani Mirzavan; Zealie LLC; Helping Hands Rehabilitation Clinic, Inc; Joser Forever LLC; Get Real Recovery LLC; Revive Premier Treatment Center, Inc.; Healing Path Detox LLC; Ocean Valley Behavioral Health, LLC; Rodeo Recovery LLC; Sunset Rehab LLC; Natural Rest House, Inc; and John Does 1 through 50, and ABC CORPS. 1-50 (collectively, "Defendants") allege as follows:

## INTRODUCTION

1.      Aetna brings this action to recover millions of dollars in payments wrongfully made as a result of Defendants' fraudulent scheme to enrich themselves under the guise of treating those suffering from addiction and substance use disorder ("SUD").

2.      Substance abuse in the United States is a widespread problem and the demand for SUD treatment has continued to markedly increase. To meet this growing demand, government and commercial payers alike have increased coverage for SUD treatment over the last fifteen (15) to twenty (20) years.

3.      At the same time, SUD treatment programs and facilities often exist in environments with few barriers of entry into the marketplace.

4.      Unfortunately, many unscrupulous actors have flooded into the SUD treatment market, capitalizing on the most vulnerable of populations for their own gain.

5.      The various schemes perpetrated by Defendants here are particularly disturbing. Since at least 2021, Defendants have targeted vulnerable Aetna members who suffer from alcohol and/or substance dependency issues as part of a concerted

---

[1] For ease of reference, all Plaintiffs are referred to in the singular as Aetna unless otherwise specified herein.

1    effort to profit at their expense. Defendants used the patients for health benefit
2    payments under the lie of helping them, while doing the exact opposite.

3        6.    As detailed further herein, Defendants lured patients into their programs
4    by offering them kickbacks in the form of, *inter alia*, free or low-cost living
5    arrangements in "sober living homes" located in highly desirable locations
6    throughout California.

7        7.    In reality, the sober living homes were little more than drug dens, used
8    to ensure patients remained in Defendants' treatment "programs" for as long as
9    possible. To continue growing, Defendants hired some patients as "body brokers,"
10   sending them out to find other addicts to cycle through their facilities.

11       8.    Stated simply, Defendants profited from patients' enrollment in health
12   benefit plans by billing Aetna for so called "treatment" while, at the same time,
13   taking steps to undercut that treatment and keep patients in their programs. If a
14   patient lacked coverage, Defendants schemed to sign them up, such as by adding
15   them as "dependents" to the health plans of other patients with whom they had no
16   familial relationship.

17       9.    To avoid fraud detection, Defendants creating multiple entities so they
18   could spread their charges across multiple providers and bill under various Tax
19   Identification Numbers ("TINs"). They often shuffled patients throughout programs
20   for seemingly no reason other than to prolong benefits payments. When Aetna
21   flagged certain providers and sought more information to prove the medical
22   necessity of each claim, Defendants moved the patients to other providers they
23   controlled and continued to collect payments. Remarkably, nearly half of the Aetna
24   members enrolled in Defendants' treatment programs were treated through multiple
25   organizations during their time in treatment.

26       10.   In the rare instance where a patient progressed through treatment while
27   still retaining some benefits, Defendants encouraged "relapse" so a patient's
28   programs and benefit payments could start anew.

11.    Defendants' conduct not only injured Aetna, but harmed the employees, businesses, and labor unions that rely upon Aetna to administer or insure their health benefits. As the FBI has explained, healthcare fraud "affects everyone—individuals and businesses alike . . . ." <u>FBI Health Care Fraud Summary</u>, available at: <u>https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud</u>.

12.    Aetna now brings this action and alleges claims against Defendants for: (i) Fraud, (ii) Negligent Misrepresentation, (iii) Intentional Interference with Economic Contractual Relationships, (iv) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(C), (v) RICO Conspiracy, 18 U.S.C. § 1962(d), (vi) Violations of Business and Professional Code § 17200, and (vii) Unjust Enrichment. Aetna seeks compensatory damages, punitive damages, treble damages, attorneys' fees, costs, prejudgment and post judgment interest, and any other relief the Court deems appropriate.

## PARTIES

13.    Aetna Life Insurance Company is a citizen of Connecticut with its principal place of business in Hartford, Connecticut. Aetna is, and at all times mentioned herein was, qualified to conduct business in the state of California.

14.    Aetna Health of California is a citizen of California with its principal place of business in California.

### I.    TREATMENT ENTITY DEFENDANTS

15.    Defendant Helping Hands Rehabilitation Clinic, Inc. ("Helping Hands") is a corporation formed under the laws of California with its principal place of business at 1776 N. Highland Ave, Los Angeles, California. Upon information and belief, Marc Adler is an officer or director of Helping Hands.

16.    Defendant Joser Forever LLC ("Joser Forever") is a limited liability company formed under the laws of California with its principal place of business at 1436 S. La Cienega Blvd, Los Angeles, California. Upon information and belief, Jose Richard Maldonado aka Joe Maldonado aka Richard Maldonado aka Jose

Ricard Toscano Maldonado (a California citizen) is the sole member of Joser Forever.

17.    Defendant Get Real Recovery LLC ("Get Real Recovery") is a limited liability company formed under the laws of California with its principal place of business at 30290 Rancho Viejo Rd. Ste 204, San Juan Capistrano, California. Upon information and belief, Nathan Young (a California citizen) is the sole member of Get Real Recovery.

18.    Defendant Revive Premier Treatment Center, Inc. ("Revive") is a corporation formed under the laws of California with its principal place of business at 13111 Ventura Blvd, Studio City, California. Upon information and belief, Ani Mirzayan is an officer or director Revive.

19.    Defendant Healing Path Detox LLC ("Healing Path") is limited liability company formed under the laws of California with its principal place of business at 7661 Amberleaf Circle, Unit #1, Huntington Beach, California. Upon information and belief, Nathan Young (a California citizen) is the sole member of Healing Path. Defendant Ali Beheshti was previously the founder and/or authorized official before transferring Healing Path to Defendant Young..

20.    Defendant Ocean Valley Behavioral Health, LLC, ("Ocean Valley") is a limited liability company formed under the laws of California with a principal place of business at 13961 Mauve Drive, Santa Ana, California. Upon information and belief, Nathan Young (a California citizen) is the sole member of Ocean Valley Behavioral Health.

21.    Defendant Rodeo Recovery LLC ("Rodeo Recovery") is a limited liability company formed under the laws of California with a principal place of business at 240 Rodeo Drive, Beverly Hills, California. Upon information and belief, Nathan Young (a California citizen) is the sole member of Rodeo Recovery.

22.    Defendant Sunset Rehab LLC ("Sunset Rehab") is a limited liability company formed under the laws of California with a principal place of business at

7235 Santa Monica Blvd, West Hollywood, California. Upon information and belief, Nathan Young (a California citizen) is the sole member of Sunset Rehab.

23.   Defendant Natural Rest House, Inc. ("Natural Rest House") is a corporation formed under the laws of California with a principal place of business at 79100 Ocotillo Dr. La Quinta, California. Upon information and belief, Defendant Nathan Young is an officer or director of the company.

## II.   ADMINISTRATIVE BILLING DEFENDANTS

24.   Defendant Zealie LLC ("Zealie") is a limited liability company formed under the laws of Delaware with its principal place of business in 1100 S. Coast Hwy Ste 300, Laguna Beach, California. Zealie purports to provide specialized administrative billing services to the Treatment Entity Defendants (sometimes, "Treating Entities"). Zealie handles the submission of most bills for the Treating Entities and employs many people who also work at or with the Treating Entities and other providers. For example, Zealie's account manager, Ceaira Coffin, is also Helping Hands' authorized agent. Of more note, Ali Beheshti is Zealie's Chief Executive Officer. Beheshti previously ran Healing Path – a defendant here – which was identified as engaging in body brokering by an FBI agent in a federal indictment against a body broker who ultimately plead guilty.[2]

## III.   INDIVIDUAL OPERATOR/OWNER DEFENDANTS

25.   Defendant Nathan Samuel Young, a/k/a Pablo Lopez a/k/a Pablo Gomez, ("Nathan Young"), is an individual and citizen of California residing in Los Angeles County.[3] Mr. Young controls Get Real Recovery, Healing Path Recovery,

---

[2] *See U.S. v. Moore*, Indictment, Dkt. 1 (C.D. Cal. Mar. 29, 2021), available at: https://www.justice.gov/media/1152236/dl?inline (last visited, October 25, 2023); *see also U.S. v. Mahoney*, Indictment, Dkt. 1 (C.D. Cal. Oct. 6, 2021), available at: https://www.justice.gov/criminal-fraud/file/1564811/download. In *U.S. v. Moore*, the defendant pled guilty to body brokering for Healing Path. In *U.S. v. Mahoney*, the defendant is scheduled to go to trial in 2024 on charges that he paid kickbacks to body brokers on behalf of Healing Path.

[3] Unless otherwise noted all counties referenced are in California.

Natural Rest House, Healing Path Detox, Ocean Valley Behavioral Health, Rodeo Recovery, and Sunset Rehab LLC.

26.    Defendant David Young, a/k/a Sancho Lopez, is an individual and citizen of California residing in Los Angeles County. Upon information and belief, he is a family member of Nathan Young that actively participates in the operations of the various entities, including Rodeo Recovery.

27.    Defendant Jose Ricardo Toscano Maldonado is an individual and citizen of California residing in Los Angeles County. Mr. Maldonado is the member and/or manager of Joser Forever, and likely participates in the operations of other entities. For example, he was a defendant in a suit brought by Beverly Hills against Rodeo Recovery and Nathan Young alleging much of the same conduct set forth herein at a specific location in Beverly Hills. *See Beverly Hills v. Rodeo Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202).

28.    Defendant Ali Beheshti is an individual and citizen of California residing in Orange County. He founded and operates the Zealie billing company that submitted a majority of the bills to Aetna that resulted in wrongful payments. He also founded Healing Path Recovery which, as noted above, was identified as participating and submitting claims for patients obtained through illegal body brokering in a federal indictment.

29.    Defendant Marc Adler is an individual and citizen of California residing in Los Angeles County.  He is listed as the CEO, Secretary, CFO, and Director of Helping Hands, and was also a defendant in *Beverly Hills v. Rodeo Recovery*, *Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202).

30.    Defendant Ani Mirzayan is an individual and citizen of California residing in Los Angeles County.  She is the CEO, CFO, Secretary, and Director of Revive Premier Treatment Center.

31.    The true names of Defendants John Does 1 through 50, and ABC CORPS. 1 through 50, inclusive, are unknown and Aetna sues them by such

fictitious names under California Code of Civil Procedure § 474. Aetna alleges that each Defendant designated as a Doe Defendant is legally responsible to it for the damages alleged herein. When Aetna ascertains the true names, involvement, and capacities of Does 1 through 50 and ABC CORPS. 1 through 50 inclusive, it will seek leave to amend the Complaint.

32.   At all times relevant times each Defendant, whether fictitiously named or otherwise, was the agent, servant, or employee of the others, and was acting within the scope of such agency, enterprise, relationship, services, or employment.

**ALTER EGO/CONSPIRACY/AIDING AND ABETTING ALLEGATIONS**

33.   The defendants are liable for the obligations of each other as alter egos because they each treated the other entities as their own. As noted herein, the individual defendants disregarded the corporate form of the numerous entities they created and helped control, and freely passed patients back and forth between them seemingly at random. They created these entities, in whole or in part, for an improper purpose, including the perpetration of the fraudulent scheme alleged herein. It would therefore be unjust to recognize the individual defendants as separate from the entity defendants. Given this relationship, all allegations can be applied equally between the individual defendants and the entity defendants.

34.   Defendants formed a group of more than two people that amounted to a civil conspiracy. They agreed and conspired to commit the acts set forth herein. They worked together by, for example, performing individual tasks in concert to cause the submission of the fraudulent misrepresentations and omissions, and further to evade detection. As such, each Defendant that did not physically commit the tort themselves shared with the immediate tortfeasor a common place or design in its preparation. They are thus jointly and severally liable for all damages arising from the conspiracy.

35.   Each Defendant knew of the misconduct alleged herein, actively participated in the scheme(s), and provided substantial assistance or encouragement

to the other tortfeasors. When they undertook to provide substantial assistance or encouragement to other tortfeasors, they knew the conduct was tortious. As such, each Defendant is liable for all torts committed as part of the scheme.

## JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Aetna's state law claims pursuant to 28 U.S.C. § 1367.

37. Venue is proper in the Central District of California under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Aetna's claims occurred in this judicial district.

## FACTUAL BACKGROUND

**I.    RELEVANT INDUSTRY BACKGROUND**

**A.    Aetna Relies on Treatment Providers (like Defendants) to Submit Accurate Information for Reimbursement**

38. Aetna administers and/or insures healthcare benefit plans and/or policies for medical, surgical, behavioral, and mental health services lawfully rendered by eligible providers pursuant to the terms of health benefit plans issued to individuals and employers throughout the United States and the state of California.

39. Individuals enrolled in these plans are referred to as Aetna "members." Individuals and entities that provide services are referred to as "providers."

40. To obtain payment for services rendered, healthcare providers submit insurance claims by completing standard billing forms (*i.e.*, CMS 1500 or HCFA forms). Per Federal law, these forms require providers to use numerical codes that describe the services for which the provider seeks payment as maintained by the American Medical Association's Current Procedural Terminology ("CPT") and the CMS Healthcare Common Procedure Coding System ("HCPCS"). *See* 45 C.F.R. §§ 162.1002(a)(5), (b)(1) & (c)(1). Similarly, providers must accurately set forth other

information regarding the treatment, such as the place the service occurred and the diagnosis.

41.    Each of these claim details is material to the determination of whether a given claim will be covered and the amount of any payment.

42.    Aetna relies upon providers to submit accurate information and make truthful representations on claim forms to determine coverage and payment.

43.    And providers like Defendants intend for Aetna to rely upon statements contained within a claim form when determining payment for services. Indeed, applicable laws, the claim forms themselves, and Aetna require that all claim submissions be certified as correct and complete and that the benefits being claimed be limited to charges actually incurred.

**B.    Out-of-Network Providers Can Charge Members More for Services**

44.    Most Aetna members receive treatment through "in-network" providers. In-network providers have entered into "network contracts" with Aetna setting the rates for services.

45.    In contrast, "out-of-network" providers do not have contracts with Aetna setting the rates for services. As a result, coverage and the amount of payment (if any) for a given service is generally determined on the basis of the individual's plan.

46.    Aetna members are generally motivated to seek treatment from in-network providers. As relevant here, there are two primary reasons for this. *First*, unlike in-network providers, out-of-network providers can "balance bill" members for the difference between what they bill and what their health benefit plan pays.

47.    *Second*, members generally have a higher patient "cost-share" under their plan when they see out-of-network providers.  This owes, in part, to the higher out-of-network bills that the health benefit plans often pay for such services. Most plans require members to pay a percentage of the cost for out-of-network care.

Referred to as "patient responsibility," such measures can take various forms, including co-insurance or copayments. Cost sharing is an important method utilized by plans to control out-of-network costs because it "sensitize[s] employees to the costs of health care, leading them not only to use less but also to seek out providers with lower fees ....[which] makes medical insurance less expensive and enables employers to furnish broader coverage (or to pay higher wages coupled with the same level of coverage." *Davidowitz v. Delta Dental Plan of California, Inc.*, 946 F.2d 1476, 699 (9th Cir. 1991) (citation omitted). When providers waive or forgive the out-of-network co-insurance, they undermine this important mechanism to limit healthcare costs and ensure quality. They are also committing fraud. *See* Publication of OIG Special Fraud Alerts, 59 FR 65372-01 ("Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.")

48.    Unscrupulous out-of-network providers sometimes take unlawful steps to incentivize members to seek treatment with them, such as by offering free housing, gifts, waived cost-shares, jobs, and even drugs in return for treatment.

**C.    There are Different Levels of Care of SUD Treatment**

49.    There are various different levels of care for SUD treatment.

50.    The most intensive level of care is the "inpatient" level of care. Inpatient treatment involves admission to a controlled environment, such as a hospital or residential treatment facility (RTF) to address SUD and potentially other health conditions. During inpatient treatment, patients are subject to 24-hour medical/nursing and emotional support. Patients are closely monitored for days to weeks (depending on their individualized needs) by licensed professionals. Inpatient treatment can include, but is not limited to, withdrawal management (detox), individualized substance use assessments, individual therapy, group

1  therapy, and milieu therapy. Such treatment often results from "acute" or "sub-
2  acute" conditions with a primary focus on "stabilization."

3      51.    Below the inpatient level of care there is the intense outpatient treatment
4  level of care, which can take a variety of forms but, as relevant here, includes partial
5  hospitalization programs ("PHP") and intensive outpatient programs ("IOP").

6      52.    PHP focuses on stabilization during early phases of recovery. IOP
7  focuses on treatment flexibility and readjustment, along with reintegration into the
8  outside world. The services offered in PHP and IOP are often similar, but differ in
9  frequency. The goals of PHPs and IOPs vary depending on the patient's needs;
10  however, common goals exist between the two:  *e.g.,* stabilization, development of
11  coping skills, improved daily function, and support. Ultimately, these programs are
12  meant to allow a patient to progress to the general – as opposed to intensive –
13  outpatient level of care.

14      53.    Each level of treatment is supposed to be temporary, with more intensive
15  treatment focused on crisis stabilization and less intensive treatment focused on
16  ensuring long-term sobriety and structured recovery assistance.

17      54.    Consequently, more intense treatment (*i.e.,* inpatient treatment) tends to
18  be shorter, while treatment ensuring long-term sobriety and recovery (*i.e.,* outpatient
19  treatment) tends to be longer.

20  **D.    At the Outpatient Level of Care, it is Often Beneficial to Live in a**
21  **Controlled Living Environment Free from the Stresses that**
22  **Caused the Members' SUD**

23      55.    A controlled living environment, like a sober home, is often very
24  beneficial to SUD recovery in the outpatient setting. That is, patients reap benefits
25  by continuing treatment and readjusting to society free of the stresses that may have
26  contributed to SUD in the first instance. As such, many outpatient treatment patients
27  live in sober homes to ensure a controlled living environment.

28

56.    A controlled living environment, like a sober home, helps individuals prioritize sobriety (and thus, recovery) while mitigating the risk of relapse. To effectuate this goal, sober homes and other controlled living environments provide access to support from peers to housing managers.

57.    Unfortunately, unscrupulous providers have rushed into the SUD treatment space and used increased insurance payments of SUD treatment to purchase or rent residential family homes to "house" patients under the guise of a sober home. In reality, many sober homes are often drug dens that do the opposite of providing a "controlled environment," thereby ensuring reliance _**on**_ treatment rather than recovery _**from**_ treatment.

## II.    DEFENDANTS' FRAUDULENT SCHEMES

### A. Kickbacks and Patient Brokering

58.    Since at least 2021, Defendants sought to, and did in fact, induce Aetna members to enroll in and attend their various treatment programs by offering kickbacks in the form of, _inter alia_, free transportation, food, and free (or low cost) housing at highly desirable locations near certain employers so the members could remain enrolled in health benefits plans.

59.    Even worse, upon information and belief, at least some patients were offered drugs. For example, the Complaint in _Beverly Hills v. Rodeo Recovery_, _Recovery_, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202), details police reports with respect to just one sober home, including allegations that (i) Defendant Young provided residents drugs, "including black tar heroin and methamphetamine," (ii) reports of multiple drug overdoses, and (iii) confirmation by multiple residents of daily drug use.

60.    Defendants also paid body brokers that found patients to enroll in their programs.

61.    In return, the patients allowed Defendants to use their health plan information to bill Aetna for SUD treatment.

62.    The members did not pay any cost-share (such as co-insurance) for this treatment. As noted above, such conduct directly interferes with Aetna's contracts with their members and is considered fraudulent.

**B. Enrollment Fraud**

63.    If individuals were not initially enrolled in health benefit plans, Defendants engaged in enrollment fraud.  They routinely signed patients up for plans and/or added members that did not have health coverage as dependents to the health benefit plans of other patients despite there being no dependent relationship.

64.    For example, member J.M. (258191470) was enrolled in a policy by a staff member at Helping Hands (R.W. W272982044) after she obtained a job that offered an employer-sponsored benefits plan. Helping Hands then listed R.W. as a "sponsored dependent" of J.M's policy and proceeded to submit bills for R.W. that ultimately resulted in over $325,040.07 in wrongful payments. Upon information and belief, R.W. was an employee or staffer of Helping Hands – in addition to apparently being a patient – who had no prior relationship with J.M., much less one that would qualify as a "sponsored dependent."  To top it off, Defendants submitted bills for J.M. as well, resulting in Helping Hands receiving $332,062.50 in wrongful payments.

65.    Upon information and belief, certain Defendants – including Defendant Young – had relationships with local employers to provide staffing that utilized patients living in a sober living home set up by Defendants.

**C. Preventing Recovery to Prolong Treatment and Payment**

66.    Perhaps worst of all, Defendants took affirmative actions to prolong treatment and created an environment to encourage relapse. In other words, Defendants weaponized addiction and pushed relapse to ***prevent*** recovery. Far from performing services ***for*** their patients, Defendants actively worked to ***harm*** their patients.

67.    For example, as noted above, Defendants provided sober home residents the opposite of the type of controlled living environment contemplated by education-backed care..

68.    Indeed, as referenced above, the city of Beverly Hills filed an action against Nathan Young, Rodeo Recovery, Marc Adler, and Jose Maldonado Toscano, for conduct occurring at a so-called "sober home" in the township. *See Beverly Hills v. Rodeo Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 2020).   As alleged therein, the "sober home" was little more than a drug "flop house" that "stacked" patients into bedrooms and even on mattresses in the garage.

69.    Upon information and belief, to prolong benefits, Defendants take steps to document patients as being in "pre-contemplation and contemplation" stages of change regardless of whether they were actually showing improvement. This ensured that patients were recorded as staying in the proper mind-frame to continue their treatment.

70.    Upon information and belief, many services Defendants billed for were not actually performed as documented and/or performed at far below acceptable standards of care.

71.    Similarly, upon information and belief, the Defendants were providing grossly substandard care that abused relaxed telehealth requirements. For example, Defendants provided members with free devices (such as chromebooks) and internet so the members could participate in "group" sessions without their participation being verified. Upon information and belief, many members allegedly participated in these group sessions while at work, meaning substantive remote participation did not occur.

72.    When benefits would run out, some members were forced to do a "pop" test, which entailed the submission of a failed drug test and stay in detox, with the hope that the member could then restart their outpatient benefits over again.

73.    Such conduct not only undercuts treatment but poses a very high risk to the health of the patients that Defendants were supposed to be helping. Rather than assist patients in moving through treatments with an ultimate goal of recovery, Defendants placed them in situations to encourage relapse so they could milk more money of out them.

74.    Naturally, Defendants purposefully concealed such conduct from Aetna, and instead certified that the services were lawfully rendered, medically necessary, and compensable.

75.    To hide their conduct, Defendants repeatedly moved the patients across providers and into different homes. This allowed them to bill under different TINS, which makes it significantly more difficult to track. As noted above, a large portion of patients were moved to at least 2 different entities throughout their treatment.

**D. Breakdown of Fraudulent Healthcare Claims**

76.    All of the foregoing was done by Defendants for the common purpose of profiting from the submission to Aetna of false, fraudulent, and or negligent claims for reimbursement at Aetna's (and its members') expense.

77.    Aetna now brings this Complaint to redress the harm caused by Defendants' fraudulent schemes, as follows:

78.    Helping Hands was paid $20,760,266.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Helping Hands is attached hereto as Exhibit A.[4]

79.    Joser Forever was paid $15,067,739.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Joser Forever is attached hereto as Exhibit B.

---

[4] To protect patient privacy and confidentiality, Aetna has redacted the member IDs and will provide unredacted copies to counsel for Defendants in compliance with applicable laws and regulations.

80.    Get Real Recovery was paid $945,147.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Get Real Recovery is attached hereto as Exhibit C.

81.    Revive was paid $549,121.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Revive is attached hereto as Exhibit D.

82.    Healing Path was paid $589,938.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Healing Path is attached hereto as Exhibit E.

83.    Ocean Valley was paid $714,004.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Ocean Valley is attached hereto as Exhibit F.

84.    Rodeo Recovery was paid $910,466.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Rodeo Recovery is attached hereto as Exhibit G.

85.    Sunset Rehab was paid $92,056.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Sunset Rehab is attached hereto as Exhibit H.

86.    Natural Rest House was paid $111,234.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Natural Rest House is attached hereto as Exhibit I.

87.    Attached hereto as Exhibit J are exemplar claim submissions and resulting EOBs showing examples of wrongful payments for each of the above-referenced Defendants. Many of the claims also include the corresponding documents establishing that Zealie was handling the submission. These are

examples of the other claims that appear on the spreadsheets following the same fraudulent pattern.

## FIRST CAUSE OF ACTION

### Fraud

### (Against All Defendants)

88.    Aetna realleges and incorporates each of this Complaint's previous paragraphs as if fully set forth herein.

89.    Defendants knowingly made, or knowingly caused to be made, material misrepresentations to Aetna in claim forms, requests for reimbursement, enrollment forms, and medical records.

90.    Every time Defendants submitted a claim, or caused a claim to be submitted, Defendants represented to Aetna that (i) they provided the services in compliance with applicable laws, regulations, and procedures, (ii) that the services billed were medically necessary and reimbursable, and (iii) that the information on the claim forms was true, accurate, and that material facts were not concealed.

(a)    Each of the above representations on claim forms were knowingly false because Defendants:

(b)    provided kickbacks in the form of free rent, meals, etc.

(c)    waived the cost-shares members were responsible for under their Plans;

(d)    took actions to eviscerate the effect of any services that were being provided to prolong treatment and submit additional claims; and

(e)    did not provide the care billed or set forth in medical records, and

(f)    violated a host of laws and regulations as set forth herein.

91.    The spreadsheets attached hereto as Exhibits A through I contain specifics of each misrepresentation made, and Exhibit J contains examples of claim forms and Aetna's resulting payment reflecting those contained in the spreadsheets.

92.    Defendants also made material misrepresentations in enrollment forms to fraudulently enroll plan members as Aetna enrollees or plan dependents, an example of which was set forth above.

93.    Defendants also made material misrepresentations in documentation because many services were not actually performed as documented, were performed at far below acceptable standards of care, and/or were manipulated per instructions from Defendants' employees.

94.    When making these false representations and material omissions, Defendants knew they were false. They made them to induce Aetna's reliance so that Aetna would pay Defendants based on materially inaccurate information.

95.    Aetna reasonably relied on Defendants' false representations and material omissions because Defendants were legally obligated to submit accurate information for valid claims and to disclose material information.

96.    As a direct and proximate result of Defendants' misrepresentations and concealments, Aetna has been damaged by, among other things, paying claims that were not properly payable under Aetna's health benefit plans, applicable laws, and regulations, in an amount to be proven at trial.

97.    Defendants' conduct constitutes malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Aetna's rights, for which Aetna should recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other persons similarly situated from engaging in similar conduct in the future.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interest, and any other such relief as this Court deems just and proper.

COMPLAINT

**SECOND CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against All Defendants)**

98.    Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

99.    Defendants negligently misrepresented to Aetna that they provided services in compliance with all laws and industry standards, that were medically necessary, and that were compensable.

100.  Aetna reasonably relied on Defendants' false representations because Defendants were legally obligated to submit accurate information for valid claims and disclose material information.

101.  As a direct and proximate result of Aetna's reasonable reliance and Defendants' misrepresentations and concealments, Aetna has been damaged by, among other things, paying claims that were not properly payable under health benefit plans, in an amount to be proven at trial.

102.  Defendants' conduct was wantonly negligent, in blatant and reckless disregard of Aetna's rights. Aetna seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated from engaging in similar conduct.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

**THIRD CAUSE OF ACTION**

**Intentional Interference with Economic/Contractual Relationship**

**(Against All Defendants)**

103.  Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

-20-

COMPLAINT

104.  Aetna entered into health benefit plans with its members. The contracts obligated Aetna's members to pay monthly premiums, deductibles, copays, or coinsurance for services that out-of-network providers rendered to them.

105. Defendants knew about Aetna's plans with its members and intentionally acted to interfere with the contracts by providing financial and other consideration to Aetna's members to induce them to treat with Defendants.

106. By Defendants inducing and incentivizing Aetna's members to seek treatment with them, Defendants interfered with Aetna's plans with their members.

107. Defendants' intentional interference with the economic relationship between Aetna and its members has directly and proximately caused Aetna to suffer monetary harm in an amount to be proven at trial.

108.  Defendants' conduct was malicious, oppressive, fraudulent, willful, and wantonly tortious, in blatant and reckless disregard of Aetna's rights. Aetna seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated from engaging in similar conduct.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## **FOURTH CAUSE OF ACTION**

### **RICO, 18 U.S.C. § 1962(c)**

### **(Against All Defendants)**

109.  Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

110. Defendants' actions violated The Racketeer Influenced and Corrupt Organizations ("RICO") Act.

111. Starting in January of 2021, Defendants associated together for the common purpose of engaging in a fraudulent scheme to deceive Aetna into paying for services that they provided at a substandard level or never provided at all.

Defendants' actions in furtherance of this scheme constituted a pattern of conduct to further racketeering activity.

112. Each of Defendants is a "***person***" within the meaning of RICO, 18 U.S.C. § 1961(3).

113. Together, the defendants compromised an ***association-in-fact enterprise*** under 18 U.S.C. § 1961(4). This enterprise operated together to achieve a common purpose, one of which was the carrying out of racketeering activity, but the association-in-fact enterprise has an ascertainable structure and purpose beyond just the commission of racketeering activity and is also distinct from each of the individual Defendants. By way of example, the treating entities provided additional services outside the racketeering activity. Zealie and Beheshti provided administrative services beyond the submission of false claims, including, upon information and belief, the verification of benefits and other administrative tasks. The individuals and treating entities scheduled patient group therapies and arranged for visits by external professionals to provide services.

114. The enterprise was engaged in or affected ***interstate commerce***. By way of example, Defendants all operated in California, treating some patients who resided out of state, and submitting claims for reimbursement to Aetna across state lines.

115. As detailed herein, Defendants fraudulent scheme involved a ***pattern of racketeering activity***, including multiple acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343), the anti-kickback statute (18 U.S.C. § 1320), the healthcare fraud statute (18 U.S.C. § 1347), and California's anti-kickback law (Ca. Ins. Code §§ 750, *et seq.*). The acts underlying these predicates, include:

(a)    Defendants participated in, or engaged, body brokers for purposes of recruiting patients solely for purposes of submitting false and fraudulent claims to Aetna.

(b)    Defendants fraudulently enrolled patients as dependents of employees or other patients to be able to submit claims to Aetna.

(c)    Defendants acted in concert in offering kickbacks and incentives to encourage SUD patients to treat with Defendants' fraudulent provider network and remain in the program for long periods of time.

(d)    Defendants formed various corporations and LLCs with the intent to misrepresent to Aetna and submit for reimbursement claims representing services that were either substandard or not provided at all.

(e)    In fact, to avoid triggering Aetna's internal audit process, Defendants submitted false and fraudulent claims data through a number of TINs and entities as set forth above.

(f)    Defendants, in furtherance of their scheme, shuffled patients between and among various providers all for purpose of ensuring a continual access to benefits (and thus reimbursement).

(g)    Defendants submitted or caused the submission of false invoices for medical services thousands of times with the expectation and knowledge that they would be reimbursed by Aetna.

116.    Additionally, Aetna is informed and believes that it was not the only victim of this racketeering activity, but that Defendants engaged in this same pattern and practice of racketeering activity with other insurers who provide similar health benefits.

117.    Each submission of the false invoices/medical claims was done intentionally as part of Defendants' scheme to defraud Aetna (and its members) through use of interstate mail.

118.    Accordingly, each fraudulently submitted claim constitutes a predicate act in support of Aetna's RICO claim and in violation of the RICO Act.

119.    Further, it was foreseeable that Aetna would, and in fact did, reasonably rely on Defendants' fraudulent and false submissions because they contained the

hallmarks of legitimate claim submission and requisite certifications. For example, the claims contained correct member information, were purportedly verified, and contained recognized CPT codes. Each claim specifically certified that the procedures billed were actually conducted, medically necessary, and lawful.

120.  By violating the RICO Act, Defendants directly and proximately caused Aetna harm because Aetna paid money to Defendants for services it never provided Aetna's members.

WHEREFORE, Aetna respectfully requests entry of judgment in its favor and awarding Aetna recovery including but not limited to threefold the amount of damages Aetna sustained, Aetna's costs incurred in pursuit of this action, and Aetna's reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus pre-judgment and post judgment interest, together with any other relief this Court deems just and proper.

## **FIFTH CAUSE OF ACTION**

### **Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**

### **(Against All Defendants)**

121.  Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

122.  Defendants have conspired with each other to violate 18 U.S.C. § 1962(c). The object of the conspiracy is to conduct and/or participate in the conduct and affairs of the Enterprise described above through a pattern of racketeering activity.

123.  As set forth above, Defendants each engaged in multiple overt predicate acts of fraudulent racketeering in furtherance of the conspiracy which, by their nature, give rise to the plausible inference that the object of the conspiracy was to violate RICO. They knew their ongoing acts were part of an overall pattern of racketeering activity. For example, a purpose of the conspiracy was to defraud Aetna into paying healthcare claims to which Defendants were not entitled to

reimbursement. The Enterprise was the vehicle that allowed the Defendants to carry out this scheme while evading detection.

124. As a direct and proximate cause of the conspiracy and the acts taken in furtherance thereof, Aetna has suffered injuries to its business and property by wrongly paying money as a result of the Enterprise's racketeering activity.

WHEREFORE, Aetna respectfully requests entry of judgment in its favor, a finding that Defendants be found jointly and severally liable and awarding Aetna recovery including but not limited to threefold the amount of damages Aetna sustained, Aetna's costs incurred in pursuit of this action, and Aetna's reasonable attorneys' fees, plus pre-judgment and post judgment interest, tougher with any other relief this Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Violations of Business and Professional Code Section 17200, et seq.

### (Against All Defendants)

125. Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

126. Defendants violated California's Unfair Competition Law ("UCL") as set forth in Business and Professions Code §§ 17200 *et seq.* Under the UCL, unfair competition means any "unlawful, unfair or fraudulent business act or practice."

127. As this Complaint sets forth, Defendants business acts and practices are unlawful because they violate the following statutes: (i) The Anti-Kickback Statute, 18 U.S.C. § 1320; (ii) The Eliminating Kickbacks in Recovery Act, 18 U.S.C. § 220; (iii) the Health Care Fraud Statute, 18 U.S.C. § 1347; (iv) RICO, 18 U.S.C. § 1962(c); (v) California's Insurance Anti-Kickback Law, Cal. Ins. Code §§ 750 *et seq.*, (vi) California's Anti-Referral Law, Health & Safety Code § 445, and (vii) California's Uniform Controlled Substances Act, Health & Safety Code § 11570.

128. Defendants also used unfair fraudulent business practices to interfere with the central purpose of Aetna's business, thereby damaging Aetna to profit for

themselves. Specifically, Defendants engaged in fraudulent scheme(s) and conduct in the form of enrollment fraud, body brokering, unlawful kickbacks, and purposefully prolonging and undercutting the effects of any treatment that was given.

129. As referenced above, Defendants took specific steps to hide their activities and evade detection.

130. Defendants' unlawful, unfair, and fraudulent business acts and practices have directly and proximately caused Aetna to suffer monetary harm. Aetna seeks restitution for the harm in an amount to be proven at trial.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

### (Against All Defendants)

131. Aetna realleges and incorporates paragraphs 1-87 as if fully set forth herein.

132. Aetna conferred benefits on Defendants by paying healthcare claims that they were not actually entitled to.

133. Defendants have unjustly accepted and retained the benefit that Aetna conferred on them.

134. Because it would be unjust and inequitable for Defendants to continue to retain the benefits that Aetna conferred on them, Aetna seeks the return of the money paid.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Aetna, respectfully requests a judgment against Defendants, and Does 1 through 50, inclusive, as follows:

A.    For damages in an amount to be proven at trial;

B.    For prejudgment interest;

C.    For civil penalties to the extent the law permits;

D.    For other statutory remedies available to Aetna to the extent the law permits;

E.    For an award of costs of its suit to the extent the law permits;

F.    For an award of attorney's fees to the extent the law permits;

G.    For punitive damages;

H.    For such other relief as the Court deems just and proper.

Dated: November 14, 2023         FOX ROTHSCHILD LLP

By: */s/ John J. Shaeffer*
Benjamin McCoy
John J. Shaeffer
Matthew Follett
Alberto Longo
10250 Constellation Avenue, Suite 900
Los Angeles, CA 90067
Tel: 310-228-4481
Fax: 310-556-9828

*Attorneys for Aetna Life Insurance Co.,*
*Aetna Health of California, Inc.*

1

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all matters so triable.

Dated: November 14, 2023

FOX ROTHSCHILD LLP

By: */s/ John J. Shaeffer*
John J. Shaeffer

*One of the attorneys for Aetna Life Insurance Co., Aetna Health of California, Inc.*