JOHN J. SHAEFFER (SBN 138331)
    JShaeffer@FoxRothschild.com
MATTHEW FOLLETT (SBN 325481)
    MFollett@FoxRothschild.com
BENJAMIN MCCOY (*PRO HAC VICE*)
    BMcCoy@FoxRothschild.com
ALBERTO LONGO (*PRO HAC VICE*)
    Alongo@FoxRothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Plaintiffs,
AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF
CALIFORNIA, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF CALIFORNIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATHAN SAMUEL YOUNG a/k/a PABLO LOPEZ; DAVID YOUNG a/k/a SANCHO LOPEZ; JOSE RICARDO TOSCANO MALDONADO; ALI BEHESHTI; MARC ADLER; ANI MIRZAYAN; ZEALIE LLC; HELPING HANDS REHABILITATION CLINIC, INC; JOSER FOREVER LLC; GET REAL RECOVERY LLC; REVIVE PREMIER TREATMENT CENTER, INC.; HEALING PATH DETOX LLC; OCEAN VALLEY BEHAVIORAL HEALTH, LLC; RODEO RECOVERY LLC; SUNSET REHAB LLC; NATURAL REST HOUSE, INC; 55 SILVER LLC, 9 SILVER LLC, AND JOHN DOES 1 THROUGH 50, AND ABC CORPS. 1-50 <br><br> Defendants. | Case No. 2:23-cv-09654-MCS-JPR <br><br> **FIRST AMENDED COMPLAINT** |

Plaintiffs Aetna Life Insurance Company and Aetna Health of California, Inc. (collectively, "Aetna"[1]) by way of this Complaint against Defendants Nathan Samuel Young, also known as Pablo Lopez ("Young"); David Young, also known as Sancho Lopez; Jose Ricardo Toscano Maldonado ("Maldonado"); Ali Beheshti ("Beheshti"); Marc Adler ("Adler"); Ani Mirzayan ("Mirzayan"); Zealie LLC ("Zealie"); Helping Hands Rehabilitation Clinic, Inc. ("Helping Hands"); Joser Forever LLC ("Joser Forever"); Get Real Recovery LLC ("Get Real"); Revive Premier Treatment Center, Inc. ("Revive"); Healing Path Detox LLC ("Healing Path"); Ocean Valley Behavioral Health, LLC ("Ocean Valley"); Rodeo Recovery LLC ("Rodeo Recovery"); Sunset Rehab LLC ("Sunset Rehab"); Natural Rest House, Inc. ("Natural Rest House"); 55 Silver, LLC ("55 Silver"), 9 Silver, LLC ("9 Silver"), and John Does 1 through 50, and ABC CORPS. 1-50 (collectively, "Defendants") allege as follows:

## INTRODUCTION

1.     Aetna brings this action to recover millions of dollars in payments wrongfully made as a result of Defendants' fraudulent scheme to enrich themselves under the guise of treating those suffering from addiction and substance use disorder ("SUD").

2.     Substance abuse in the United States is a widespread problem and the demand for SUD treatment has continued to markedly increase. To meet this growing demand, government and commercial payers alike have increased coverage for SUD treatment over the last fifteen (15) to twenty (20) years.

3.     At the same time, SUD treatment programs and facilities often exist in environments with few barriers of entry into the marketplace.

---

[1] For ease of reference, all Plaintiffs are referred to in the singular as Aetna unless otherwise specified herein.

4.     Unfortunately, many unscrupulous actors have flooded into the SUD treatment market, capitalizing on the most vulnerable of populations for their own gain.

5.     The various schemes perpetrated by Defendants here are particularly disturbing. Since at least 2021, Defendants have targeted vulnerable Aetna members who suffer from alcohol and/or substance dependency issues as part of a concerted effort to profit at their expense. Defendants used the patients for health benefit payments under the lie of helping them, while doing the exact opposite.

6.     As detailed further herein, Defendants lured patients into their programs by offering them kickbacks in the form of, *inter alia*, free or low-cost living arrangements in "sober living homes" located in highly desirable locations throughout California.

7.     In reality, the sober living homes were little more than drug dens, used to ensure patients remained in Defendants' treatment "programs" for as long as possible. To continue growing, Defendants hired some patients as "body brokers," sending them out to find other addicts to cycle through their facilities.

8.     Stated simply, Defendants profited from patients' enrollment in health benefit plans by billing Aetna for so called "treatment" while, at the same time, taking steps to undercut that treatment and keep patients in their programs. If a patient lacked coverage, Defendants schemed to sign them up, such as by adding them as "dependents" to the health plans of other patients with whom they had no familial relationship.

9.     To avoid fraud detection, Defendants creating multiple entities so they could spread their charges across multiple providers and bill under various Tax Identification Numbers ("TINs"). They often shuffled patients throughout programs for seemingly no reason other than to prolong benefits payments. When Aetna flagged certain providers and sought more information to prove the medical necessity of each claim, Defendants moved the patients to other providers they

controlled and continued to collect payments. Remarkably, nearly half of the Aetna members enrolled in Defendants' treatment programs were treated through multiple organizations during their time in treatment.

10.   In the rare instance where a patient progressed through treatment while still retaining some benefits, Defendants encouraged "relapse" so a patient's programs and benefit payments could start anew.

11.   Defendants' conduct not only injured Aetna, but harmed the employees, businesses, and labor unions that rely upon Aetna to administer or insure their health benefits. As the FBI has explained, healthcare fraud "affects everyone—individuals and businesses alike . . . ." FBI Health Care Fraud Summary, available at: https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud.

12.   Aetna now brings this action and alleges claims against Defendants for: (i) Fraud, (ii) Negligent Misrepresentation, (iii) Intentional Interference with Economic Contractual Relationships, (iv) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(C), (v) RICO Conspiracy, 18 U.S.C. § 1962(d), (vi) Violations of Business and Professional Code § 17200, and (vii) Unjust Enrichment. Aetna seeks compensatory damages, punitive damages, treble damages, attorneys' fees, costs, prejudgment and post judgment interest, and any other relief the Court deems appropriate.

## THE PLAINTIFFS

13.   Aetna Life Insurance Company is a citizen of Connecticut with its principal place of business in Hartford, Connecticut. Aetna is, and at all times mentioned herein was, qualified to conduct business in the state of California.

14.   Aetna Health of California is a citizen of California with its principal place of business in California.

## THE DEFENDANTS' AND THEIR ROLES IN THE SCHEME

15.    The following nomenclature is used to refer to the parties herein:

| The Young Defendants | Young, David Young, Maldonado, Adler, Helping Hands, Joser Forever, Get Real Recovery, Healing Path, Ocean Valley, Rodeo Recovery, Sunset Rehab, Natural Rest House |
| The Treating Entity Defendants | The Young Defendants together with Revive and Mirzayan |
| Billing Entity Defendants | Beheshti and Zealie |

## I.    THE YOUNG DEFENDANTS

16.    Defendant Nathan Samuel Young, a/k/a Pablo Lopez a/k/a Pablo Gomez, ("Nathan Young"), is an individual and citizen of California residing in Los Angeles County.[2] Mr. Young is the ringleader of the scheme set forth herein. He formally controls Get Real Recovery, Healing Path Recovery, Natural Rest House, Healing Path Detox, Ocean Valley Behavioral Health, Rodeo Recovery, and Sunset Rehab LLC. He also has ultimate control over Joser Forever and Helping Hands Rehabilitation Center. Although other individuals are listed as the managing agents or executives on corporate documents, they report and answer to Young.

### A.    Individual Defendants Reporting to Young

17.    Defendant David Young, a/k/a Sancho Lopez, is an individual and citizen of California residing in Los Angeles County. Upon information and belief, he is a family member of Nathan Young. David Young actively participates in and manages the operations of the various entities. He directly assisted Young in carrying out the misconduct alleged herein at each of the entities Young owns or operates. He was specifically involved in, and instructed, the health providers operating at the entities to falsify medical records as alleged below.

18.    Defendant Maldonado is an individual and citizen of California residing in Los Angeles County. Mr. Maldonado is the member and/or manager of Joser Forever, and all misconduct carried out at Joser and the fraudulent claims submitted by Joser were caused directly by him in concert with Defendant Young. Mr.

_____

[2] Unless otherwise noted all counties referenced are in California.

Maldonado also participates in the operations of other entities. For example, he was a defendant in a suit brought by Beverly Hills against Rodeo Recovery and Nathan Young alleging much of the same conduct set forth herein at a specific location in Beverly Hills. *See Beverly Hills v. Rodeo Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202).

19.   Defendant Marc Adler is an individual and citizen of California residing in Los Angeles County.  He is listed as the CEO, Secretary, CFO, and Director of Helping Hands. Mr. Adler reports to Defendant Young and is responsible for the day-to-day operations of Helping Hands. All misconduct occurring at Helping Hands was done via the direct commands of Mr. Adler in concert with Defendant Young. Mr. Adler is also involved in the operations and misconduct occurring at other Young entities, as set forth in *Beverly Hills v. Rodeo Recovery*, *Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202).

### B.   The Young Treating Entities

20.   The treating entities are incorporations or limited liability companies set up or purchased by Defendant Young to provide substance use disorder treatment to individuals enrolled in Aetna's health benefit plans. As alleged herein, the treating entities were little more than a fraudulent front used to obtain patient insurance information and extract payments from Aetna for substandard or non-existent treatment.

21.   Defendant Helping Hands is a corporation formed under the laws of California with its principal place of business at 1776 N. Highland Ave, Los Angeles, California. Marc Adler is an officer or director of Helping Hands and responsible for the day-to-day operations, but Young is the true owner and final decisionmaker for Helping Hands.

22.   Defendant Joser Forever is a limited liability company formed under the laws of California with its principal place of business at 1436 S. La Cienega Blvd,

Los Angeles, California. Defendant Maldonado is the sole member of Joser Forever but Young is the true owner and final decisionmaker for Joser Forever.

23.   Defendant Get Real Recovery is a limited liability company formed under the laws of California with its principal place of business at 30290 Rancho Viejo Rd. Ste 204, San Juan Capistrano, California. Defendant Young is the sole member of Get Real Recovery. According to the indictment in the matter of *U.S. v. Moore*,[3] Get Real Recovery was purchased by Defendant Beheshti, with others, in or around 2019 and Beheshti served as a director and/or registered agent after that purchase. Upon information and belief, after the indictment, Get Real Recovery was sold to Young.

24.   Defendant Healing Path is a limited liability company formed under the laws of California with its principal place of business at 7661 Amberleaf Circle, Unit #1, Huntington Beach, California. Young is the sole member of Healing Path. Beheshti was previously the founder and/or managing member before transferring Healing Path to Defendant Young in the spring of 2021.

25.   Defendant Ocean Valley is a limited liability company formed under the laws of California with a principal place of business at 13961 Mauve Drive, Santa Ana, California. Young is the sole member of Ocean Valley.

26.   Defendant Rodeo Recovery is a limited liability company formed under the laws of California with a principal place of business at 240 Rodeo Drive, Beverly Hills, California. Young is the sole member of Rodeo Recovery.

27.   Defendant Sunset Rehab is a limited liability company formed under the laws of California with a principal place of business at 7235 Santa Monica Blvd, West Hollywood, California. Young is the sole member of Sunset Rehab.

---

[3] *See U.S. v. Moore*, Indictment, Dkt. 1 (C.D. Cal. Mar. 29, 2021), available at: https://www.justice.gov/media/1152236/dl?inline (last visited, February 19, 2023)

28.    Defendant Natural Rest House is a corporation formed under the laws of California with a principal place of business at 79100 Ocotillo Dr. La Quinta, California. Young is an officer or director of the company.

### C.    The Young Non-Treating Entities

29.    Defendant 9 Silver LLC is a limited liability company formed under the laws of California with its principal place of business at 1800 Vine Street, Los Angeles, California, 90028. At all relevant times, 9 Silver LLC was owned and controlled by Young.

30.    Defendant 55 Silver LLC ("55 Silver") is a limited liability company formed under the laws of California with its principal place of business at 1800 Vine Street, Los Angeles, California, 90028. At all relevant times, 55 Silver was owned by Young.

31.    At all relevant times, 9 Silver and 55 Silver served as entities through which Young paid for clients, body brokers, sober living home leases or rentals, and other payments necessary to carry out the fraudulent operations of the Young entities.

32.    For example, 9 Silver and 55 Silver were the entities that officially retained and paid patients to serve as drivers, house managers, and body brokers. While these individuals technically functioned as employees of Young, they were characterized as independent contractors and paid as such through 9 Silver and 55 Silver.

33.    More specifically, 9 Silver (and, upon information and belief, 55 Silver) used Gusto, Inc. to manage payroll and other aspects of the clients' employment.[4]

34.    9 Silver and 55 Silver also entered into the leases for the sober living homes used in Young's operations or guaranteed leases for sober living homes that Young himself entered into.

---

[4]  Gusto is a California company specializing in payroll, benefits, and human resource management for businesses throughout the United States. *See* https://gusto.com/.

35.   By using these entities, Young ensured he had full financial control over all his entities and access to the money they generated.

36.   Unsurprisingly, Young used the accounts of 9 Silver and 55 Silver interchangeably with his personal bank accounts. For example, in June of 2022, he used his personal account to transfer money to and from the account of 9 Silver, paid rent for sober living homes, and continued to send thousands of dollars in "recurring" payments to Defendant Beheshti and others.

## II.   THE REVIVE DEFENDANTS

37.   Defendant Revive is a corporation formed under the laws of California with its principal place of business at 13111 Ventura Blvd, Studio City, California. Upon information and belief, Ani Mirzayan the owner of Revive and ultimately responsible for its operations.

38.   Defendant Mirzayan is an individual and citizen of California residing in Los Angeles County.  She is the CEO, CFO, Secretary, and Director of Revive Premier Treatment Center. She is responsible for the misconduct occurring at Revive and the misrepresentations made by Revive.

39.   Revive is connected to the Young Defendants through a practice of targeting, brokering, and exchanging patients with them to obtain additional insurance payments and prevent fraud detection.

## III.   ADMINISTRATIVE BILLING DEFENDANTS

40.   Defendant Zealie is a limited liability company formed under the laws of Delaware with its principal place of business in 1100 S. Coast Hwy Ste 300, Laguna Beach, California. Zealie purported to provide specialized administrative billing services to the following Treatment Entity Defendants: Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley. Zealie serves as an agent of these entities along with Young, David Young, Adler, and Maldonado, and handles the submission of the claim forms for these entities that directly result in payment. Its employees also serve in various roles for these entities. For example, Zealie's

account manager, Ceaira Coffin, was also Helping Hands' authorized official and office manager.[5]

41.    Ali Beheshti is an individual and citizen of California residing in Orange County. He founded and operates Zealie billing company, which submitted a majority of the bills to Aetna that resulted in wrongful payments. He personally worked with David Young and Nathan Young to allow the furtherance of the schemes alleged herein.

42.    According to Articles of Incorporation field with the California Secretary of State, Beheshti was the sole managing member of Defendant Healing Path at its founding. He also helped start and/or was a part owner of Healing Path Recovery LLC, a related entity that did business as Healing Path Detox. Healing Path Recovery doing business as Healing Path Detox was identified as participating and submitting claims for patients obtained through illegal body brokering in a federal indictment.[6]

43.    That same indictment also alleged that Beheshti was a director and/or owner of Defendant Get Real Recovery. Upon information and belief, Beheshti and others sold Get Real Recovery and the Healing Path entities to Defendant Young around the time of the indictment, but Zealie continued to provide billing services for these entities and received a percentage of the health benefit plan payments these entities' generated. Beheshti also received recurring monthly payments from Young through at least June 2022.

---

[5] *See Helping Hands Rehabilitation Clinic NPI Noumber*, available at: https://npino.com/drug-rehab/1740723006-helping-hands-rehabilitation-clinic/ (last visited: February 19, 2024).

[6] *See U.S. v. Moore*, Indictment, Dkt. 1 (C.D. Cal. Mar. 29, 2021), available at: https://www.justice.gov/media/1152236/dl?inline (last visited, February 20, 2024); *see also U.S. v. Mahoney*, Indictment, Dkt. 1 (C.D. Cal. Oct. 6, 2021), available at: https://www.justice.gov/criminal-fraud/file/1564811/download (last visited: February 20, 2024). In *U.S. v. Moore*, the defendant pled guilty to body brokering for Healing Path. In *U.S. v. Mahoney*, the defendant is scheduled to go to trial in 2024 on charges that he paid kickbacks to body brokers on behalf of Healing Path.

## IV.   DOE DEFENDANTS

44.    The true names of Defendants John Does 1 through 50, and ABC CORPS. 1 through 50, inclusive, are unknown and Aetna sues them by such fictitious names under California Code of Civil Procedure § 474. Aetna alleges that each Defendant designated as a Doe Defendant is legally responsible to it for the damages alleged herein. When Aetna ascertains the true names, involvement, and capacities of Does 1 through 50 and ABC CORPS. 1 through 50 inclusive, it will seek leave to amend the Complaint.

45.    At all times relevant times each Defendant, whether fictitiously named or otherwise, was the agent, servant, or employee of the others, and was acting within the scope of such agency, enterprise, relationship, services, or employment.

## ALTER EGO/CONSPIRACY/AIDING AND ABETTING ALLEGATIONS

46.    The defendants are liable for the obligations of each other as alter egos because they each treated the other entities as their own. As noted herein, the treating entity defendants disregarded the corporate form of the numerous entities they created and helped control, commingled funds, and freely passed patients back and forth between them seemingly at random to maximize payments.

47.    They also created these entities, in whole or in part, for an improper purpose, including the perpetration of the fraudulent scheme alleged herein. It would therefore be unjust to recognize the individual defendants as separate from the entity defendants. Given this relationship, all allegations can be applied equally between the individual defendants and the entity defendants.

48.    Billing Entity Defendants and the Young Defendants also liable as alter egos of each other as they worked together to monetize the fraudulent conduct through consultation and the submission of fraudulent claims, then split the payments that were ultimately made.

49.    Defendants formed a group of more than two people that amounted to a civil conspiracy. They agreed and conspired to commit the acts set forth herein. They

worked together by, for example, performing individual tasks in concert to cause the submission of the fraudulent misrepresentations and omissions, and further to evade detection. As such, each Defendant that did not physically commit the tort themselves shared with the immediate tortfeasor a common place or design in its preparation. They are thus jointly and severally liable for all damages arising from the conspiracy.

50.    Each Defendant knew of the misconduct alleged herein, actively participated in the scheme(s), and provided substantial assistance or encouragement to the other tortfeasors. When they undertook to provide substantial assistance or encouragement to other tortfeasors, they knew the conduct was tortious. As such, each Defendant is liable for all torts committed as part of the scheme.

## JURISDICTION AND VENUE

51.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Aetna's state law claims pursuant to 28 U.S.C. § 1367.

52.    Venue is proper in the Central District of California under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Aetna's claims occurred in this judicial district.

## FACTUAL BACKGROUND

**I.    RELEVANT INDUSTRY BACKGROUND**

**A.    Aetna Relies on Treatment Providers (like Defendants) to Submit Accurate Information for Reimbursement**

53.    Aetna administers and/or insures healthcare benefit plans and/or policies for medical, surgical, behavioral, and mental health services lawfully rendered by eligible providers pursuant to the terms of health benefit plans issued to individuals and employers throughout the United States and the state of California. For plans that it administers, Aetna has administrative services agreements with the

plan's sponsors that authorize Aetna to bring this action to recover the wrongful payments set forth herein.

54. Individuals enrolled in these plans are referred to as Aetna "members." Individuals and entities that provide services are referred to as "providers."

55. To obtain payment for services rendered, healthcare providers submit insurance claims by completing standard billing forms (*i.e.*, CMS 1500 or HCFA forms). Per Federal law, these forms require providers to use numerical codes that describe the services for which the provider seeks payment as maintained by the American Medical Association's Current Procedural Terminology ("CPT") and the CMS Healthcare Common Procedure Coding System ("HCPCS"). *See* 45 C.F.R. §§ 162.1002(a)(5), (b)(1) & (c)(1). Similarly, providers must accurately set forth other information regarding the treatment, such as the place the service occurred and the diagnosis.

56. Each of these claim details is material to the determination of whether a given claim will be covered and the amount of any payment.

57. Aetna relies upon providers to submit accurate information and make truthful representations on claim forms to determine coverage and payment.

58. And providers like Defendants intend for Aetna to rely upon statements contained within a claim form when determining payment for services. Indeed, applicable laws, the claim forms themselves, and Aetna require that all claim submissions be certified as correct and complete and that the benefits being claimed be limited to charges actually incurred.

**B.    Out-of-Network Providers Can Charge Members More for Services**

59. Most Aetna members receive treatment through "in-network" providers. In-network providers have entered into "network contracts" with Aetna setting the rates for services.

60.    In contrast, "out-of-network" providers do not have contracts with Aetna setting the rates for services. As a result, coverage and the amount of payment (if any) for a given service is generally determined on the basis of the individual's plan.

61.    Aetna members are generally motivated to seek treatment from in-network providers. As relevant here, there are two primary reasons for this. ***First***, unlike in-network providers, out-of-network providers can "balance bill" members for the difference between what they bill and what their health benefit plan pays.

62.    ***Second***, members generally have a higher patient "cost-share" under their plan when they see out-of-network providers.  This owes, in part, to the higher out-of-network bills that the health benefit plans often pay for such services. Most plans require members to pay a percentage of the cost for out-of-network care. Referred to as "patient responsibility," such measures can take various forms, including co-insurance or copayments. Cost sharing is an important method utilized by plans to control out-of-network costs because it "sensitize[s] employees to the costs of health care, leading them not only to use less but also to seek out providers with lower fees ....[which] makes medical insurance less expensive and enables employers to furnish broader coverage (or to pay higher wages coupled with the same level of coverage." *Davidowitz v. Delta Dental Plan of California, Inc.*, 946 F.2d 1476, 699 (9th Cir. 1991) (citation omitted). When providers waive or forgive the out-of-network co-insurance, they undermine this important mechanism to limit healthcare costs and ensure quality. They are also committing fraud. *See Publication of OIG Special Fraud Alerts*, 59 FR 65372-01 ("Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.")

FIRST AMENDED COMPLAINT

63.    Unscrupulous out-of-network providers sometimes take unlawful steps to incentivize members to seek treatment with them, such as by offering free housing, gifts, waived cost-shares, jobs, and even drugs in return for treatment.

### C.    There are Different Levels of Care of SUD Treatment

64.    There are various different levels of care for SUD treatment.

65.    The most intensive level of care is the "inpatient" level of care. Inpatient treatment involves admission to a controlled environment, such as a hospital or residential treatment facility (RTF) to address SUD and potentially other health conditions. During inpatient treatment, patients are subject to 24-hour medical/nursing and emotional support. Patients are closely monitored for days to weeks (depending on their individualized needs) by licensed professionals. Inpatient treatment can include, but is not limited to, withdrawal management (detox), individualized substance use assessments, individual therapy, group therapy, and milieu therapy. Such treatment often results from "acute" or "sub-acute" conditions with a primary focus on "stabilization."

66.    Below the inpatient level of care there is the intense outpatient treatment level of care, which can take a variety of forms but, as relevant here, includes partial hospitalization programs ("PHP") and intensive outpatient programs ("IOP").

67.    PHP focuses on stabilization during early phases of recovery. IOP focuses on treatment flexibility and readjustment, along with reintegration into the outside world. The services offered in PHP and IOP are often similar, but differ in frequency. The goals of PHPs and IOPs vary depending on the patient's needs; however, common goals exist between the two: *e.g.,* stabilization, development of coping skills, improved daily function, and support. Ultimately, these programs are meant to allow a patient to progress to the general – as opposed to intensive – outpatient level of care.

FIRST AMENDED COMPLAINT

68.    Each level of treatment is supposed to be temporary, with more intensive treatment focused on crisis stabilization and less intensive treatment focused on ensuring long-term sobriety and structured recovery assistance.

69.    Consequently, more intense treatment (*i.e.,* inpatient treatment) tends to be shorter, while treatment ensuring long-term sobriety and recovery (*i.e.,* outpatient treatment) tends to be longer.

**D.    At the Outpatient Level of Care, it is Often Beneficial to Live in a Controlled Living Environment Free from the Stresses that Caused the Members' SUD**

70.    A controlled living environment, like a sober home, is often very beneficial to SUD recovery in the outpatient setting. That is, patients reap benefits by continuing treatment and readjusting to society free of the stresses that may have contributed to SUD in the first instance. As such, many outpatient treatment patients live in sober homes to ensure a controlled living environment.

71.    A controlled living environment, like a sober home, helps individuals prioritize sobriety (and thus, recovery) while mitigating the risk of relapse. To effectuate this goal, sober homes and other controlled living environments provide access to support from peers to housing managers.

72.    Unfortunately, unscrupulous providers have rushed into the SUD treatment space and used increased insurance payments of SUD treatment to purchase or rent residential family homes to "house" patients under the guise of a sober home. In reality, many sober homes are often drug dens that do the opposite of providing a "controlled environment," thereby ensuring reliance _**on**_ drugs rather than recovery _**from**_ drugs.

## II.   DEFENDANTS' FRAUDULENT SCHEMES

### A.   Patient Brokering

73.   At all relevant times, Treating Entity Defendants have employed an army of "body brokers" to find patients with prized health benefit plans and get them to enroll in their programs.

74.   To give the appearance of legitimacy, Treating Entity Defendants refer to these brokers as "marketers," and pay them a set amount for each patient they enroll in their programs.

75.   In other words, Treating Entity Defendants buy and sell patients. Indeed, Young is known to have labeled potential patients by their insurance policy, instructing body brokers to bring him "Aetna's" to enroll in his programs.

76.   Some body brokers start formal businesses. For example, Defendant Mirzayan's partner, identified by the initials K.A., incorporated a "marketing" company that was used as a cover for K.A.'s brokering services. K.A. has deep connections in the industry and, Aetna is informed and believes, that K.A. personally worked for some of Young's entities and Zealie. As a result, he was able to obtain the identities of individuals in need of treatment who had "good" health benefit plans that would pay top dollar for treatment at Revive. This information was then used to target the patients with the best policies to enroll at Revive.

77.   Other body brokers that provided patients to the Treating Entity Defendants were less formal. Through social media and connections with individuals in the treatment industry, these body brokers would first work to identify people in need of treatment. They then would initiate contact with patients and try to induce them to enroll in the programs of the Treating Entity Defendants by, for example, offering to pay them to go to treatment and/or promising to provide them free drugs and housing.

78.   Oftentimes this would play out via text, WhatsApp, or social media messaging. For example, in screenshots of text messages Aetna has obtained, a well-

known body broker for Young with the initials S.S. who publicly associates himself with Helping Hands texted a potential patient: (i) asking if they were interested in making money to go to treatment, (ii) offering to provide drugs, and (iii) promising to pay the individual thousands of dollars to enroll in one of Young's programs if they "had good insurance."

79.   Some conduct was even more egregious. For example, Young was known to go to Alcoholics Anonymous and/or other drug counseling meetings, where he targeted recently sober individuals and offered them employment and/or housing in his "sober living homes" that were rife with drugs if they would allow him to use their insurance companies to bill for treatment. Such temptations for recently sober individuals are extremely dangerous and naturally can result in relapse.

80.   At least a few body brokers provided services without regards to entities or geographic areas. For example, a body broker associated with Helping Hands was seen "marketing" potential patients at Revive even though that broker had no formal relationship with Revive. Over a third of the patients at-issue in this suit that received services from Revive also received treatment at one of the entities owned and/or operated by Defendant Young.

81.   Sadly, some patients themselves then became body brokers, and would be sent out into the community they were involved in prior to treatment to get patients enrolled in Treating Entity Defendants' programs in return for payments. For example, Aetna member N.S. (WXXXXX9182)[7] was a regional manager and suspected body broker for Defendant Young and his entities. From May 13, 2021 through November 18, 2022, while he was operating as a regional manager carrying out Young's commands, Helping Hands and Healing Path submitted hundreds of

---

[7] Out of an abundance of caution, Aetna is only providing the last 4 digits of member IDs, and can provide full member IDs upon request. The last 4 digits, coupled with initials, will permit the identification of applicable claims.

claims for alleged services provided to N.S. and received wrongful payments of around $777,859.43.

**B.    Kickbacks**

82.    Treating Entity Defendants sought to, and did in fact, induce Aetna members to enroll in and attend their various treatment programs by offering kickbacks in the form of, *inter alia*, free transportation and food.

83.    The most obvious kickback was Treating Entity Defendants' provision of free (or low cost) housing at highly desirable locations near certain employers that issued robust health benefit plans so the members could remain enrolled in health benefits plans. The Young Defendants provided free housing in hotels David Young and Nathan Young controlled, individual apartments, and sober living homes throughout California, including on downtown Los Angeles, Venice Beach, Huntington beach, and West Hollywood California. Upon information and belief, the Revive Defendants provided sober living at various locations as well, such as in Simi Valley, California and in other locations owned, controlled, or associated with Mirzayan and her partner K.A.

84.    Sometimes, this entailed Treating Entity Defendants providing patients housing at sober living homes or locations associated with one of their co-conspirator defendants or their body brokers. For example, Revive submitted claims purporting to provide treatment for member B.M. (WXXXXX4380). While these claims were denied payment due to a failure to obtain plan-required precertification, the claims showed that during the entirety of the alleged treatment period, member B.M.'s address was listed as 1800 N. Vine Street, Los Angeles, CA 90008-5250, which is the also the address for Defendants 55 Silver, 9 Silver, Ocean Valley, and was previously associated with Sunset Rehab.

85.    Even worse, many patients were offered drugs. As noted above, text message screenshots Aetna has obtained show a body broker that publicly associates

himself with Helping Hands expressly offering drugs to a potential patient if they have "good insurance."

86.    The Complaint in *Beverly Hills v. Rodeo Recovery*, *Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 202) offers additional examples of drug-related kickbacks and the consequences therefrom, detailing numerous police reports containing allegations that (i) Defendant Young provided residents drugs, "including black tar heroin and methamphetamine," (ii) reports of multiple drug overdoses, and (iii) confirmation by multiple residents of daily drug use.

87.    Treating Entity Defendants also provided kickbacks in the form of side employment to their patients, hiring and paying them either while they were in treatment or promising them future employment in their programs, thereby inducing them to continue staying in their program and/or allowing their health benefit plan information to be used to submit claims.  Below are just a few examples of side-employment kickbacks:

(a)    Defendant Revive submitted claims for member A.R (WXXXXX9935) and hired A.R. as a Revive employee. Helping Hands, Healing Path, and Rodeo Recovery also submitted claims and received payments for member A.R.

(b)    Defendant Young, through 9 Silver, hired patient A.R. (WXXXXX8450) as a driving coordinator for the various contractors he employed. Helping Hands, Natural Rest House, Ocean Valley Behavioral Health, and Rodeo Recovery all submitted claims and received payments for member A.R.

(c)    Defendant Young hired member C.P. (WXXXXX7917) as a driver and then in an administrative role for various entities. Helping Hands, Joser Forever, and Rodeo Recovery all submitted claims and received payments for member C.P.

88.    In return, Treating Entity Defendants used the health plan information of these individuals to bill Aetna for SUD treatment.

FIRST AMENDED COMPLAINT

89.   The members did not pay any cost-share (such as co-insurance) for this treatment. As noted above, such conduct directly interferes with Aetna's contracts with their members and is considered fraudulent.

## C.   Enrollment Fraud

90.   If individuals were not initially enrolled in health benefit plans, the Young Defendants engaged in enrollment fraud.  They routinely signed patients up for plans and/or added members that did not have health coverage as dependents to the health benefit plans of other patients despite there being no dependent relationship.

91.   For example, member J.M. (WXXXXX1470) was enrolled in a policy by a staff member at Helping Hands R.W. (WXXXXX2044) after she obtained a job that offered an employer-sponsored benefits plan. Helping Hands then listed R.W. as a "sponsored dependent" of J.M's policy and proceeded to submit bills for R.W. that ultimately resulted in over $325,040.07 in wrongful payments. Upon information and belief, R.W. was an employee or staffer of Helping Hands – in addition to apparently being a patient – who had no prior relationship with J.M., much less one that would qualify as a "sponsored dependent."   To top it off, Defendants submitted bills for J.M. as well, resulting in Helping Hands receiving $332,062.50 in wrongful payments.

92.   Attached as Exhibit BB is a list of the member IDs associated with the "dependent" fraud set forth above. Any and all claims associated with these member IDs were based upon misrepresentations and would not have been paid had Aetna known the truth.

93.   Upon information and belief, certain Defendants – including Young – had relationships with local employers to provide staffing that utilized patients living in a sober living home set up by Defendants.

**D.     Preventing Recovery to Prolong Treatment and Payment**

94.     Perhaps worst of all, Treating Entity Defendants took affirmative actions to prolong treatment and created an environment to encourage relapse. In other words, Treating Entity Defendants weaponized addiction and pushed relapse to **_prevent_** recovery. Far from performing services **_for_** their patients, Defendants actively worked to **_harm_** their patients.

95.     For example, as noted above, Treating Entity Defendants provided sober homes to patients either directly or indirectly that were the opposite of the type of controlled living environment contemplated by education-backed care.

96.     Indeed, as referenced above, the city of Beverly Hills filed an action against Young, Rodeo Recovery, Adler, and Maldonado, for conduct occurring at a so-called "sober home" in the township. *See Beverly Hills v. Rodeo Recovery*, No. 20SMCV00704 (Cal. Super Ct. filed May 15, 2020).  As alleged therein, the "sober home" was little more than a drug "flop house" that "stacked" patients into bedrooms and even on mattresses in the garage.

97.     To prolong benefits, the Young Defendants took steps to document patients as being in "pre-contemplation and contemplation" stages of change regardless of whether they were actually showing improvement.[8] This ensured that patients were recorded as staying in the proper mind-frame to continue their treatment.

98.     Defendants Young, David Young, Maldonado, and Adler also ordered the individuals providing treatment to document services and symptoms that did not occur or to falsely note members who did not actively participate in the sessions as

---

[8] For the sake of clarity, based upon information currently available to Aetna, Revive and Mirzayan are not alleged to have doctored medical records or abused telehealth requirements using the practices carried out by the Young Defendants as alleged in paragraphs 97 through 99. Nor does Aetna currently have any information suggesting that Revive or Mirzayan instructed members to carry out "pop" tests to restart treatment as alleged in paragraphs 100. To the extent discovery uncovers a basis for such allegations, Aetna reserves the right to pursue relief under the theories set forth herein.

"actively participating." When these treating individuals complained about these orders, they were ignored.

99.   Similarly, upon information and belief, the Young Defendants were providing grossly substandard care that abused relaxed telehealth requirements. For example, the Young Defendants provided members with free devices (such as chromebooks) and internet so the members could participate in "group" sessions without their participation being verified. Upon information and belief, many members allegedly participated in these group sessions while at work, meaning substantive remote participation did not occur.

100.  When benefits would run out, some members were forced to do a "pop" test, which entailed the submission of a failed drug test and stay in detox, with the hope that the member could then restart their outpatient benefits over again.

101.  Such conduct not only undercuts treatment but poses a very high risk to the health of the patients that the treating entities were supposed to be helping. Rather than assist patients in moving through treatments with an ultimate goal of recovery, Aetna's members were placed in situations to encourage relapse so they could continue being monetized.

### E.   Treating Entity Defendants Pass Patients Around to Maximize Payments

102.  Treating Entity Defendants concealed their misconduct from Aetna, and instead certified that the services were lawfully rendered, medically necessary, and compensable.

103.  To further maximize payments, Treating Entity Defendants repeatedly moved the patients across providers and into different homes. This allowed them to bill under different TINS, which makes it significantly more difficult to discover misconduct and allows individual providers to avoid triggering fraud detection software utilized in claims software.

104. It also allowed Treating Entity Defendants to maximize the payments they could obtain for a given member, as the payments they could obtain for services at different entities exceed the payments they would have been able to obtain for services at a single entity.

105. As noted above, a majority of patients were associated with claims from at least 2 different entities throughout their treatment. By way of example:

(a)     Member D.K. (WXXXXX3077) received treatment at Helping Hands from March 3, 2021 to July 16, 2021, then went to Joser Forever from July 19, 2021 through March 10, 2022, then went to Ocean Valley from September 22, 2022 through October 2, 2022, and ended at Revive from October 3, 2022 through April 7, 2022. In total, Aetna paid $481,896 for claims associated with D.K.

(b)     Member R.H. (WXXXXX1157) received treatment at Joser Forever from June 7, 2022 through July 22, 2022, then went to Helping Hands from July 28, 2022 through August 29, 2022, then went to Revive from August 30, 2022 through September 1, 2022. On September 2, 2022, he apparently received treatment from both Helping Hands **_and_** Revive, and then continued at Revive again until October 21, 2022. He then went back to Helping Hands from October 28, 2022 through October 31, 2022. In total, Aetna paid $148,617.92 for claims associated with R.H.

(c)     Member M.C. (WXXXXX9053) received treatment at Helping Hands from August 27, 2021 through November 11, 2021, from Natural Rest House from November 11, 2021 through November 14, 2021, from Helping Hands and Natural Rest House on November 15, 2021, from Ocean Valley on November 17, 2021 through November 20, 2021, from Helping Hands on November 22, 2021 through December 6, 2021, from Healing Path on December 6, 2021 through December 10, 2021, from Helping Hands on December 14, 2021 through March 10, 2022, from Ocean Valley on March 16, 2022 through March 29, 2022, and from

-24-

Helping Hands on April 4, 2022 through August 31, 2022. In total, Aetna paid, $597,584.84 for claims associated with M.C.

### III.   BRINGING THE FRAUD TO THE MARKET

106.  While the Young Defendants were adept at fraudulently obtaining patients and prolonging their treatment, they could not complete their scheme without the help of billing entities that could bring their fraud to the insurance marketplace.

107.  Defendant Beheshti is the founder of Defendant Zealie, which served as the agent of the following entities: Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley.

108.  As the agent of these entities, Zealie submitted the claim forms containing the actual misrepresentations therein that are at-issue in this suit for the treating entities set forth above. The fraud perpetrated by Young could not have happened without Zealie and Beheshti.

109.  Zealie and Beheshti are liable beyond just being agents.  As noted above, Defendant Beheshti was the co-owner and/or CEO of Defendant Healing Path and Get Real Recovery, both of which were the subject of an indictments filed in March of 2021.

110.  According to the indictment filed in *U.S. v. Moore*, a bank account for Defendant Get Real Recovery – for which Defendant Beheshti was a co-signatory – paid over $210,000 to Moore Recovery Solutions for body brokering services. In addition, in 2020, Healing Path Recovery and Healing Path Detox both paid thousands of dollars monthly to "marketing companies" that were covers for body brokering services.

111.  As a result of the scrutiny generated by the indictment, Beheshti and his co-owners sold Healing Path Recovery and Healing Path Detox to Young. At some point, Get Real Recovery was also transferred to Young, although it is unclear exactly when.

112.  Aetna is informed and believes that Young's purchase of these entities was funded, in part, by the fraudulent scheme set forth herein. For example, in June of 2022, Young made a "recurring" payment of thousands of dollars from his personal bank account directly to Beheshti, along with payments to Casey Mahoney – the indicted defendant in *U.S. v. Mahoney* – and another Beheshti family member who was a co-owner of either Healing Path or Get Real.

113.  After the indictment and sale, Zealie nevertheless continued to serve as the billing agent for these companies and split fees from insurance payments for patients enrolled at the Healing Path companies and Get Real Recovery, many (if not all) of whom Beheshti knew had been body brokered. Specifically, Zealie was paid a set percentage of all insurance payments obtained from these companies.

114.  Furthermore, Young – who Aetna is informed and believes did not have knowledge regarding billing and insurance reimbursement – and his relative David Young continued to regularly consult with Beheshti, who was particularly close with David Young and ensured the Young's businesses were made a priority within Zealie. Notably, Beheshti proudly markets his time as CEO of indicted behavioral health providers on his website and offers "business strategy consulting" to his behavioral health clients:

As part of Zealie's services, our clients have access to one of the most successful CEO's in the behavioral healthcare industry, Ali Beheshti. Ali is the former CEO of a behavioral healthcare treatment center, so he understands the challenges that you face from personal experience. Treatment centers have to be structured and run properly to maximize revenue. Ali and his team of behavioral health billing consultants have led our clients to success with their industry expertise.

Ali not only knows how to increase revenue but more importantly, he knows how to increase profits. Ali enjoys collaborating and sharing his vast knowledge and experience in the sector. This

-26-

knowledge is shared with business owners during business strategy sessions that can significantly help in increasing a company's profits. Ali has seen what has led to the success of so many of his clients and loves to share that knowledge to help others enjoy similar success.

Zealie Website, available at: https://zealie.com/behavioral-health-billing-consultants-business-strategy/ (last visited February 18, 2024).

115. Left unsaid is that the "behavioral healthcare treatment center" referenced in these materials was utilizing a body brokering kickback model.

116. Thus, after receiving Beheshti's "consultation," and following in the wake of the example set at Healing Path and Get Real Recovery prior to Young's ownership, Young expanded his operations to open and/or purchase other behavioral health centers, victimizing Aetna and its members up and down California.

117. As he did so, he continued to hire Beheshti and Zealie as his billing agents and entered into similar fee splitting arrangements for Helping Hands, Sunset Rehab, and Ocean Valley.

118. In addition, Zealie provides other tools and methods to carry out the aforementioned scheme. For example, Zealie and Beheshti know what should be in medical records to receive higher reimbursements for claims, and work with providers to adjust medical records to support what they want to bill. Aetna is informed and believes that Young, Adler, Maldonado, and David Young – or employees under their direction – doctored medical records to support the billing of a given service or scrubbed records to remove harmful information using an electronic software system following guiding principles provided by Zealie or with the assistance of Zealie employees. No notation of changes were made to signify that changes had been made.

119. As the Office of Inspector General has made clear, billing companies have "no less of a duty to ensure truthful information on claims than do the providers

-27-
FIRST AMENDED COMPLAINT

who use these services."[9] The OIG therefore guides billing companies to investigate reasonable indications of fraud. *See* 63 Fed. Reg. 70138 (Dec. 18, 1998).

120.  Suffice to say, Zealie and Beheshti not only failed to fulfill these duties, but instead submitted claims resulting in millions of dollars in payments as an agent of the Young Defendants' fraudulent scheme, provided vital consultation directly to Young and his entities, and provided tools that the Young Defendants used to carry out the schemes.

121.  And there is no dispute that Zealie and Beheshti profited immensely off the fraudulent payments that its clients obtained. Zealie took a percentage of all payments obtained and Beheshti received personal recurring payments from Young that, upon information and belief, were funded at least in part (if not entirely) from the fraudulent schemes alleged herein.

## IV.   BREAKDOWN OF FRAUDULENT HEALTHCARE CLAIMS

122.  All of the foregoing was done by Defendants for the common purpose of profiting from the submission to Aetna of false, fraudulent, and or negligent claims for reimbursement at Aetna's (and its members') expense.

123.  Aetna now brings this Complaint to redress the harm caused by Defendants' fraudulent schemes, as follows:

124.  Helping Hands was paid $20,760,266.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Helping Hands is attached hereto as Exhibit A.[10]

---

[9] *Radiology Billing Company to Pay $1.95 Million to Resolve False Claims Act Allegations*, available at: https://www.justice.gov/usao-ndga/pr/radiology-billing-company-pay-195-million-resolve-false-claims-act-allegations (last visited: February 18, 2024).

[10] To protect patient privacy and confidentiality, Aetna has redacted the member IDs and will provide unredacted copies to counsel for Defendants in compliance with applicable laws and regulations.

125.  Joser Forever was paid $15,067,739.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Joser Forever is attached hereto as Exhibit B.

126.  Get Real Recovery was paid $945,147.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Get Real Recovery is attached hereto as Exhibit C.

127.  Revive was paid $549,121.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Revive is attached hereto as Exhibit D.

128.  Healing Path was paid $589,938.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Healing Path is attached hereto as Exhibit E.

129.  Ocean Valley was paid $714,004.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Ocean Valley is attached hereto as Exhibit F.

130.  Rodeo Recovery was paid $910,466.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Rodeo Recovery is attached hereto as Exhibit G.

131.  Sunset Rehab was paid $92,056.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Sunset Rehab is attached hereto as Exhibit H.

132.  Natural Rest House was paid $111,234.00 from the wrongful acts herein. A claims spreadsheet detailing information sufficient to identify the members, claims, services, and payments made to Natural Rest House is attached hereto as Exhibit I.

FIRST AMENDED COMPLAINT

133.  Attached hereto as Exhibits J-AA are exemplar claim submissions and resulting EOBs showing examples of wrongful payments for each of the above-referenced Defendants. These are examples of the other claims that appear on the spreadsheets following the same fraudulent pattern.

134.  Aside from dependent enrollment fraud, all of the claims at-issue were infected by the wrongful acts alleged herein. Dependent enrollment fraud is only associated with claims for the members set forth in Exhibit BB.

## FIRST CAUSE OF ACTION

### Fraud

### (Against All Defendants)

135.  Aetna realleges and incorporates each of this Complaint's previous paragraphs as if fully set forth herein.

136.  Defendants knowingly made, or knowingly caused to be made, material misrepresentations to Aetna in claim forms, requests for reimbursement, enrollment forms, and medical records.

137.  Every claim submitted to Aetna represented that Defendants: (i) provided the services in compliance with applicable laws, regulations, and procedures, (ii) the services billed were medically necessary and reimbursable, and (iii) that the information on the claim forms was true, accurate, and that material facts were not concealed.

138.  As set forth in paragraphs 73 through 134, each of the above representations on claim forms were knowingly false because Treating Entity Defendants:

(a)    paid body brokers to obtain the patients;

(b)    provided kickbacks in the form of free rent, meals, etc.;

(c)    waived the cost-shares members were responsible for under their Plans;

(d)     took actions to eviscerate the effect of any services that were being provided to prolong treatment and submit additional claims; and

(e)     violated a host of laws and regulations as set forth herein, and

139.  The spreadsheets attached hereto as Exhibits A through I contain the specifics of each misrepresentation made, and Exhibits J-AA contain examples of claim forms and Aetna's resulting payment reflecting those contained in the spreadsheets.

140.  The Young Defendants also made material misrepresentations in enrollment forms to fraudulently enroll patients or their employees as Aetna enrollees or plan dependents. The members involved in enrollment fraud are set forth Exhibit BB, and all claims for such members misrepresented that the members were validly covered under Aetna health benefits plans when, in fact, that was false. Defendants Revive and Mirzayan then furthered this fraud to maximize the payout by later treating some of these fraudulently enrolled patients after, or at the same time, as claims that were submitted by the Young Defendants.

141.  Billing Entity Defendants knowingly caused the submission of fraudulent misrepresentations by themselves submitting claims for Treating Entity Defendants Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley with knowledge of falsity as alleged herein, in addition to the other acts set forth above.

142.  The Young Defendants also made material misrepresentations in documentation because many services were not actually performed as documented, were performed at far below acceptable standards of care, and/or were manipulated per instructions from Defendants' Young, David Young, Adler, and Maldonado. Upon information and belief, Zealie and Beheshti were aware of or aided such conduct. Indeed, Zealie's website highlights that it will instruct providers on what needs to appear in medical records and help them correct medical records that do

not contain the prerequisites to establish medical necessity.[11] The resulting claims that were submitted misrepresented the details of the services provided.

143. When making these false representations and material omissions, Defendants knew they were false. They made them to induce Aetna's reliance so that Aetna would issue payments based on materially inaccurate information.

144. Aetna reasonably relied on Defendants' false representations and material omissions because Defendants were legally obligated to submit accurate information for valid claims and to disclose material information.

145. As a direct and proximate result of Defendants' misrepresentations and concealments, Aetna has been damaged by, among other things, paying claims that were not properly payable under Aetna's health benefit plans, applicable laws, and regulations, in an amount to be proven at trial.

146. Defendants' conduct constitutes malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Aetna's rights, for which Aetna should recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other persons similarly situated from engaging in similar conduct in the future.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interest, and any other such relief as this Court deems just and proper.

## <u>SECOND CAUSE OF ACTION</u>
### AIDING AND ABETTING FRAUD
### (Against Beheshti and Zealie)

147. Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

---

[11] Specifically, Zealie advertises its ability to review provider's medical records before claims submission and assist with fixing issues to ensure payment. Available at: https://zealie.com/behavioral-health-billing/ (last visited: February 19, 2024)

148. Beheshti and Zealie are also liable for aiding and abetting the fraud carried out by Defendants Young, David Young, Adler, Moldanado, and Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley.

149. As set forth above, Beheshti and, by extension, Zealie, knew of the misconduct carried out by the Defendants set forth in paragraphs 73 through 134.

150. Beheshti and Zealie gave substantial assistance or encouragement to these individuals and entities in the carrying out of their scheme by bringing the fraud to the marketplace, submitting the false claims for payment, providing consultation services to Defendant Young, and assisting in the wrongful editing of medical records.

151. As billing agents for the above-referenced Defendants, Beheshti and Zealie had, at a minimum, a duty to refrain from submitting claims they knew to be a product of fraud and misconduct. They breached that duty.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

### **THIRD CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against All Defendants)**

152. Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

153. Defendants negligently misrepresented to Aetna that all services were provided in compliance with all laws and industry standards, were medically necessary, were compensable, and all material information had been disclosed.

154. Aetna reasonably relied on Defendants' false representations because Defendants were legally obligated to submit accurate information for valid claims and disclose material information.

155.  As a direct and proximate result of Aetna's reasonable reliance and Defendants' misrepresentations and concealments, Aetna has been damaged by, among other things, paying claims that were not properly payable under health benefit plans, in an amount to be proven at trial.

156.  Defendants' conduct was wantonly negligent, in blatant and reckless disregard of Aetna's rights. Aetna seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated from engaging in similar conduct.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### Intentional Interference with Economic/Contractual Relationship

### (Against All Defendants)

157.  Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

158.  Aetna entered into health benefit plans with its members. The contracts obligated Aetna's members to pay monthly premiums, deductibles, copays, or coinsurance for services that out-of-network providers rendered to them.

159.  Treating Entity Defendants knew about Aetna's plans with its members and Treating Entity Defendants intentionally acted to interfere with the contracts by providing financial and other consideration to Aetna's members to induce them to treat with Defendants.

160.  Billing Entity Defendants also knew about Aetna's plans with members and verified the benefits of those plans upon request from the Young Defendants for whom they served as agents.

161.  By inducing and incentivizing Aetna's members to seek treatment with them, Treating Entity Defendants interfered with Aetna's plans with their members.

By knowingly assisting the Young Defendants for whom they served as agents, Billing Entity Defendants also interfered with Aetna's plans with their members.

162. Defendants' intentional interference with the economic relationship between Aetna and its members has directly and proximately caused Aetna to suffer monetary harm in an amount to be proven at trial.

163. Treating Entity Defendants' conduct was malicious, oppressive, fraudulent, willful, and wantonly tortious, in blatant and reckless disregard of Aetna's rights. Aetna seeks to recover punitive and exemplary damages in an amount sufficient to punish Treating Entity Defendants and deter other similarly situated individuals and entities from engaging in similar conduct.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## **FIFTH CAUSE OF ACTION**

### **RICO, 18 U.S.C. § 1962(c)**

### **(Against All Defendants)**

164. Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

165. Defendants' actions violated The Racketeer Influenced and Corrupt Organizations ("RICO") Act.

166. Starting in January of 2021, Defendants associated together for the common purpose of engaging in a fraudulent scheme to deceive Aetna into paying for services that they provided at a substandard level or never provided at all. Defendants' actions in furtherance of this scheme constituted a pattern of conduct to further racketeering activity.

167. Each of Defendants is a "***person***" within the meaning of RICO, 18 U.S.C. § 1961(3).

168. Together, the defendants compromised an **_association-in-fact enterprise_** under 18 U.S.C. § 1961(4). This enterprise operated together to achieve a common purpose, one of which was the carrying out of racketeering activity. The association-in-fact enterprise has an ascertainable structure and purpose beyond just the commission of racketeering activity and is also distinct from each of the individual Defendants. By way of example, the treating entities provided additional services outside the racketeering activity. Zealie and Beheshti provided administrative services beyond the wrongful acts set forth herein, including, upon information and belief, the verification of benefits and other administrative tasks. The individuals at the treating entities ran the day-to-day operations of the facilities, and the treating entities scheduled patient group therapies and arranged for visits by external professionals to provide services.

169. In the alternative, there are **_two_** separate **_associations-in-fact_** under 18 U.S.C. § 1961(4), as follows:

(a)    The first association-in-fact is comprised of Treating Entity Defendants. As noted above, these defendants operated as an ongoing organization that functioned as a continuing unit that worked to achieve an outcome that could not be achieved alone. This association-in-fact had an ascertainable structure distinct from the racketeering activity as alleged above. It was also created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same. Each of the individual persons and entities are distinct from the enterprise and also had an ascertainable structure and purpose beyond just the commission of racketeering activity as set forth above.

(b)    The second association-in-fact is comprised of Defendants Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Helping Hands, Get Real, Healing Path, Sunset Rehab, Ocean Valley, Zealie, and Beheshti. As noted herein, these defendants operated as an ongoing organization that functioned as a continuing unit that worked to achieve an outcome that could not be achieved alone,

and was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same, with Young, Maldonado, and Adler running the operations, 9 Silver and 55 Silver contracting with body brokers and renting the sober living homes, the treating entity defendants providing the services, and Zealie and Beheshti working to bring the fraud to the marketplace.

170. In the alternative, there are *six **associations-in-fact***, as follows:

(a) The first association-in-fact is comprised of Treating Entity Defendants as alleged above. The entities operated as common unit and achieved a purpose they could not accomplish on their own as set forth above by, for example, being able to pass patients around to maximize payments, using various sober living homes and common body brokers to rope patients in, and using their combined contacts and resources to purchase drugs and keep patients in treatment.

(b) There are also five different associations-in-fact:

(i) One comprised of Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Zealie, and Beheshti, and Helping Hands;

(ii) One comprised of Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Zealie, and Beheshti, and Get Real Recovery;

(iii) One comprised of Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Zealie, and Beheshti, and Healing Path;

(iv) One comprised of Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Zealie, Beheshti, and Sunset Rehab;

(v) One comprised of Young, David Young, Maldonado, Adler, 9 Silver, 55 Silver, Zealie, Beheshti, and Ocean Valley.

(c) The entities in subsection B operated as common unit and achieved a purpose they could not accomplish on their own by. For example, Young, Maldonado, and Adler ran the day-to-day operations, 9 Silver and 55 Silver contracted with body brokers and rented the sober living homes, the treating entity

-37-

FIRST AMENDED COMPLAINT

defendants provided the services, and Zealie and Beheshti brought the fraud to the marketplace.

171.  The enterprise(s) were engaged in or affected ***interstate commerce***. Treating Entity Defendants all operated in California, treating some patients who resided out of state, and submitting claims for reimbursement to Aetna across state lines.

172.  As detailed herein, Defendants fraudulent scheme involved a ***pattern of racketeering activity***, including multiple acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343). The acts underlying these predicates are set forth in paragraphs 73 through 134 herein.

173.  These acts demonstrate a sustained pattern of racketeering activity as well as a threat of continued racketeering activity. As set forth herein, fraudulent claims were submitted on a near-weekly basis starting as of at least 2021 and continuing through the present. Defendants' actions were part of a sustained pattern of doing business that was continuously ongoing from 2021 through the present.

174.  Additionally, Aetna was not the only victim of this racketeering activity. Defendants engaged in this same pattern and practice of racketeering activity with other insurers and health plans that provide similar health benefits. More importantly, the hundreds of patients harmed by Defendants' schemes are, and continue to be, victims.

175. Each submission of the false invoices/medical claims was done intentionally as part of Defendants' scheme to defraud Aetna (and its members) through use of interstate mail and/or interstate wires.

176.  Accordingly, each fraudulently submitted claim constitutes a predicate act of mail or wire fraud in support of Aetna's RICO claim and in violation of the RICO Act. In the Exhibits attached hereto, the submission of any claim where the claim ID starts with an E is an act of wire fraud because it utilized wires to submit

claims, and the claim IDs starting with a P constitute an act of mail fraud because they were submitted using mail across state lines.

177.  Further, it was foreseeable that Aetna would, and in fact did, reasonably rely on Defendants' fraudulent and false submissions because they contained the hallmarks of legitimate claim submission and requisite certifications. For example, the claims contained correct member information, were purportedly verified and certified, and contained recognized CPT codes. Each claim specifically certified that the procedures billed were actually conducted, medically necessary, and lawful.

178.  By violating the RICO Act, Defendants directly and proximately caused Aetna harm because Aetna paid money to Defendants for services it never provided Aetna's members or that were provided fraudulently as alleged herein.

WHEREFORE, Aetna respectfully requests entry of judgment in its favor and awarding Aetna recovery including but not limited to threefold the amount of damages Aetna sustained, Aetna's costs incurred in pursuit of this action, and Aetna's reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus pre-judgment and post judgment interest, together with any other relief this Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

179.  Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

180.  Defendants have conspired with each other to violate 18 U.S.C. § 1962(c). The object of the conspiracy is to conduct and/or participate in the conduct and affairs of the Enterprise described above through a pattern of racketeering activity.

181.  As set forth above, Defendants each engaged in multiple overt predicate acts of fraudulent racketeering in furtherance of the conspiracy which, by their

nature, give rise to the plausible inference that the object of the conspiracy was to violate RICO. They knew their ongoing acts were part of an overall pattern of racketeering activity. For example, a purpose of the conspiracy was to defraud Aetna into paying healthcare claims to which Defendants were not entitled to reimbursement. The Enterprise was the vehicle that allowed the Defendants to carry out this scheme while evading detection.

182.  As a direct and proximate cause of the conspiracy and the acts taken in furtherance thereof, Aetna has suffered injuries to its business and property by wrongly paying money as a result of the Enterprise's racketeering activity.

WHEREFORE, Aetna respectfully requests entry of judgment in its favor, a finding that Defendants be found jointly and severally liable and awarding Aetna recovery including but not limited to threefold the amount of damages Aetna sustained, Aetna's costs incurred in pursuit of this action, and Aetna's reasonable attorneys' fees, plus pre-judgment and post judgment interest, tougher with any other relief this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

### Violations of Business and Professional Code Section 17200, et seq.

### (Against All Defendants)

183.  Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

184.  Defendants violated California's Unfair Competition Law ("UCL") as set forth in Business and Professions Code §§ 17200 *et seq.* Under the UCL, unfair competition means any "unlawful, unfair or fraudulent business act or practice."

185.  As this Complaint sets forth, Defendants business acts and practices are unlawful because they violate the following statutes: (i) The Anti-Kickback Statute, 18 U.S.C. § 1320; (ii) The Eliminating Kickbacks in Recovery Act, 18 U.S.C. § 220; (iii) the Health Care Fraud Statute, 18 U.S.C. § 1347; (iv) RICO, 18 U.S.C. § 1962(c); (v) California's Insurance Anti-Kickback Law, Cal. Ins. Code §§ 750 *et*

-40-

*seq.*, (vi) California's Anti-Referral Law, Health & Safety Code § 445, and (vii) California's Uniform Controlled Substances Act, Health & Safety Code § 11570.

186. Defendants also used unfair fraudulent business practices to interfere with the central purpose of Aetna's business, thereby damaging Aetna to profit for themselves. Specifically, Defendants engaged in fraudulent scheme(s) and conduct in the form of enrollment fraud, body brokering, unlawful kickbacks, purposefully prolonging and undercutting the effects of any treatment that was given, and the submission of claims infected by such conduct.

187. As referenced above, Defendants took specific steps to hide their activities and evade detection.

188. Defendants' unlawful, unfair, and fraudulent business acts and practices have directly and proximately caused Aetna to suffer monetary harm. Aetna seeks restitution for the harm in an amount to be proven at trial.

WHEREFORE, Aetna respectfully requests entry of a judgment in its favor awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## **EIGHTH CAUSE OF ACTION**
### **MONEY HAD AND RECEIVED**
#### **(Against all Defendants)**

189. Aetna realleges ad incorporates paragraphs 1-134 as if fully set forth herein.

190. In addition, or in the alternative, Defendants are liable for money had and received.

191. As set forth herein, Aetna paid claims to Treating Entity Defendants, and thus funds were then passed to the Individual Defendants and Billing Entity Defendants as set forth herein.

192. Aetna would not have paid the claims but for the wrongful conduct of Defendants as alleged herein.

193. Defendants extracted the payments by withholding the truth of the conduct that was occurring.

194. The amounts paid by Aetna should be returned to Aetna in good conscience.

WHEREFORE, Aetna seeks judgment in its favor and the return of funds Defendants received, together with taxable costs, pre-judgment and post judgment interests, and any other such relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION

### Unjust Enrichment/Quantum Meruit/Restitution

### (Against All Defendants)

### *In the Alternative*

195. Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

196. Aetna conferred benefits on Defendants by paying healthcare claims that they were not actually entitled to.

197. Treating Entity Defendants have unjustly accepted and retained the benefit that Aetna conferred on them.

198. Billing Entity Defendants have unjustly accepted and retained a percentage of the payments that Aetna made for Treating Entities Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley.

199. Defendant Beheshti has unjustly accepted and retained recurring payments directly from Young that can be traced to the fraudulent schemes alleged herein.

200. Because it would be unjust and inequitable for Defendants to continue to retain the benefits that Aetna conferred on them, Aetna seeks the return of the money paid.

FIRST AMENDED COMPLAINT

1   WHEREFORE, Aetna respectfully requests entry of a judgment in its favor
2   awarding Aetna its damages, taxable costs, pre-judgment and post judgment interests,
3   and any other such relief as this Court deems just and proper.

### TENTH CAUSE OF ACTION

### RESTITUTION, 29 U.S.C. § 1132(a)(3)

### (Against All Defendants)

201.   Aetna realleges and incorporates paragraphs 1-134 as if fully set forth
herein.

202.   Aetna is a fiduciary within the meaning of Section 502(a)(3) of ERISA.
Aetna has discretion to interpret the ERISA plans under which the wrongful
payments were made in this suit. This discretion extends to Aetna's activities in
processing claims and issuing payments on behalf of the aforementioned ERISA
plans.

203.   In claim forms submitted to Aetna, Defendants represented that they had
obtained assignments of benefits from Aetna members, thereby allowing them to
obtain payments of the members' benefits. To the extent they obtained such
assignments, they are subject to the terms of the ERISA plans.

204.   The specific terms of the ERISA plans vary, but the following terms are
representative of the terms in the ERISA plans implicated by the claims in this case:

(a)   "Aetna processes claims and performs other administrative
duties. Aetna has been delegated the discretionary authority to determine claims for
benefits and to construe the terms of the [Plan] to the extent necessary to perform its
services."

(b)   "If a benefit payment is made by the Plan, to or on your behalf,
which exceeds the benefit amount that you are entitled to receive, the Plan has the
right to require the return of the overpayment."

(c)   "Fraudulent misstatements in connection with any claim or
application for coverage may result in termination of all coverage under this plan."

1    (d)    For determining out-of-network payments, the Plan "ha[s] the

2    right to apply Aetna reimbursement policies."

3    (e)    The Plans exclude from coverage:

4    (i)    "charges the recipient has no legal obligation to pay."

5    (ii)    Non-medically necessary services, including but not

6    limited to, those treatments, services, prescription drugs and supplies which are not

7    medically necessary, as determined by Aetna, for the diagnosis and treatment of

8    illness, injury, restoration of physiological functions, or covered preventive

9    services."

10    (iii)    Personal comfort and convenience items: Any service or

11    supply primarily for your convenience and personal comfort or that of a third party,

12    including: Telephone, television, internet, barber or beauty service or other guest

13    services; housekeeping, cooking, cleaning, shopping, monitoring, security or other

14    home services; and travel, transportation, or living expenses, rest cures, recreational

15    or diversional therapy.

16    (f)    In the event of fraud or intentional misrepresentation of material

17    facts, Aetna may rescind coverage, deny benefits, and/or recover amounts already

18    paid.

19    (g)    Copays are "This is a specified dollar amount or percentage,

20    shown in the Schedule of Benefits, you are required to pay for covered expenses."

21    (h)    You will be responsible for deductibles, payment percentage and

22    copayments, if any.

23    205. Defendants caused Aetna to wrongfully pay on behalf of the ERISA

24    plans.

25    206. Aetna made these wrongful payments directly to Treating Entity

26    Defendants. As noted above, the Billing Entity Defendants received a percentage of

27    these payments per their agreements with Treating Entity Defendants, and the

28    individual defendants ultimately gained control of these payments for their own use.

207.  Aetna has no basis or reason to believe that Defendants have dissipated the overpayments and, upon information and belief, the overpayments are separately identifiable.

208. As noted above, the ERISA plans provide for Aetna to recover overpayments made on behalf of ERISA Plans. Defendants who were assigned the benefits are put on notice that the overpayments referenced in the Exhibits to the Complaint are subject to an equitable lien by agreement and rightfully belong to the ERISA Plans.

WHEREFORE, Aetna therefore seeks restitution, equitable liens by agreement, and a constructive trust on the overpayments to the Defendants on behalf of the ERISA Plans.

## ELEVENTH CAUSE OF ACTION
### INJUNCTIVE RELIEF, 29 U.S.C. § 1132(a)(3)
### (Against All Defendants)

209.  Aetna realleges and incorporates paragraphs 1-134 as if fully set forth herein.

210.  Section 502(a)(3) of ERISA permits ERISA fiduciaries to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan."

211.  Defendants have continued to submit claims to Aetna and, therefore, there is a need for injunctive relief.

212.  None of the claims that have been submitted, remain pending, or that will be submitted in the future resulting from the misconduct alleged herein are payable.

WHEREFORE, Aetna therefore seeks an order enjoining: (i) all Defendants from transferring or dissipating funds paid by Aetna on behalf of ERISA Plans, (ii) Treating Entity Defendants from billing claims to Aetna or the ERISA plans, (iii) Billing Entity Defendants from submitting claims from Treating Entity Defendants,

(iv) Young, Adler, Maldonado, and Mirzayan from submitting, or causing any provider they are associated with, from submitting claims to Aetna, and (v) all Defendants from engaging in the misconduct alleged herein..

## **PRAYER FOR RELIEF**

WHEREFORE, Aetna, respectfully requests a judgment against Defendants, and Does 1 through 50, inclusive, as follows:

A.    For damages in an amount to be proven at trial;

B.    For prejudgment interest;

C.    For civil penalties to the extent the law permits;

D.    For other statutory remedies available to Aetna to the extent the law permits;

E.    For an award of costs of its suit to the extent the law permits;

F.    For an award of attorney's fees to the extent the law permits;

G.    For punitive damages;

H.    For such other relief as the Court deems just and proper.

I.    An order enjoining: (i) all Defendants from transferring or dissipating funds paid by Aetna on behalf of ERISA Plans, (ii) Treating Entity Defendants from billing claims to Aetna or the ERISA plans, (iii) Billing Entity Defendants from submitting claims from Treating Entity Defendants, (iv) Young, Adler, Maldonado, and Mirzayan from submitting, or causing any provider they are associated with, from submitting claims to Aetna, and (v) all Defendants from otherwise engaging in the misconduct alleged herein.

Dated: February 20, 2024                FOX ROTHSCHILD LLP

                                        By: */s/ Benjamin H. McCoy*
                                        Benjamin McCoy
                                        John J. Shaeffer
                                        Matthew Follett
                                        Alberto Longo
                                        10250 Constellation Avenue, Suite 900
                                        Los Angeles, CA 90067
                                        Tel: 310-228-4481
                                        Fax: 310-556-9828

                                        *Attorneys for Aetna Life Insurance Co.,*
                                        *Aetna Health of California, Inc.*

FIRST AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as to all matters so triable.

Dated: February 20, 2023      FOX ROTHSCHILD LLP

By: */s/ Benjamin H. McCoy*
Benjamin H. McCoy

*One of the attorneys for Aetna Life Insurance Co., Aetna Health of California, Inc.*

FIRST AMENDED COMPLAINT