EXHIBIT "1"

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
03/29/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
03/29/21
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ mba _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

Plaintiff,

v.

Darius Moore,

Defendant.

Case No.   **8:21-mj-00214-DUTY**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of October 5, 2020 in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 220(a)(1) | Solicitation and receipt of remuneration in return for referring a patient or patronage to a recovery home or clinical treatment facility |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Kathleen I. Kennedy, Special Agent (FBI)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 29, 2021

*Judge's signature*

City and state:   Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Kathleen I. Kennedy, being duly sworn, declare and state:

## I.  INTRODUCTION

1.   I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed for more than 23 years.  I have specialized in the investigation of health care fraud for six years and have prior investigative experience in other fraud investigations, including money laundering.  I have received training from the FBI and other public and private organizations in the investigation of health care fraud on a variety of health care fraud schemes including health care provider fraud, kickback schemes, and health care fraud investigations involving opioids and addiction treatment facilities.  I have been the lead investigator in a variety of health care fraud investigations.  I have participated in the execution of numerous search warrants in investigations pertaining to health care fraud.  As a result of my training and experience, I am familiar with the federal laws relating to health care fraud and common health care fraud techniques and schemes.

2.   In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become

familiar with the manner and means by which health care fraud schemes are operated.

3.    Through my training and experience I have become familiar with a variety of schemes used to defraud health care benefit programs, including the billing of insurance for services that were unnecessary or never provided to patients, and the payment of illegal remunerations, or "kickbacks," to doctors, patients, and patient marketers (also known as "recruiters" or "brokers") as an enticement to refer patients for expensive medical services or products such as laboratory tests, diagnostic tests, home health care, power wheelchairs, orthopedic braces, and treatment of substance abuse.

4.    Based on my training and experience, I am also familiar with methods perpetrators use to conceal such illegal payments from insurance auditors and law enforcement, including by generating and using cash, or by employing contracts and invoices to disguise kickback payments as legitimate business service expenses, like billing, collections, payroll, marketing, consulting, or office space rental.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  In preparing this affidavit, I conferred with other FBI personnel who are involved in health care fraud investigations involving addiction treatment facilities as well as Detectives from the California Department of Insurance ("CDI") and Special Agents ("SAs") of the United States Office of Personnel Management,

2

Office of the Inspector General ("OPM-OIG") who are assisting the FBI in conducting this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

## II.  PURPOSE OF AFFIDAVIT

6.    This affidavit is made in support of a criminal complaint against DARIUS MOORE, for a violation of Title 18, United States Code, Section 220(a)(1) (solicitation and receipt of remuneration in return for referring a patient or patronage to a recovery home or clinical treatment facility) (the "SUBJECT OFFENSE"), as follows:

    a.    On or about October 5, 2020, in Orange County, California, within the Central District of California, and elsewhere, DARIUS MOORE knowingly and willfully solicited and received remuneration, including a kickback, bribe, and rebate, namely, the following payments, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient or patronage to a recovery home or clinical treatment facility, namely, an approximately $16,000 electronic payment drawn from STONE RIDGE RECOVERY's Bank of America checking account and sent to the JP Morgan Chase bank account held in the name of MOORE RECOVERY SOLUTIONS LLC and controlled by defendant MOORE.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

3

witnesses. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

8. I submit that probable cause exists that DARIUS MOORE is engaged in activities that include the SUBJECT OFFENSE. Specifically, he is believed to be soliciting and receiving illegal payments from addiction rehabilitation facilities in exchange for finding patients to accept services, and of offering and paying kickbacks to other patients to receive purported services from such facilities, which are then billed to the patients' insurance providers, in a scheme commonly referred to as "body brokering" of addicted patients.

### A. Overview of Drug and Alcohol Rehabilitation

9. From conversations either I or FBI colleagues I have consulted with have had with other investigators and with individuals in the substance abuse treatment industry, from listening to recordings confidential human sources conducted with subjects of this and other investigations, from information provided to me or other law enforcement colleagues by cooperative subjects of these investigations and from listening to recordings made by those cooperative subjects with other subjects, from reviewing emails and other digital evidence from this and other investigations, and from publicly available information I or FBI colleagues have read about the substance abuse treatment industry, I know the following:

a. When a person first enters addiction treatment, he or she receives a clinical assessment to determine the type

4

of treatment is best fitted for that person.  The first step in treatment may involve a medically supervised withdrawal, often called detoxification or "detox."  Detoxification uses medication to help people withdraw from alcohol or drugs and can take place on a regular medical ward of a hospital, in a specialized inpatient detoxification unit, or on an outpatient basis with close medical supervision.  Detoxification may take several days to a week or more.  It is not a treatment but the first step that can prepare a person for treatment.

       b.    Following detoxification, a patient will enter a treatment program.  The treatment program could be outpatient, hospital inpatient, or residential inpatient.  Outpatient treatment is given at a program site while the patient lives on his or her own.  The patient is expected to attend regular counseling sessions and other appointments.  Care frequency depends on the program, with some requiring daily attendance and others meeting one to three times per week.  Outpatient care usually lasts from about two months to one year.  Hospital inpatient treatment is generally 24-hours-a-day/7-days-a-week care usually connected to a hospital or clinic and provides detox and rehabilitative care.  People with serious mental or medical concerns, as well as substance use disorders, are the most likely to use hospital inpatient treatment ("dual diagnosis").  Residential treatment is one in which the patient lives in a facility that is not connected to a hospital. They're best for people without stable living or work situations, and/or who have limited or no family support in

treatment.  They also help people with very serious disorders who have been unable to get and stay sober or drug free in other treatment.  Residential care usually lasts from a few months to a year.  Once a patient has completed intensive treatment, he or she may temporarily stay in transitional housing, often called "sober homes", while continuing to receive treatment and support with recovery.

       c.   To treat opioid or alcohol addiction, a hospital or residential facility may offer Medication-Assisted Treatment ("MAT").  MAT is the use of FDA-approved medications, in combination with counseling and behavioral therapies, to provide a "whole-patient" approach to the treatment of substance abuse disorders.  Opioid treatment programs ("OTPs") provide MAT for individuals diagnosed with an opioid use disorder.  Federal law requires patients who receive treatment in an OTP to receive medical, counseling, vocational, educational, and other assessment and treatment services, in addition to prescribed medication.

       d.   The FDA has approved several different medications to treat opioid addiction and alcohol dependence. Some of the medications used in MAT are controlled substances due to their potential for misuse.  Methadone, buprenorphine, and naltrexone are used to treat opioid dependence and addiction to short-acting opioids such as heroin, morphine, and codeine, as well as semi-synthetic opioids like oxycodone and hydrocodone.

e.     Substance abuse residential treatment facilities provide services, such as individual or group therapy sessions, to assist patients in overcoming their addictions.  There are varying levels of treatment provided based on the severity of the addiction, including Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP").  PHPs, IOPs, or OPs can be billed to insurance companies when they are medically necessary, provided by, or overseen by, licensed medical professionals, and their services are lawfully rendered.

f.     Pursuant to guidelines published by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), PHPs are formal substance abuse treatment programs that provide services to patients with mild to moderate symptoms of withdrawal that are not likely to be severe or life-threatening and that do not require 24-hour medical support.  PHPs are considered a "step down" from an inpatient detoxification program.

g.     According to SAMHSA's Guidelines, IOPs are formal substance abuse treatment programs that adhere to a set of formal guidelines.  IOPs must be overseen by a qualified professional.  Patients must receive a thorough evaluation to determine the stage and severity of their illness, including medical and mental disorders.  Qualified medical personnel must assign patients to a formal treatment plan.  The IOP is

accountable for the treatment or referral of the patient to additional services as necessary.

h.   According to SAMHSA's Guidelines, OPs, also known as "aftercare" or "continuing care," are traditional outpatient treatments that followed residential or intensive outpatient treatment.  This type of treatment is generally associated with mutual help support groups such as the 12-Step programs used by Alcoholics Anonymous and Narcotics Anonymous.

i.   SAMHSA's Guidelines provide that substance abuse treatment programs, particularly IOPs and PHPs, include the following core services:  orientation and intake; bio-psychosocial assessment; individual treatment planning; group and individual counseling; psycho-educational programming; case management; integration into mutual-help and community based support groups; 24-hour crisis coverage; medical treatment; substance use screening via urine or breath tests; vocational and/or educational services; psychiatric evaluation and psychotherapy; medication management; and transition or discharge planning.

**B.   Overview of Fraud and Kickbacks in Drug and Alcohol Addition Rehabilitation**

10.   From my training and experience, I know the following regarding the common *modus operandi* of fraud and kickbacks in the context of drug and alcohol addiction rehabilitation treatment:

a.   Patient brokers (also referred to as "body brokers") or marketers are individuals who recruit patients and

8

direct them to particular treatment facilities in exchange for a fee or some type of compensation.

   b.   This practice is a violation of California Insurance Code Section 750(a) that prohibits anyone engaged in the practice of processing, presenting, or negotiating claims, including claims under policies of insurance, from offering, delivering, receiving, or accepting any commission or other consideration, whether in the form of money or otherwise, as compensation or inducement to any person for the referral or procurement of clients, cases, patients, or customers.

   c.   In October 2018, the "Eliminating Kickbacks in Recovery Act" ("EKRA"), codified at 18 U.S.C. § 220, was enacted into law, and specifically designated paying or receiving payment for the referral of patients to recovery homes, clinical treatment facilities, or laboratories to be a violation of federal law.

   d.   The patient brokers are paid on a per-patient basis an amount that depends on the anticipated reimbursement rate of the patient's insurance policy.  To recruit patients, patient brokers often promise patients money, as much as a few hundred to a few thousand dollars, depending on the length of stay and the anticipated value of the patient's insurance benefits.

   e.   I understand patient brokering has created a situation where substance abusers with no desire to stop using drugs are able to gain income from their insurance benefits by periodically participating in treatment programs.  I have also

9

been told by persons in the industry that legitimate facilities that refuse to pay patient brokers have had to cease business for lack of patients.

       f.   The facilities and the patient brokers understand that it is illegal to pay patient brokers on a per-patient basis, so they have devised structures to disguise the payments, including making the payments in cash, or by creating sham contracts and invoices that allege the patient broker is providing hourly services, such as consulting or counseling, to prospective patients and their families.  Since the enactment of EKRA in October 2018, facilities and patient brokers have taken additional measures to hide the referral fees by entering into sham contracts that describe the provision of marketing services under a fixed-rate recurring monthly or bi-weekly fee.  Such contracts typically state in writing there is no relationship between the payment and the number or value of patient referrals, but they conceal an unwritten verbal quota agreement between the facility operators and patient broker for the number or value of patient referrals the broker is required to provide.

       g.   The facilities generally know patient brokers pay patients and give patients drugs, but they maintain deniability by discharging patients who admit they were paid and stopping work with particular patient brokers as soon as such actions become overtly known.  Even so, these patient marketers continue to refer patients to the facility, but through other intermediary patient marketers.  Facility operators further insulate themselves from the illegal activities by working with

10

intermediate marketers who employ less scrupulous sub-tier marketers.

**C.   Background on the SUBJECT TREATMENT FACILITIES**

11.   The following is background information regarding addiction treatment facilities discussed in this affidavit (collectively, the "SUBJECT TREATMENT FACILITIES"), which are believed to be paying kickbacks to MOORE in exchange for patient referrals as part of the target "body brokering" and health care fraud scheme.

1.   <u>GET REAL</u>

12.   GET REAL RECOVERY INC. ("GET REAL") is a corporation organized and existing under the laws of the state of California and headquartered at 30290 Rancho Viejo Road, Suite 204, San Juan Capistrano, California 92675.  I reviewed public corporate documents available on the California Secretary of State's website.  GET REAL was incorporated on February 22, 2011, and the initial registered agent was Subject 1.  In a corporate filing on May 3, 2019, Owner 1 was listed as the chief executive officer, chief financial officer, and secretary and the registered agent was changed to Subject 2.   The corporation described itself as an outpatient behavioral health treatment facility.  The corporate document was signed by Subject 2, identified as a director of the corporation.  In a corporate filing on January 22, 2020, GET REAL filed a document with the California Secretary of State that indicated there had been no change in corporate information since the previous filing.

13.  During the investigation, I obtained bank records from Wells Fargo Bank for a checking account in the name of GET REAL. The account was opened on July 2, 2014, and Subject 1 was one of the account signatories.  On April 25, 2019, a new signature card for the account was filed with Wells Fargo Bank.  The original account signatories were removed and Owner 1 and Subject 2 were added.  Based on evidence gathering during the course of the investigation, I believe that Owner 1 and Subject 2 had purchased GET REAL from its original owners in April 2019.

14.  According to a publicly available website, GET REAL purportedly offers PHP, IOP, and OP programs to patients as well as dual-diagnosis treatment programs.

15.  During the investigation, I obtained claims data from Anthem Blue Cross Blue Shield ("Anthem") which confirmed that GET REAL submitted claims for reimbursement to Anthem for services.  From approximately May 14, 2019, through October 14, 2020, GET REAL submitted claims for approximately 172 individuals and was paid by Anthem approximately $3,929,912 on those claims.

16.  I also obtained claims data from United Health Group ("UHG") which confirmed that GET REAL submitted claims for reimbursement for services.  From approximately June 13, 2019, (after Owner 1 and Subject 2 took control of the entity) until October 14, 2020, GET REAL submitted claims for approximately 39 individuals and was paid by UHG approximately $683,828 on those claims.

12

### 2. HEALING PATH DETOX and HEALING PATH RECOVERY

17. HEALING PATH DETOX LLC ("HEALING PATH DETOX") is a limited liability corporation organized and existing under the laws of the state of California and headquartered at 7661 Amberleaf Circle, Unit 1, Huntington Beach, California 92648. I reviewed public corporate documents available on the California Secretary of State's website. HEALING PATH DETOX was incorporated on July 29, 2016. The document was signed by Subject 2 In a corporate document filed August 6, 2020, Owner 1 was identified as a manager, chief executive officer, and the registered agent. (As noted above, Owner 1 also holds executive positions at GET REAL, and Subject 2 is its registered agent.)

18. HEALING PATH RECOVERY LLC ("HEALING PATH RECOVERY") is a limited liability corporation organized and existing under the laws of the state of California and is headquartered at 3188 Airway Ave., Building L, Costa Mesa, California 92626. I reviewed public corporate documents available on California Secretary of State's website. The entity was originally incorporated on January 9, 2014, by Subject 3. Subject 2 was the registered agent. On February 15, 2017, a document was filed with the California Secretary of State, converting the corporation to a limited liability corporation. Subject 3 was identified as the president and Subject 2 was identified as the secretary. On February 21, 2018, a corporate document was filed that identified Subject 2 as the entity's president, manager, and registered agent. On April 10, 2020, a corporate document was filed that stated there had been no change in any of the

13

information on the previously filed corporate documents.  I reviewed the content of a publicly available website under the name HEALING PATH RECOVERY and noted that it operates as a substance abuse treatment center under the name HEALING PATH RECOVERY.  It purportedly offers detoxification, PHP, IOP, and OP programs to patients as well as dual-diagnosis treatment programs.  Based upon the above information, I believe that HEALING PATH DETOX and HEALING PATH RECOVERY are sister organizations.

19.  During the investigation, I obtained claims data from Anthem for both HEALING PATH DETOX and HEALING PATH RECOVERY.  The entities submitted claims using two different tax identification numbers.  A review of the claims data revealed that HEALING PATH DETOX used the entity name HEALING PATH RECOVERY on some of the claims.  From approximately August 4, 2015, through October 13, 2020, HEALING PATH DETOX or HEALING PATH RECOVERY submitted claims for approximately 237 individuals and was paid by Anthem approximately $3,562,179 on those claims.

3.  <u>STONE RIDGE and LANDMARK</u>

20.  STONE RIDGE RECOVERY INC. ("STONE RIDGE") is a corporation organized and existing under the laws of the state of California and headquartered at 24951 Sandridge Circle, Laguna Hills, California 92653-5893.  I reviewed public corporate documents available on the California Secretary of State's website.  STONE RIDGE was incorporated on October 31, 2017, and as of the most recent corporate filing on August 13, 2019, listed Owner 2 as the chief executive officer, chief

14

financial officer, and secretary. STONE RIDGE operates as a substance abuse treatment center. I reviewed a publicly available website for STONE RIDGE and learned that it purportedly offers detoxification, PHP, IOP, and OP programs to patients as well as dual-diagnosis treatment programs. STONE RIDGE has a sister treatment facility LANDMARK RECOVERY LLC ("LANDMARK"), which shares the same owners and a business office. Based on the investigation, I know that the facilities operate separately but transfer clients between them.

21. During the investigation, I obtained bank records from Bank of America for checking account XXXX4782 ("BofA 4782") in the name of STONE RIDGE RECOVERY INC. for the approximate time period of December 11, 2017, through November 30, 2020. On July 16, 2019, the name on the account was changed to STONE RIDGE RECOVERY INC. d/b/a LANDMARK RECOVERY LLC. Owner 2 was the sole signatory on the account.

22. During the investigation, I obtained claims data from Anthem which confirmed that STONE RIDGE submitted claims for reimbursement for services. From approximately July 16, 2018, through November 2, 2020, STONE RIDGE submitted claims for approximately 67 individuals and was paid by Anthem approximately $927,913 on those claims.

23. I also obtained claims data from Anthem for LANDMARK, which confirmed that LANDMARK submitted claims for reimbursement. From approximately July 19, 2019, through October 15, 2020, LANDMARK submitted claims for 24 individuals and was paid by Anthem approximately $581,253 on those claims.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

24. The FBI, with assistance from the CDI and OPM-OIG, is conducting an investigation into health care fraud and body brokering being engaged in by individuals and the owners and/or operators of addiction treatment facilities located in Orange County, California. One of those subjects is DARIUS JARELL MOORE. Specifically, MOORE is believed to be soliciting and receiving illegal kickbacks from addiction rehabilitation facilities in exchange for finding patients to accept services, and of paying kickbacks to other patients to receive services from such facilities, which are then billed to the patients' insurance providers as part of a body brokering and health care fraud scheme. Other subjects of investigations into body brokering and health care fraud schemes are the persons identified herein as CHS-1 and CHS-2.

25. I know that it is a common *modus operandi* of body brokering and health care fraud schemes for perpetrators to supply opioids and other drugs to addicted patients, to ensure that they provide urine samples that test positive for drug use, thus helping to ensure that the addicted patients qualify for insurance reimbursements for addiction treatment.

### A. Development of Cooperation by CHS-1 and CHS-2

26. I am the case agent for the related investigation into CHS-1 and CHS-2, and another non-cooperating co-conspirator Broker 1 for their involvement in a body brokering and health care fraud scheme similar in manner to MOORE's conduct. In late September 2020, as part of the investigation, I and my

16

colleagues executed search warrants at CHS-1's and CHS-2's residences in California.  Another warrant was executed on a vehicle registered to CHS-1, which investigators later determined was in fact being used by Broker 1 at the time.  Neither CHS-1 nor CHS-2 were located during the execution of the warrants, as both were out of state at the time, though Broker 1 was present at the apartment shared by him and CHS-1.  Broker 1 consented to be interviewed and provided what I believe was a minimized statement about his involvement in patient body brokering, and he did not discuss MOORE.  During the search, FBI agents seized from a desk located in the bedroom used by Broker 1 and his girlfriend three small plastic baggies containing a bluish white substance.  During the search of his apartment, Broker 1 identified the substance as fentanyl.  Subsequent testing by the Drug Enforcement Agency's laboratory confirmed that the substance was fentanyl.  During the search, a large amount of cash was also seized from a vehicle registered to CH-1.

27.  After the search warrants were executed, CHS-1 and CHS-2 contacted the investigation team through an attorney and agreed to cooperate.  They each retained local counsel and traveled to the Central District of California, where they submitted to separate proffer interviews handled by myself and another FBI agent working with me.  During those proffers, and in subsequent interviews CHS-1 and CHS-2 admitted to engaging in a health care fraud and kickback scheme involving referrals of body brokered patients to addiction treatment facilities,

17

including regarding MOORE's involvement in a similar kickback scheme with his own brokered patients.  Both CHS-1 and CHS-2 have also conducted consensually recorded conversations, over the telephone in our presence or in person, with subjects of this investigation and related investigations, including recordings during which MOORE was also captured discussing kickback payments for brokered patients.[1]

28.  CHS-1 had consensually recorded conversations with Owner 1, the CEO of HEALING PATH DETOX and GET REAL; with Owner 2, the CEO of STONE RIDGE; as well as with MOORE directly.  CHS-2 had consensually recorded meetings with the owners, operators, or employees of other addiction treatment facilities located in Orange County, California.  The recorded conversations confirmed the information provided by CHS-1 and CHS-2 regarding their involvement in a scheme to broker individuals to addiction treatment facilities in exchange for payments from those facilities.

**B.  Interviews with CHS-1**

29.  During the interviews, CHS-1 told me and/or my colleagues the following, among other things:

---

[1] CHS-1 has no known criminal history.  CHS-2's criminal history includes a misdemeanor conviction for possession of an altered controlled substance.  CHS-2 currently has pending felony charges of possession of a controlled substance and possession of marijuana.  Both CHS-1 and CHS-2 are cooperating in the hope of receiving sentencing benefits in the expected prosecution against them stemming from this investigation.  Based on their cooperation to date, including their proffers, follow-up investigation, and their participation in recorded meetings, I consider CHS-1 and CHS-2 to be reliable cooperators.

a. CHS-1 was paid by addiction treatment facilities in Orange County to refer patients to those facilities. He/she was paid by multiple addiction treatment facilities, including HEALING PATH DETOX, GET REAL, and STONE RIDGE. He/she worked with CHS-2 in the brokering business and used a corporate entity he/she created, identified here as "CHS Business A," to receive payments from the facilities. The amount that a facility paid CHS-1 for a patient depended on the value of the patient's insurance policy to the facility and how long the patient stayed at the facility.

b. CHS-1 explained that following the passage of the federal EKRA law, facilities insisted on having a written contract with a corporate entity created by him/her, to cover the payments made by the facility to CHS-1. The written contract purported to be a marketing contract in which CHS-1's corporate entity, the CHS Business A, provided marketing services to raise the awareness of the facility's services to other health care providers, potential clients, and the general public. The terms of the written contract stated that the facility would pay the CHS Business A a flat monthly rate as payment. CHS-1 told me, however, that the actual agreement between himself/herself and the facility was that he/she would locate and refer patients with substance addictions to the facility and the facility would pay him/her on a per-person basis, the amount of the payment was dependent upon the health insurance policy that the patient had. He/she did not engage in any marketing efforts on behalf of the facility. I know from my

19

training and experience that other corrupt sober living homes in the Central District of California are utilizing this method to conceal kickbacks in the wake of EKRA. CHS Business A had a contract with HEALING PATH DETOX in which it paid CHS Business A $60,000 per month. CHS Business A also had a contract with GET REAL in which it paid it $40,000 per month. The owner of STONE RIDGE did not insist that CHS-1 sign a written contract.

      c.  Each month, CHS-1 had a conversation with the controlling owner or operator of each facility in which he/she had placed patients. They negotiated the amount owed to CHS-1 for each patient he/she had referred that month. The facility owner and CHS-1 kept track of the amount agreed to for each patient and compared it to the monthly payment the facility made to CHS Business A. From this analysis, they would agree whether CHS-1 had met his obligation or if he was "ahead," or "up" meaning the facility owed him/her more than it had paid him/her that month.

      d.  CHS-1 worked with CHS-2 in the body brokering business. CHS-2 has his/her own corporate entity, identified here as "CHS Business B." If CHS Business B did not have a contract with a facility, then the facility paid CHS Business A for patients both CHS-1 and CHS-2 placed in it. CHS-2, through CHS Business B, had a contract with HEALING PATH DETOX under which it paid $25,000 per month. CHS Business B did not have a contract with GET REAL so CHS-2 referred clients to GET REAL using CHS Business A.

e.   CHS-1 paid the patients, whom he/she called "clients," he/she referred to facilities.  He/she paid them using money transfer services such as Square, Venmo, or Western Union, or he/she paid them cash.  Most of the brokered clients knew that he/she was going to be paid by the facility for the referral and knew CHS-1 would be willing to pay them.  The clients themselves would negotiate with CHS-1 the amount he/she would pay them.

f.   In 2020, CHS-1 was introduced to MOORE by CHS-2. CHS-1 had previously heard of MOORE and knew him to be a broker who worked primarily with facilities in Los Angeles, California. CHS-1 wanted to stop brokering and leave California.  CHS-1 informed the facility owners of his/her plans.  Owner 1 of HEALING PATH DETOX and GET REAL, having also met MOORE, wanted CHS-1 to mentor MOORE so that MOORE could replace CHS-1 when CHS-1 left California.  In March 2020, Owner 1 arranged for a telephone conversation between himself, CHS-1, and MOORE to discuss MOORE taking over for CHS-1 in the brokering business in Orange County.

g.   CHS-1 was aware that MOORE had his own contract with HEALING PATH DETOX and GET REAL but the owners of other facilities were not familiar enough with MOORE to be comfortable with working with him.  In late July or early August 2020, following the March 2020 telephone call noted above, CHS-1 arranged a meeting with MOORE, CHS-2, and Owner 2 of STONE RIDGE.  CHS-1 wanted to introduce Owner 2 to CHS-2 and MOORE so Owner 2 would be comfortable working with them.  But Owner 2,

not yet comfortable with MOORE or CHS-2, wanted CHS-1 to be the contact for any patients MOORE or CHS-2 referred to STONE RIDGE, or another facility controlled by Owner 2, LANDMARK. In September 2020, MOORE, through CHS-1, referred three patients to STONE RIDGE.

      h. MOORE did not know the owners or operators at other facilities used by CHS-1, including TRUVIDA RECOVERY and another facility, OCEAN VALLEY BEHAVIORAL HEALTH LLC. MOORE used CHS-1 to refer one client to each of those facilities in September 2020. The facilities were to pay CHS Business A and CHS-1 would then pay MOORE for those referrals.

      **C. Interviews with CHS-2**

    30. During the interviews, CHS-2 told me the following:

      a. CHS-2 admitted he/she was engaged in a scheme to receive payments from addiction treatment facilities in exchange for finding patients who were willing to enter the treatment programs in exchange for money and the information he/she provided was similar to what CHS-1 provided to me and my colleagues. CHS-2 engaged in this scheme with his/her business partner, CHS-1. CHS-2's corporate entity, CHS Business B, received payments from the facilities. Consistent with CHS-1's statements, CHS-2 has known MOORE for around a year and knows MOORE to be involved in body brokering with facilities including HEALING PATH.

      b. CHS Business B had written marketing contracts with some facilities that purported to show that CHS Business B had been hired to make telephone calls to prospective patients

or engage in other marketing activities in an effort to find patients for the facility. But CHS-2 told me that he/she never engaged in such any marketing efforts and has never provided any facility with any kind of invoice or document to support that any such activity took place. The actual agreement between CHS-2 and the facility was that CHS-2 would refer patients who have health insurance to the facility and in exchange the facility will pay him/her on a per-patient basis.

c. CHS Business B had a contract with HEALING PATH DETOX in which it paid CHS Business B $25,000 per month. CHS Business B did not have a contract with GET REAL or STONE RIDGE so CHS-1's corporate entity, CHS Business A, was paid for any patient CHS-2 referred to them.

d. The amount of the facility was willing to pay CHS-2 depended on the patient's insurance policy, and how many days the patient stayed in the facility.

e. It was the facilities' practice to pay CHS Business B a flat rate twice a month under the terms of the written contract. For those facilities with whom CHS Business B did not have a written contract, the payments were sent to CHS Business A and CHS-1 forwarded the funds owed to CHS-2 to CHS Business B. At the end of the month, CHS-2 had a conversation with the facility owner or operator to discuss the clients under the terms of the verbal contract, including confirming that a client entered the facility, how many days the client stayed in the facility, and how much the insurance company paid the facility on the claims submitted. If the contract with the

23

Case 8:21-cv-00674-JSS-PRB   Document 1140-3   Filed 05/29/21   Page 225 of 46 PageID #: 1341
Case 8:21-cv-00674-JSS-PRB   Document 1140-3   Filed 05/29/21   Page 225 of 46 PageID #:
ID #:1341

facility was with CHS Business A rather than CHS Business B, the facility had that conversation with CHS-1 or had a joint conversation with CHS-2 and CHS-1.  CHS-2, CHS-1, and/or the facility owner/operator then reached an agreement on the value of the clients referred that month.  That figure was then compared to the monthly payment made by the facility and a determination would be made whether CHS-2 was "ahead" or "up." In those cases, the amount owed by the facility was carried over to the next month.  If CHS-2 was "down" or "behind" for that month, then he/she would attempt to refer more clients or clients who would be valued higher by the facility to make up the amount he/she was down.  CHS-2 preferred to be "ahead" because then the facility didn't put so much pressure on him/her to find patients.

      f.   CHS-2 brokered patients for the following facilities, among others: HEALING PATH DETOX, GET REAL, and STONE RIDGE.

### D.   Consensually Recorded Conversations

31.   During the course of the investigation, CHS-1 conducted a consensually recorded meeting with Owner 1 and the admissions personnel for HEALING PATH DETOX and GET REAL.  CHS-1 also had consensually recorded telephone conversations with Owner 2 of STONE RIDGE and MOORE.  Relevant to the discussion below, these recordings occurred soon after agents executed the warrants noted above at locations including CHS-1's and CHS-2's residences and interviewed related individuals.

1. Meeting at HEALING PATH DETOX

32. On October 1, 2020, CHS-1 conducted a consensually recorded meeting at 7661 Amberleaf, Huntington Beach, California, the listed address of HEALING PATH DETOX. The meeting occurred in one of the garages located at the rear of the property which contains a 4-unit apartment building in which HEALING PATH DETOX's office and residential facility are located. At that meeting were CHS-1, Owner 1, and two HEALING PATH DETOX employees who work in admissions, Employee 1 and Employee 2. CHS-1 also met with Employee 3, who is employed by GET REAL in admissions. CHS-1 was there to negotiate the month's-end settlement with HEALING PATH DETOX and GET REAL. While CHS-1 was present, MOORE arrived to conduct his month's-end settlement negotiations. CHS-1 remained in the room for MOORE's discussion with Employee 3 of GET REAL. I have listened to the recording of the meeting and interviewed CHS-1 to confirm the identity of the speakers and what was shown to him during the meeting. The excerpts below are from the recording.

33. During the meeting at HEALING PATH DETOX, CHS-1 told Owner 1 that he/she had decided to "lay low" since law enforcement had found drugs and cash in the apartment and car (i.e., referring the September 2020 searches described above). CHS-1 told Owner 1 he/she was concerned that law enforcement would think he/she was involved in drug trafficking if they saw Broker 1's bank activity in which CHS-1 regularly wire transferred him money, which Broker 1 then withdrew as cash. Owner 1 told CHS-1 "it is illegal for a treatment center to do

per-head marketing, but I don't think, yeah, I think marketers are allowed to pay marketers any way they want. Although it's never been examined or really come up. That's not, that's not the focus. The focus is on treatment centers paying per head."

34. Owner 1 then criticized how CHS-1 ran his/her operation, telling him/her that his/her organization was full of chaos because he/she hired "sub-par" people, which I understand to refer to Broker 1 and others the investigation has identified as low-level brokers who are or were also patients at addiction treatment facilities. Owner 1 told CHS-1 that "DARIUS [MOORE] doesn't have any problems like that. He placed 16 people last month inpatient plus everyone he placed in Get Real. So, he's at the point now where he's placing like 30 people a month." From my training and experience, I recognize that Owner 1 was saying that, in the prior month, MOORE had referred 14 patients to GET REAL and 16 patients to HEALING PATH DETOX (30 total) as part of his body brokering business, and that MOORE's work in recruiting brokered patients was superior to CHS-1's.

35. The recording captures that, while CHS-1 was present at HEALING PATH DETOX and GET REAL, MOORE arrived. CHS-1 and MOORE were recorded discussing one of MOORE's clients who CHS-1 had referred to a facility that did not deal with MOORE directly. Neither MOORE nor CHS-1 could recall the name of the facility to which CHS-1 had placed the client. CHS-1 agreed to contact Owner 2 of STONE RIDGE to see if the client was at his facility.

        a. The recording then captures a conversation

between MOORE and Employee 3.  (As noted above, Employee 3 is an employee of GET REAL who helped compile logs of brokered patients for tracking amounts owed to body brokers for the prior month in exchange for brokered patients.)  MOORE and Employee 3 discussed the clients MOORE had placed into the facility and the value of those clients.  This conversation was captured over CHS-1's recording device.  MOORE, seen referring to his cellular phone in the video portion of the recording made by CHS-1, read off the client's name from the phone, and Employee 3 confirmed MOORE's information.  The names of the patients have been abbreviated.

MOORE: [Looking at his cell phone] So for [R.A.] . . .

Employee 3: [Holding laptop] Uh huh.

MOORE: It's thirty-six hundred.

Employee 3: One sec.  Uh, yes.

MOORE: For [J.], it's eleven hundred.

Employee 3: Yes.

MOORE: [C.] is twenty-two hundred.

Employee 3: Yes.

MOORE: [K.] is twenty-two hundred.

Employee 3: Yes

MOORE: [K.] is forty-four hundred.

Employee 3: Uh, yes, wait, no, forty-two.

MOORE: Yeah, forty-two hundred.  Uh, [C.] is twenty-two hundred.

Employee 3: Yep.

MOORE: [D.] is eleven.

Employee 3: Yes.

MOORE: [T.] is eleven.

Employee 3: Yes.

MOORE: [A.] is twenty-two hundred.

Employee 3: [A.], yes.

MOORE: [R.] is twenty-two hundred.

Employee 3: Wait.

MOORE: [R.G.].

Employee 3: Yes.

MOORE: [D.] and [R.] are twenty-two hundred.

Employee 3: Yes, uh, hold on, their last week was IOP.

MOORE: Okay.

Employee 3: So, the last week, um, they went into IOP on the 20th.

MOORE: Okay, so then that's one week of, so then it's two thousand.

Employee 3: Yeah.

MOORE: So, that's where, the, that's where [unintelligible] okay and then [J.] is eleven hundred. [J.] made days today

Employee 3:  Yes

MOORE: And then [D.] is eleven hundred.

CHS-1: Damn, you got a client with my name and everything.

Employee 3: Yeah, uh, not yet, he's gonna go, well, hold on, oh, that's his last one, yes, he was in, he got here twice in the month of September.

MOORE: Yeah, so then he made days this time.

28

Employee 3: Yes.

MOORE: The first time he didn't.

Employee 3: No.

MOORE: So did you add the, the, that, that time for [D.] making days today.

Employee 3: [D.] is making days today and he is at eleven.

MOORE: Okay and that's added already.

Employee 3: Yeah that's on there.

MOORE: Okay alright.

CHS-1: Alright, I'm going to [Owner 2's] bud.

MOORE: Yeah, alright. You were just here to get the replay?

CHS-1: To see how much motivation.

  b. I reviewed claims data received from Anthem and UHG to identify the GET REAL patients R.A. and R.G., who were discussed by name by MOORE and Employee 3 in the above conversation but are identified in this affidavit by initials only. In the claims data received from UHG, I identified claims submitted by GET REAL for R.A. The first date of service was July 16, 2020 and continued until September 28, 2020. GET REAL was paid by UHG approximately $81,105 on those claims.

  c. I also located claims for R.G. GET REAL submitted claims with dates of service from September 28, 2020, until October 9, 2020, several days after the above conversation occurred. There were earlier dates of service in the claims data for R.G., starting February 18, 2020, through March 6,

2020; April 21, 2020, through June 29, 2020; and August 8, 2020, through August 15, 2020.  UHG paid GET REAL for the claims submitted for R.G.

    2.  <u>Conversations with Owner 2 of STONE RIDGE</u>

36.  On October 1, 2020, CHS-1 had a telephone conversation with Owner 2 of STONE RIDGE.  CHS-1 made the call in my presence and because the call was on speakerphone, I was able to overhear it.  The call was also consensually recorded.

    a.  In the call, Owner 2 told CHS-1 that MOORE had called and wanted to meet with him/her.  CHS-1 told Owner 2 that MOORE probably wanted to talk to him/her about "his people because four or five of them are his."  From my knowledge of the investigation, including from debriefing CHS-1, CHS-1 meant that some of the people he/she had referred to Owner 2's entities were MOORE's clients, and thus that MOORE wanted to meet with CHS-1 to discuss kickbacks owed to MOORE for MOORE's role in supervising the four or five body brokered patients.  (CHS-1 and MOORE in fact held a consensually recorded phone call right after CHS-1 finished speaking with Owner 2)

37.  On October 2, 2020, CHS-1 had another telephone conversation with Owner 2.  CHS-1 placed the call on speakerphone so I was able to overhear it and it was consensually recorded.

    a.  During the conversation, Owner 2 said to CHS-1 "Let's go over the list" and then proceeded to mention patients by name and often gave the name of their insurance carrier.  The two then agreed on an amount for each patient.  At one point,

after Owner 2 mentioned patient A.M. (referred to by name in the call), CHS-1 said "I don't know if that one is mine or DARIUS' " — *i.e.*, MOORE's. Owner 2 replied "I think his is [sic] [A.(2)], [J.], and [D.R.]." Owner 2 then asked CHS-1 if he should "work out" the price with MOORE to which CHS-1 replied, "I think they are all Blue Crosses" (*i.e.*, that they all have Blue Cross health insurance plans). Owner 2 asked CHS-1 if he/she (CHS-1) was receiving any money for placing MOORE's clients with Owner 2. Initially, CHS-1 denied it but later asked Owner 2 to give him $500 for each patient. Owner 2 agreed to pay $4,500 for each patient. CHS-1 asked if Owner 2 could pay MOORE directly rather than through CHS Business A. Owner 2 agreed. They continued to discuss each patient and how much Owner 2 was to pay CHS-1 for referring them. CHS-1 asked Owner 2 to pay MOORE an additional $4,000. I understand from speaking with CHS-1 that CHS-1 owed that amount to MOORE for another patient who had been brokered, and CHS-1 was thus asking Owner 2 to pay an extra $4,000 to MOORE on CHS-1's behalf, and to reduce payment to CHS-1 by the same amount, as a way of CHS-1 paying the debt. CHS-1 told Owner 2 that CHS-1 owed MOORE that much for another of MOORE's clients that CHS-1 had placed in different facility. Owner 2 agreed and then summed up the amounts agreed to for the clients as MOORE would get $16,000 and CHS-1 would get $25,000. Owner 2 then continued the discussion, negotiating deductions from the amount owed to CHS-1 because of lower-than-expected payments from insurance companies for clients previously referred to STONE RIDGE by CHS-1. This discussion did not

include any deductions from the amount STONE RIDGE was to pay MOORE.

**E.    Communication with MOORE**

38.    On October 1, 2020, CHS-1 had a conversation with MOORE through text messages.  MOORE texted CHS-1 from a telephone number that CHS-1 used to speak with Moore during consensually monitored calls.  The text messages concerned clients that MOORE referred to facilities through CHS-1.  Some of the text messages regarded the law enforcement activity that had occurred in this investigation, as described above.  CHS-1 told MOORE that he has been "laying low" as a result.  MOORE wanted CHS-1 to pay him for his clients.  MOORE then sent a list of the clients to CHS-1.  Below I have included the text messages without correcting any typographical errors, but I have abbreviated the patient names.  The text messages said:

> MOORE: "Yo call me when you can // Hit me back. Can we settle soon? // I'm overdue on more than a few"
>
> CHS-1: "Yea. I gotta go meet [Owner 2 of STONE RIDGE] and then I got you"
>
> MOORE: "If I give you a list of clients I have in with you.  Can you tell me where they are? // Only 2 of my clients are at SR [*i.e.*, STONE RIDGE] // I have 5 clients in with you now. // Only two of them are at SR // I have [D.R.]. (SR) [J.]. (SR) [A.(1).]?  [A.(2)]? [P.]? // Those 3 clients I don't know where they are. Yo yo"
>
> CHS-1: "Waiting for [Owner 2 of STONE RIDGE] to get back to me so we can do numbers // But he's gonna cut you your own check // But I will call around to try to figure out where the rest of them are.  Which policies were they // And I think one is at [redacting facility name]"
>
> MOORE: "[D.R.] is a blue // He's at Stoneridge // [J.] is a blue // Stoneridge"

CHS-1: "Some are at landmark"

MOORE: "[A.(1)] is a multi"

CHS-1: "I believe and one at o[] v[] // Which one is that? She might be t[]. [redacted facility names]"

MOORE: "I have all low payers and [A.(1)]. I know for a fact is at [redacting facility name]. // Her admissions date is the 9/23 so we're chilling with her. // So [A.(1)]. – T[] [redacted facility name] 9/23 [J.] – Stoneridge 9/13 [D.] – Stoneridge 9/11 [A.(2)] -? 9/12 [P.] -? 9/18

39.  On October 2, 2020, immediately after CHS-1 finished his telephone conversation with Owner 2 discussed above, he called MOORE.  CHS-1 placed the call on speakerphone so I was able to overhear it.  The call was also consensually recorded. They discussed MOORE's clients and to which facility CHS-1 had placed them.  CHS-1 told MOORE that Owner 2 was going to send MOORE a wire payment which included $4,000 for each of MOORE's four clients plus another $4,000 to pay him what CHS-1 owed MOORE for another of MOORE's clients CHS-1 placed in a different facility.

a.  I reviewed the Anthem claims data for STONE RIDGE and LANDMARK and identified claims submitted by LANDMARK for two of the patients for whom I was able to obtain a full name from the communications with MOORE and Owner 2, A.M. and D.R.

b.  LANDMARK submitted claims to Anthem for A.M. with a starting date of service of September 19, 2020 and continued through September 27, 2020.  The claims were submitted on October 5, 2020, and Anthem paid only $500 on the claims. LANDMARK submitted claims to Anthem for D.R. with a starting date of service of September 11, 2020, and continued through

33

September 29, 2020. LANDMARK was paid by Anthem $15,600 on those claims. These claims are thus consistent with the above discussion in early October about patients sent to Owner 2's facilities, as they discussed funds owed for patients referred the prior month (September).

**F. Financial Analysis**

40. During this investigation, I obtained bank records from JP Morgan Bank for a checking account opened by MOORE in the name of his corporate entity, MOORE RECOVERY SOLUTIONS LLC, for the approximate time period of January 23, 2020, when the account was opened, until September 30, 2020. MOORE was the sole signatory on the account. A review of those records revealed that MOORE deposited checks from GET REAL and HEALING PATH DETOX. I also found one wire transfer from CHS-1's entity CHS Business A. In the debits to the account, I found money transfers to at least one patient identified in the conversations above, R.G., who was discussed during MOORE's meeting with Employee 3 of GET REAL. During the investigation into CHS-1 and CHS-2, I obtained financial records for accounts controlled by them, both in their own names and in the name of a corporate entities that they controlled. Analysis of subpoenaed financial records has shown that CHS-1, CHS-2, and MOORE have each received hundreds of thousands of dollars from various SUBJECT TREATMENT FACILITIES in the same approximate time frame. CHS-1 and CHS-2 admitted to me that these funds were paid to them by facilities in exchange for patient referrals. Since the deposits into MOORE's corporate account are similar to those

seen in CHS-1's and CHS-2's, I believe this confirms that MOORE is also engaged in body brokering and is being paid by facilities to do so.

41. Relevant to the financial analysis, during the investigation, I have identified corporations controlled by CHS-1, CHS-2, and MOORE:

a. From the State of Florida's Secretary of State, I obtained a copy of the Articles of Organization for an LLC held in CHS-1's name, which was incorporated on September 22, 2017. The records identify CHS-1 as the entity's manager.

b. From the State of Pennsylvania's Department of State, I obtained a copy of the Articles of Organization for CHS Business A, which was organized by CHS-1 on September 24, 2018.

c. From the State of California's Secretary of State, I obtained a copy of the Articles of Organization for MOORE RECOVERY SOLUTIONS LLC, which was organized by MOORE on December 30, 2019.

42. On January 23, 2020, MOORE opened checking account XXXX9621 at JP Morgan Chase Bank ("Chase 9621") under the name MOORE RECOVERY SOLUTIONS LLC. MOORE was the sole signatory on the account. Deposited into the account from approximately April 9, 2020, through September 30, 2020, were checks or wire transfers from GET REAL which totaled approximately $107,000 and from HEALING PATH DETOX totaling approximately $60,000. On August 21, 2020, a wire transfer from CHS Business A for $11,000 was credited to the account.

43.  During this investigation, I have obtained bank records for Wells Fargo Bank checking account XXXX3729 under the name GET REAL RECOVERY for the approximate time period of October 28, 2019 through February 28, 2021.  The signatories on the account were Owner 1 and Subject 2  This account was opened after Owner 1 and Subject 2 purchased GET REAL from the prior owners.  I found in the account activity additional payments made to MOORE RECOVERY SOLUTIONS during the approximate time period of October 1, 2020 through November 2020 that totaled approximately $210,000.  So, my investigation to date has found at least $317,000 paid to MOORE's LLC from GET REAL.

44.  While the bank records for MOORE RECOVERY SOLUTIONS that I have obtained thus far in the investigation do not reveal any deposits from STONE RIDGE RECOVERY, I have obtained bank records for STONE RIDGE RECOVERY through November 30, 2020.  Those records revealed that in October 2020, STONE RIDGE RECOVERY sent three wire transfers from its BofA 4782 account to MOORE RECOVERY SOLUTIONS' Chase 9621 account.  The first wire transfer for $16,000 was sent October 5, 2020.  (*I.e.*, the SUBJECT OFFENSE.)  The second wire transfer, for $20,000, was sent October 20, 2020, and the third wire transfer, for $5,500, was sent October 22, 2020.  I believe these transfers confirms that MOORE is engaged in body brokering and being paid by STONE RIDGE RECOVERY.

45.  During the investigation into CHS-1, I obtained bank records for his corporate entities from Wells Fargo Bank and Bank of America.  The Wells Fargo Bank records were for the

approximate time period of January 2015 through October 2019. When those accounts were closed, CHS-1 opened accounts at Bank of America, and I have obtained records for those accounts for the approximate time period of October 2019 through October 2020. CHS-1 was the sole signatory on all the accounts. I reviewed the deposited items into those accounts and found deposits from STONE RIDGE, GET REAL, and HEALING PATH DETOX totaling hundreds of thousands of dollars.

46. I reviewed the source of the funds deposited into these accounts and found credits from HEALING PATH DETOX, GET REAL, and STONE RIDGE. From STONE RIDGE, the deposits into all of CHS-1's accounts totaled approximately $710,500; from HEALING PATH DETOX the deposits totaled approximately $728,000; and from GET REAL the deposits totaled approximately $120,000.

47. Similar to what I observed in my investigation into CHS-1 and CHS-2, MOORE regularly made transfers using internet-based money transfer services, namely, Square, Venmo, Facebook Pay, and Zelle. These transfers were debited from his Chase 9621 account.

48. I identified one of the payees as a client that MOORE referred to GET REAL and for which it submitted claims for payment. Specifically, in MOORE's conversation with Employee 3 of GET REAL, they discuss MOORE's client R.G. who, according to UHG claims for R.G., was admitted to GET REAL from February 18, 2020, through March 6, 2020; from April 21, 2020, through June 29, 2020; from August 8, 2020, through August 15, 2020; and again from September 28, 2020, through at least October 9, 2020.

UHG paid GET REAL for the claims submitted for R.G. R.G. was in HEALING PATH DETOX from July 13, 2020, through August 6, 2020. HEALING PATH DETOX was paid approximately $82,520 on those claims. I observed that MOORE transferred money to R.G. from at least April 29, 2020, through September 22, 2020, totaling approximately $7,450.

49. I also observed that MOORE regularly withdrew large sums of cash from his account. Based on my training and experience, I know that body brokers also pay brokered patients in cash in addition to using money transfer services, and CHS-1 told me that he/she often did so. In September 2020, the cash withdrawals totaled approximately $42,500; in August 2020, approximately $48,500; in July 2020, approximately $10,000; and in June 2020, approximately $18,000.

### a. Basis for the SUBJECT OFFENSE – $16,000 Kickback to MOORE

50. Relevant to the SUBJECT OFFENSE charged in the complaint against MOORE, I observed that, on October 5, 2020, MOORE's account (held in the name MOORE RECOVERY SOLUTIONS LLC) received an electronic transfer of $16,000 from a checking account held in the name STONE RIDGE RECOVERY.

### G. Interview with Associate 1

51. During the investigation, my colleagues, SA Richard Pandis and SA Mark Malogrino, OPM-OIG, interviewed Associate 1, a former associate of MOORE's, during which Associate 1 stated the following:

a.   Associate 1 met MOORE in 2016 while both were residing in a sober living facility.  Associate 1 learned about body brokering while residing in sober homes and decided to go into the body brokering business with MOORE.  Associate 1 helped MOORE recruit individuals and assisted with making travel arrangements for those individuals to travel to California.  MOORE placed them into facilities in exchange for payment.  One of those facilities was HEALING PATH.  MOORE paid Associate 1 for the clients he/she recruited.

b.   MOORE recruited one of Associate 1's friends who came to California and later died of drug overdose.  The friend, A.H., sent Associate 1 a text message, telling him/her that "D" had recruited him and he was flying to California to enter a facility.  Associate 1 believed that "D" referred to MOORE (*i.e.*, by the initial of his first name, Darius).  Associate 1 felt some guilt about A.H.'s death, stating that if he/she had known that A.H. was being recruited by MOORE, he/she would have intervened to try to get A.H. into a safer environment that the one that MOORE would place him in.

52.   I reviewed the claims data received during this and other investigations to determine what facility A.H. may have attended.  I did not find his name in any of the claims data but I obtained claims data for specific facilities.  From a review of MOORE's bank records, he deposited checks from facilities for which I do not have claims data.  So, A.H. may have attended a facility for which I do not have claims data.

**H.    Interview with Former Associate 2**

53.    During the investigation, SA Pandis and SA Malogrino interviewed Associate 2, a former associate of MOORE's, during which Associate 2 stated the following:

a.    Associate 2 came to California in 2016 to enter an addiction treatment facility.  After finishing his/her own treatment, Associate 2 stayed in California and was paid by facilities when he/she referred others.  In 2019, the facilities started to pay more to brokers who were actively engaged in efforts to locate and refer patients to facilities.  The facilities wanted the brokers to form corporate entities that could be paid for the referrals.

b.    Associate 2 met MOORE through another broker. Associate 2 started to work with MOORE and the two of them then met [CHS-2's first name], another body broker who worked for GET REAL and HEALING PATH.  (Associate 2 could not remember that person's last name but I believe, based on the information Associate provided, that he/she was referring to CHS-2.)

c.    MOORE and Associate 2 referred brokered patients to GET REAL and HEALING PATH and were paid $20,000 a month for finding and referring patients to those facilities.  Associate 2 said that the facilities' owner "[Owner 1 first name]" (*i.e.*, Owner 1) gave them a monthly quota of patients to refer for the $20,000.  Associate 2 explained that the quota varied between five to eight patients, depending on the patient's level of addiction.  (I believe Associate 2 is referring to the level of

40

care that the patient's insurance would authorize because of the addiction, *i.e.*, detox, PHP, or IOP.)

    d.   Associate 2 and MOORE paid the clients they referred from the funds received from the facilities.  Associate 2 said that the clients were generally paid $500 per week.  Associate 2 explained that amount was "standard" and the standard had been set by "[CHS-1's first name]."  (I believe Associate 2 is referring to CHS-1).

54.   Associate 2 stopped working with MOORE and eventually left California.  In November 2020, Associate 2 heard from others that MOORE was attempting to replace CHS-1 who was "on the run from law enforcement."

**I.   December 2020 Search Warrants**

55.   On December 15, 2020, investigators in this matter executed search warrants at MOORE's residence and vehicle, and the warrants were previously issued by the Hon. John D. Early, United States Magistrate Judge.  (Case Nos. 20-MJ-864 and -866.)  Judge Early also issued a search warrant for another vehicle believed to belong to MOORE, but investigators were unable to locate it and thus did not execute that warrant.  (Case No. 20-MJ-865.)  On the same date, investigators also executed search warrants for HEALING PATH DETOX (Case No. 20-MJ-872), and for the business office of LANDMARK and STONE RIDGE (Case No. 20-MJ-896), each issued by the Hon. Karen E. Scott, United States Magistrate Judge.  MOORE was encountered at HEALING PATH DETOX on the date of the search.  Investigators subsequently obtained a further search warrant for a cellular telephone found on

41

MOORE's person during that encounter, also issued by the Hon. Karen E. Scott, United States Magistrate Judge. (Case No. 20-MJ-892.)

56. I am aware of the following, among other things, regarding execution of those search warrants.

a. During the search of MOORE's residence, agents found executed marketing agreements between MOORE RECOVERY and GET REAL RECOVERY under which MOORE was to provide marketing and advertising services to GET REAL RECOVERY. Under the first agreement, dated February 15, 2020, GET REAL was to pay MOORE $12,000 per month. Under the second agreement, dated October 1, 2020, the monthly amount was increased to $70,000 per month. Owner 1 signed the agreements on behalf of GET REAL and MOORE signed on behalf of MOORE RECOVERY.

b. Additionally, agents found another marketing agreement, dated May 1, 2020, between HEALING PATH DETOX and MOORE RECOVERY SOLUTIONS under which HEALING PATH DETOX paid $10,000 per month for marketing services. This agreement was also signed by Owner 1 on behalf of HEALING PATH DETOX.

c. The terms of the agreements were essentially the same — MOORE was to market and advertise the company to health care providers, employers, and other individuals who were legally authorized to refer clients or recommend the company's services or to potential clients seeking addiction treatment.

d. During the search of the residence and MOORE's vehicle, agents did not find any documents, literature, or other items that investigators recognized as indicating MOORE was

engaged in active legitimate marketing efforts. I reviewed the
results of the forensic examination of a laptop and desktop
computer found in MOORE's residence. I did not find any
documents regarding marketing efforts or any documents I would
expect to find if an individual is running a business. For
example, I did not find any lead sheets, telephone call sheets,
invoices, or any other documentation that one would expect to
find if legitimate marketing efforts were being conducted. I
also did not find any business documents such as account
payables, account receivables, or any other accounting documents
I would expect to find if either the laptop or computer were
being used by someone running a business.

57.  The forensic search of MOORE's cellphone is ongoing
and being conducted by SA Malogrino. I know from this
investigation and from information provided to me from CHS-1 and
CHS-2 that brokers obtain copies of client's identification and
insurance cards and then send them via text message to employees
at the facilities. The employees then have the client's
insurance benefits checked prior to agreeing to accept the
client.

58.  In addition to the identification and health insurance
cards, SA Malogrino found text messages that appear to be from
patients to MOORE asking for money and asking to be placed in
treatment. SA Malogrino also found text messages from patients
to MOORE asking for money and asking to be placed in treatment
where MOORE told the patients he would only talk to them through
the encrypted communication application known as Signal. The

below excerpt on December 8, 2020, is from D[] to MOORE

discussing placement of D[] and E[]. (Last names for D[] and

E[] were not used in the message and, thus, at this point in the

investigation they have not been identified.)

> D: yo darius its [D]. they kicked me out for no
> reason bro

> D: just because of word by mouth

> MOORE: You good g?

> D: yo darius. My boy and [E] need to go back to
> treatment. he has aetna

> MOORE: Send over his info my boy

> D: Aetna w[XXX]

> D: DOB [XX/XX/XX]

> D: his dads^

> D: his dob is [XX/XX/XX]

> MOORE: When is he ready?

> D: yo im tryna go in with him though

> D: we can stay out for a little though, he has some
> money. but I would only need money for the hotel room.
> Feel me?

> D: like after his bread runs out…

> D: so whats the deal bro. do you have fb messenger
> [Facebook Messenger], it wont let me use sig [Signal]

> MOORE: That's the only thing I talk on.

> MOORE: Signal.

59.   During the search of MOORE's cellphone, SA Malogrino

also found two lists of names in the phone's Notes application.

The first list, created on November 4, 2020, contains 33 first

names followed by what I believe to be intake and discharge

dates from addiction treatment facilities.  The second list, created on December 1, 2020, contains 42 names, some first and last name, some first name only, and what I believe to be intake/discharge dates and insurance providers.  Two names on the second list, A.S. and J.P., were previously identified during this investigation as patients brokered by MOORE.

### IV.  CONCLUSION

For all the reasons described above, I submit there is probable cause to believe that MOORE has committed a violation of Title 18, United States Code, Section 220(a)(1) as described in paragraph 6 above.

/s/
_____
Special Agent Kathleen Kennedy
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 29th day of
March, 2021.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE