1  Marc S. Williams (Bar No. 198913)
   Email: mwilliams@cohen-williams.com
2  Reuven L. Cohen (Bar. No 231915)
   Email: rcohen@cohen-williams.com
3  Kathleen M. Erskine (Bar No. 223218)
   Email: kerskine@cohen-williams.com
4  Joseph E. Saei (Bar No. 321341)
   Email: ysaei@cohen-williams.com
5  COHEN WILLIAMS LLP
   724 South Spring Street, 9th Floor
6  Los Angeles, CA 90014
   Telephone: (213) 232-5160
7  Facsimile: (213) 232-5167

8  Attorneys for Defendants and Counterclaimants
   Nathan Young, David Young, Get Real
9  Recovery, Inc., Healing Path Detox LLC,
   Ocean Valley Behavioral Health, LLC, Rodeo
10 Recovery LLC, Sunset Rehab LLC, Natural
   Rest House, Inc., 55 Silver LLC, 9 Silver LLC,
11 Helping Hands Rehabilitation Clinic Inc., and
   Joser Forever LLC

12

13              UNITED STATES DISTRICT COURT

14     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16
   AETNA LIFE INSURANCE COMPANY,     Case No. 2:23-cv-09654-MCS-JPR
17 AETNA HEALTH OF CALIFORNIA,
   INC.,                             **YOUNG DEFENDANTS' ANSWER
18                                    TO AMENDED COMPLAINT AND
                                      COUNTERCLAIMS**
19           Plaintiffs,
                                      **DEMAND FOR JURY TRIAL**
20        v.

21 NATHAN SAMUEL YOUNG a/k/a          Judge:  Hon. Marc C. Scarsi
22 PABLO LOPEZ; DAVID YOUNG a/k/a     Trial Date:      Not Set
   SANCHO LOPEZ; JOSE RICARDO
23 TOSCANO MALDONADO; ALI
   BEHESHTI; MARC ADLER; ANI
24 MIRZAVAN; ZEALIE LLC; HELPING
   HANDS REHABILITATION CLINIC
25 INC; JOSER FOREVER LLC, GET
   REAL RECOVERY LLC; REVIVE
26 PREMIER TREATMENT CENTER,
27 INC.; HEALING PATH DETOX LLC;
28

COHEN WILLIAMS LLP

OCEAN VALLEY BEHAVIORAL HEALTH, LLC; RODEO RECOVERY LLC; SUNSET REHAB LLC; NATURAL REST HOUSE, INC; 55 SILVER LLC, 9 SILVER LLC; JOHN DOES 1 THROUGH 50, AND ABC CORPS. 1-50,

          Defendants.

GET REAL RECOVERY, INC.; HEALING PATH DETOX LLC; OCEAN VALLEY BEHAVIORAL HEALTH, LLC; SUNSET REHAB LLC; HELPING HANDS REHABILITATION CLINIC, INC. AND JOSER FOREVER LLC,

          Counterclaimants,

    v.

AETNA LIFE INSURANCE COMPANY; AETNA HEALTH OF CALIFORNIA, INC.; DAVID ERICKSON; ROES 1-10,

          Counterdefendants.

YOUNG DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Defendants Nathan Young, David Young, Get Real Recovery, Inc. (erroneously sued as Get Real Recovery, LLC), Healing Path Detox LLC, Ocean Valley Behavioral Health, LLC, Rodeo Recovery LLC, Sunset Rehab LLC, Natural Rest House, Inc., 55 Silver LLC, 9 Silver LLC, Helping Hands Rehabilitation Clinic Inc., and Joser Forever LLC (collectively, the "Young Defendants") answer the First Amended Complaint of Plaintiffs Aetna Life Insurance Company and Aetna Health of California, Inc. (collectively, "Aetna"). If an averment is not specifically admitted, it is hereby denied.

As a preliminary matter, the First Amended Complaint contains references to documents and third-party publications and statements that have often been excerpted, paraphrased, characterized, and otherwise taken out of context. These documents and third-party publications and statements should be considered in context and in unmodified form, and Young Defendants respectfully refer the Court to the respective materials for their accurate and complete contents.

Young Defendants expressly reserve, and do not waive, the right to amend and supplement this Answer, including to assert any further counterclaims or crossclaims, as may be appropriate or necessary, consistent with applicable rules and the Court's orders. Young Defendants incorporate the foregoing by reference into each of the following specific responses to each allegation of the First Amended Complaint.

## ANSWER TO AMENDED COMPLAINT

1. Young Defendants deny the allegations in Paragraph 1.

2. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2. Young Defendants reserve all rights.

3. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3. Young Defendants reserve all rights.

4. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4. Young Defendants reserve all rights.

5. Young Defendants deny the allegations in Paragraph 5.

6.   Young Defendants deny the allegations in Paragraph 6.

7.   Young Defendants deny the allegations in Paragraph 7.

8.   Young Defendants deny the allegations in Paragraph 8.

9.   Young Defendants deny the allegations in Paragraph 9.

10.   Young Defendants deny the allegations in Paragraph 10.

11.   Young Defendants deny the allegations in Paragraph 11.

12.   Paragraph 12 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.

13.   Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 13.  Young Defendants reserve all rights.

14.   Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14.  Young Defendants reserve all rights.

15.   Paragraph 15 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.

16.   Young Defendants admit that Defendant Nathan Young is an individual and citizen of California residing in Los Angeles County.  Young Defendants deny the remaining allegations in Paragraph 16.

17.   Young Defendants admit that Defendant David Young is an individual and citizen of California residing in Los Angeles County and a family member of Nathan Young.  Young Defendants deny the remaining allegations in Paragraph 17.

18.   Young Defendants admit that Maldonado is an individual and citizen of California residing in Los Angeles County.  Young Defendants deny the remaining allegations in Paragraph 18.

19.   Young Defendants admit that Adler is an individual and citizen of California residing in Los Angeles County.  Young Defendants deny the remaining allegations in Paragraph 19.

20.     Young Defendants deny the allegations in Paragraph 20.

21.     Young Defendants admit that Helping Hands is a corporation formed under the laws of California.  Young Defendants deny the remaining allegations in Paragraph 21.

22.     Young Defendants admit that Joser Forever is a limited liability company formed under the laws of California with a principal place of business at 1436 S. La Cienega Blvd., Los Angeles, California.  Young Defendants deny the remaining allegations in Paragraph 22.

23.     Young Defendants admit that Get Real Recovery, Inc. (erroneously sued as Get Real Recovery, LLC) ("Get Real"), has a principal place of business at 30290 Rancho Viejo Rd., Suite 204, San Juan, Capistrano, California.  Young Defendants admit that Get Real was sold to Nathan Young.  Young Defendants either deny or are without sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 23.

24.     Young Defendants admit that Healing Path is a limited liability company formed under the laws of California with a principal place of business at 7661 Amberleaf Circle, Unit #1, Huntington Beach, California.  Young Defendants admit that Nathan Young is a member of Healing Path.  Young Defendants either deny or are without sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 24.

25.     Young Defendants admit the allegations in Paragraph 25.

26.     Young Defendants admit the allegations in Paragraph 26.

27.     Young Defendants admit the allegations in Paragraph 27.

28.     Young Defendants admit the allegations in Paragraph 28.

29.     Young Defendants admit the allegations in Paragraph 29.  The principal place of business of 9 Silver LLC is 1800 North Vine St., Los Angeles, California 90028.

30.     Young Defendants admit the allegations in Paragraph 30.  The principal place of business of 55 Silver LLC is 1800 North Vine St., Los Angeles, California 90028.

31.     Young Defendants deny the allegations in Paragraph 31.

32.     Young Defendants deny the allegations in Paragraph 32.

33.    Young Defendants admit that at times they used Gusto, Inc. to manage payroll.

34.    Young Defendants admit that 9 Silver and 55 Silver entered into leases for sober living homes.  Young Defendants deny the remaining allegations in Paragraph 34.

35.    Young Defendants deny the allegations in Paragraph 35.

36.    Young Defendants deny the allegations in Paragraph 36.

37.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37.  Young Defendants reserve all rights.

38.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38.  Young Defendants reserve all rights.

39.    Young Defendants deny the allegations in Paragraph 39.

40.    Young Defendants admit that Defendant Zealie provided administrative billing services to Helping Hands, Get Real, Healing Path, Sunset Rehab, and Ocean Valley and handled the submission of claim forms for these entities.  Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations regarding Defendant Zealie's corporate structure or principal place of business. Young Defendants deny the remaining allegations in Paragraph 40.

41.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations regarding Ali Beheshti's citizenship or place of residence.  Young Defendants deny the remaining allegations in Paragraph 41.

42.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 42.  Young Defendants reserve all rights.

43.    Young Defendants deny the allegations in Paragraph 43.

44.    Paragraph 44 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.

COHEN WILLIAMS LLP

45.    Paragraph 45 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.  To the extent a response is required, Young Defendants deny the allegations in Paragraph 45.

46.    Paragraph 46 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.  To the extent a response is required, Young Defendants deny the allegations in Paragraph 46.

47.    Young Defendants deny the allegations in Paragraph 47.

48.    Young Defendants deny the allegations in Paragraph 48.

49.    Young Defendants deny the allegations in Paragraph 49.

50.    Young Defendants deny the allegations in Paragraph 50.

51.    Young Defendants admit the allegations in Paragraph 51.

52.    Young Defendants admit the allegations in Paragraph 52.

53.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 53.  Young Defendants reserve all rights.

54.    Young Defendants admit the allegations in Paragraph 54.

55.    Young Defendants admit that healthcare providers submit insurance claims forms such as CMS 1500 or HCFA forms and that providers use numerical codes as maintained by the American Medical Association's Current Procedural Terminology ("CPT") and the CMS Healthcare Common Procedure Coding System ("HCPCS") and that treatment, diagnosis, and location of service information submitted on such forms must be accurate.   Except as expressly admitted, the remaining allegations in Paragraph 55 are denied.

56.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56.  Young Defendants reserve all rights.

57.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57.  Young Defendants reserve all rights.

58.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58.  Young Defendants reserve all rights.

59.    Young Defendants admit that in-network providers have entered into "network contracts" with Aetna setting the rates for services.  Young Defendants are without sufficient knowledge or information to form a belief as to the remaining allegation in Paragraph 59.  Young Defendants reserve all rights.

60.    Young Defendants deny or are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 60.  Young Defendants reserve all rights.

61.    Young Defendants deny or are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 61.  Young Defendants reserve all rights.

62.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 62.  Young Defendants reserve all rights.

63.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 63.  Young Defendants reserve all rights.

64.    Young Defendants admit the allegations in Paragraph 64.

65.    Young Defendants deny the allegations in Paragraph 65.

66.    Young Defendants admit that below the in-patient level of care, there are three levels of care, outpatient ("OP"), intensive outpatient ("IOP"), and partial hospitalization ("PHP").  Except as expressly admitted, the allegations in Paragraph 66 are denied.

67.    Young Defendants deny the allegations in Paragraph 67.

68.    Young Defendants deny the allegations in Paragraph 68 to the extent that they purport to apply general statements to all substance use disorder treatment, which is highly individualized.

69.    Young Defendants admit the allegations in Paragraph 69.

70.    Young Defendants deny the allegations in Paragraph 70.

71.    Young Defendants deny the allegations in Paragraph 71.

72.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 72.  Young Defendants reserve all rights.

73.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 73.

74.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 74.

75.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 75.

76.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 76.

77.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 77.

78.    Young Defendants deny the allegations in Paragraph 78.

79.    Young Defendants deny the allegations in Paragraph 79.

80.    Young Defendants deny the allegations in Paragraph 80.

YOUNG DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

81.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 81.

82.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 82.

83.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 83.

84.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 84.

85.     Young Defendants deny the allegations in Paragraph 85.

86.     Young Defendants deny the allegations in Paragraph 86.

87.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 87.

88.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 88.

89.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 89.

90.     Young Defendants deny the allegations in Paragraph 90.

91.     Young Defendants deny the allegations in Paragraph 91.

92.     Young Defendants deny the allegations in Paragraph 92.

93.     Young Defendants deny the allegations in Paragraph 93.

COHEN WILLIAMS LLP

94.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 94.

95.     Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 95.

96.     Young Defendants admit that the City of Beverly Hills filed the action referred to therein and otherwise deny the characterizations of the action, the allegations made in the referenced complaints, and all remaining allegations in Paragraph 96.

97.     Young Defendants deny the allegations in Paragraph 97.

98.     Young Defendants deny the allegations in Paragraph 98.

99.     Young Defendants deny the allegations in Paragraph 99.

100.    Young Defendants deny the allegations in Paragraph 100.

101.    Young Defendants deny the allegations in Paragraph 101.

102.    Young Defendants deny the allegations in Paragraph 102.

103.    Young Defendants deny the allegations in Paragraph 103.

104.    Young Defendants deny the allegations in Paragraph 104.

105.    Young Defendants deny the allegations in Paragraph 105.

106.    Young Defendants deny the allegations in Paragraph 106.

107.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegation that Beheshti is the founder of Defendant Zealie. Young Defendants deny the remaining allegations in Paragraph 107 in the absence of allegations as to the scope of the alleged agency.

108.    Young Defendants deny the allegations in Paragraph 108.

109.    Young Defendants deny the allegations in Paragraph 109.

110.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 110.  Young Defendants reserve all rights.

111.    Young Defendants deny the allegations in Paragraph 111.

112.    Young Defendants deny the allegations in Paragraph 112.

113.    Young Defendants deny the allegations in Paragraph 113.

114.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 114 that Zealie's website made the statement quoted.  Young Defendants admit that Young did not have knowledge or experience regarding billing and insurance reimbursement and looked to Beheshti as a consultant.  Young Defendants deny the remaining allegations in Paragraph 114.

115.    Young Defendants deny the allegations in Paragraph 115.

116.    Young Defendants deny the allegations in Paragraph 116.

117.    Young Defendants deny the allegations in Paragraph 117.

118.    Young Defendants deny the allegations in Paragraph 118.

119.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 119.  Young Defendants reserve all rights.

120.    Young Defendants deny the allegations in Paragraph 120.

121.    Young Defendants deny the allegations in Paragraph 121.

122.    Young Defendants deny the allegations in Paragraph 122.

123.    Young Defendants deny the allegations in Paragraph 123.

124.    Young Defendants deny the allegations in Paragraph 124.

125.    Young Defendants deny the allegations in Paragraph 125.

126.    Young Defendants deny the allegations in Paragraph 126.

127.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 127.  Young Defendants reserve all rights.

128.    Young Defendants deny the allegations in Paragraph 128.

129.    Young Defendants deny the allegations in Paragraph 129.

130.    Young Defendants deny the allegations in Paragraph 130.

COHEN WILLIAMS LLP

131. Young Defendants deny the allegations in Paragraph 131.

132. Young Defendants deny the allegations in Paragraph 132.

133. Young Defendants deny the allegations in Paragraph 133.

134. Young Defendants deny the allegations in Paragraph 134.

135. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

136. Young Defendants deny the allegations in Paragraph 136.

137. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 137.  Young Defendants reserve all rights.

138. Young Defendants deny the allegations in Paragraph 138.

139. Young Defendants deny the allegations in Paragraph 139.

140. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants.  Young Defendants deny the remaining allegations in Paragraph 140.

141. Young Defendants deny the allegations in Paragraph 141.

142. Young Defendants deny the allegations in Paragraph 142.

143. Young Defendants deny the allegations in Paragraph 143.

144. Young Defendants deny the allegations in Paragraph 144.

145. Young Defendants deny the allegations in Paragraph 145.

146. Young Defendants deny the allegations in Paragraph 146.

147. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

148. Young Defendants deny the allegations in Paragraph 148.

149. Young Defendants deny the allegations in Paragraph 149.

150. Young Defendants deny the allegations in Paragraph 150.

151. Young Defendants deny the allegations in Paragraph 151.

COHEN WILLIAMS LLP

152. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

153. Young Defendants deny the allegations in Paragraph 153.

154. Young Defendants deny the allegations in Paragraph 154.

155. Young Defendants deny the allegations in Paragraph 155.

156. Young Defendants deny the allegations in Paragraph 156.

157. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

158. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 158. Young Defendants reserve all rights.

159. Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations related to Revive Defendants. Young Defendants deny the remaining allegations in Paragraph 159.

160. Young Defendants admit the allegations in Paragraph 160.

161. Young Defendants deny the allegations in Paragraph 161.

162. Young Defendants deny the allegations in Paragraph 162.

163. Young Defendants deny the allegations in Paragraph 163.

164. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

165. Young Defendants deny the allegations in Paragraph 165.

166. Young Defendants deny the allegations in Paragraph 166.

167. Paragraph 167 does not include any factual allegations and no response is required under Rule 8(b) of the Federal Rules of Civil Procedure.

168. Young Defendants deny the allegations in Paragraph 168.

169. Young Defendants deny the allegations in Paragraph 169.

170. Young Defendants deny the allegations in Paragraph 170.

171. Young Defendants deny the allegations in Paragraph 171.

COHEN WILLIAMS LLP

172. Young Defendants deny the allegations in Paragraph 172.

173. Young Defendants deny the allegations in Paragraph 173.

174. Young Defendants deny the allegations in Paragraph 174.

175. Young Defendants deny the allegations in Paragraph 175.

176. Young Defendants deny the allegations in Paragraph 176.

177. Young Defendants deny the allegations in Paragraph 177.

178. Young Defendants deny the allegations in Paragraph 178.

179. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

180. Young Defendants deny the allegations in Paragraph 180.

181. Young Defendants deny the allegations in Paragraph 181.

182. Young Defendants deny the allegations in Paragraph 182.

183. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

184. Young Defendants deny the allegations in Paragraph 184.

185. Young Defendants deny the allegations in Paragraph 185.

186. Young Defendants deny the allegations in Paragraph 186.

187. Young Defendants deny the allegations in Paragraph 187.

188. Young Defendants deny the allegations in Paragraph 188.

189. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

190. Young Defendants deny the allegations in Paragraph 190.

191. Young Defendants deny the allegations in Paragraph 191.

192. Young Defendants deny the allegations in Paragraph 192.

193. Young Defendants deny the allegations in Paragraph 193.

194. Young Defendants deny the allegations in Paragraph 194.

195. Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

196.    Young Defendants deny the allegations in Paragraph 196.

197.    Young Defendants deny the allegations in Paragraph 197.

198.    Young Defendants deny the allegations in Paragraph 198.

199.    Young Defendants deny the allegations in Paragraph 199.

200.    Young Defendants deny the allegations in Paragraph 200.

201.    Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

202.    Young Defendants are without sufficient knowledge or information to form a belief as to whether Aetna, as defined in the First Amended Complaint, is a fiduciary within the meaning of Section 502(a)(3) as to any particular claim(s) at issue in this case.  Young Defendants deny the remaining allegations in Paragraph 202.

203.    Young Defendants admit that they obtained assignments of benefits from Aetna members.  Young Defendants deny the remaining allegation in Paragraph 203 as phrased in the First Amended Complaint.

204.    Young Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 204.  Young Defendants reserve all rights.

205.    Young Defendants deny the allegations in Paragraph 205.

206.    Young Defendants deny the allegations in Paragraph 206.

207.    Young Defendants deny the allegations in Paragraph 207.

208.    Young Defendants deny the allegations in Paragraph 208.

209.    Young Defendants restate and incorporate by reference their above answers to the allegations in Paragraphs 1 through 134.

210.    Young Defendants admit the allegation in Paragraph 210.

211.    Young Defendants deny the allegations in Paragraph 211.

212.    Young Defendants deny the allegations in Paragraph 212.

213.    Young Defendants deny that the Plaintiffs are entitled to any of the relief they seek in the Prayer for Relief.

**AFFIRMATIVE DEFENSES**

Young Defendants allege the affirmative defenses set forth below. By such pleading, Young Defendants do not waive, excuse, or alter the burden of proof and/or burden of going forward with the evidence that otherwise exists with respect to any particular issue of law or in equity. Furthermore, all affirmative defenses are pled in the alternative, and do not constitute an admission of liability or an admission as to whether Plaintiffs are entitled to any relief whatsoever. Young Defendants also do not waive any affirmative defenses and reserve the right to assert any and all affirmative defenses that may be available after reasonable discovery.

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

1.     The Amended Complaint fails to state facts sufficient to constitute a cause of action.

**SECOND AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

2.     Aetna's claims are time-barred, in whole or in part, under the applicable statutes of limitations and/or statutes of repose.

**THIRD AFFIRMATIVE DEFENSE**

**(No Standing)**

3.     Aetna's claims are barred, in whole or in part, because Aetna lacks standing to bring its claims.

**FOURTH AFFIRMATIVE DEFENSE**

**(No Subject Matter Jurisdiction)**

4.     Aetna's claims are barred, in whole or in part, for lack of subject matter jurisdiction.

YOUNG DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

COHEN WILLIAMS LLP

1

## FIFTH AFFIRMATIVE DEFENSE

2

### (Failure to Plead with Particularity)

3

5.      The First Amended Complaint is barred, in whole or in part, because it fails

4

to comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil

5

Procedure.

6

## SIXTH AFFIRMATIVE DEFENSE

7

### (Alleged Violations Caused by Others)

8

6.      Any alleged violations were fully or partially caused by the acts or omissions

9

of persons/entities other than Young Defendants, including the other Young Defendants.

10

## SEVENTH AFFIRMATIVE DEFENSE

11

### (ERISA Preemption)

12

7.      The First Amended Complaint is barred on the basis of ERISA preemption to

13

the extent the claims for which Aetna seeks relief are governed by ERISA.

14

## EIGHTH AFFIRMATIVE DEFENSE

15

### (Laches, Waiver, and/or Estoppel)

16

8.      The First Amended Complaint is barred, in whole or in part, by the doctrines

17

of laches, waiver, and/or estoppel.

18

## NINTH AFFIRMATIVE DEFENSE

19

### (Consent)

20

9.      The First Amended Complaint is barred, in whole or in part, because the

21

matters alleged in the First Amended Complaint as they pertain to Young Defendants were

22

authorized, consented to, and/or ratified, and thus Aetna is precluded and barred from

23

asserting any such claim against Young Defendants.

24

## TENTH AFFIRMATIVE DEFENSE

25

### (Lack of Materiality)

26

10.     The First Amended Complaint is barred, in whole or in part, because any

27

alleged misrepresentation and/or omission was not material.

28

COHEN WILLIAMS LLP

## ELEVENTH AFFIRMATIVE DEFENSE

### (Indemnification)

11.    If Aetna recovers a verdict against Young Defendants, then Young Defendants are entitled to indemnification and/or contribution from any person or entity that contributed to the alleged violations of the law.

## TWELFTH AFFIRMATIVE DEFENSE

### (Good Faith)

12.    Aetna is barred from recovery and/or relief by virtue of the fact that Young Defendants acted in good faith at all pertinent times.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (No Causation)

13.    The First Amended Complaint is barred, in whole or in part, because Aetna cannot establish that the alleged damages and/or injuries were caused and/or proximately caused by the alleged acts and/or omissions of Young Defendants.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (No Reliance)

14.    The First Amended Complaint is barred, in whole or in part, because Aetna cannot establish that it reasonably relied on any purported false statements and/or omissions by Young Defendants.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (No Damages)

15.    The First Amended Complaint is barred, in whole or in part, because Aetna cannot establish that any damages and/or injuries were the result of any alleged actions, representations, and/or omissions by Young Defendants.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (No Equitable Monetary Relief)

16.    The First Amended Complaint is barred, in whole or in part, because Aetna is not entitled to any equitable monetary relief, including restitution or disgorgement, as a

COHEN WILLIAMS LLP

result of any alleged actions taken by Young Defendants.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (No Injunctive Relief)

17.     The First Amended Complaint is barred, in whole or in part, because Aetna cannot establish that there is an inadequate remedy at law, that there is a risk of interim or irreparable harm absent injunctive relief, that any conduct sought to be enjoined is likely to be repeated in the future, and/or that there is a likelihood of prevailing on the merits.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

18.     The First Amended Complaint is barred, in whole or in part, on the basis that Aetna seeks relief from the court with unclean hands.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

19.     Young Defendants have insufficient knowledge or information upon which to form a belief as to whether additional affirmative defenses are available.   Young Defendants reserve the right to raise such additional affirmative defenses, and to amend existing affirmative defenses, upon receiving more complete information regarding the matters alleged in the Amended Complaint, through discovery or otherwise.

WHEREFORE, Young Defendants pray for relief as follows:

1.     That the First Amended Complaint be dismissed, with prejudice and in its entirety;

2.     That Aetna take nothing by reason of the First Amended Complaint and that judgment be entered against Aetna and in favor of Young Defendants;

3.     That Young Defendants be awarded their costs incurred in defending this action; and

4.     That Young Defendants be granted such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Young Defendants hereby respectfully demand a jury trial.

**COUNTERCLAIMS**

Defendants and Counterclaimants Get Real Recovery, Inc. (erroneously named as Get Real Recovery LLC) ("Get Real Recovery"), Healing Path Detox LLC ("Healing Path"), Ocean Valley Behavioral Health, LLC ("Ocean Valley"), Sunset Rehab LLC ("Sunset Rehab"), Helping Hands Rehabilitation Clinic, Inc. ("Helping Hands"), and Joser Forever LLC ("Joser Forever") (collectively "Counterclaimants" and sometimes referred to collectively as "Providers"), by and through their undersigned counsel, bring the following counterclaims against Plaintiffs and Counterdefendants Aetna Life Insurance Company and Aetna Health of California, Inc. (collectively "Aetna") and Counterdefendant David Erickson, and in support of the following claims for relief, allege as follows:

**INTRODUCTION**

1.    In addiction treatment, more is generally better. Decades of research point to longer treatment as the number one predictor of a successful addiction treatment outcome.

2.    Aetna, one of America's largest health insurance companies, disagrees. Aetna believes—contrary to the evidence and to common sense—that less is more when it comes to addiction treatment.

3.    Why? Because that way Aetna (and/or the plans it administers) keep more money. Addiction treatment services can be expensive and typically involve medication, therapy, and, at higher levels of care, supervision in a controlled environment with regular check-ins from a healthcare professional. Recovery from addiction, by nature, is nonlinear, often involving relapse and a concomitant need to reenter treatment after a period out of treatment.

4.    Aetna knows that erecting obstacles to addiction treatment will result in less treatment, meaning less cost to Aetna and plan sponsors. But addicted individuals who receive less treatment are more likely to fall deeper into addiction, to give up on recovery

altogether, to lose their jobs, and to lose their private health insurance. They are at greater risk of becoming houseless and even dying. They are a problem for government healthcare, for first responders, and for local emergency rooms, not Aetna.

5.     Counterclaimants have, since July 2020, provided invaluable addiction treatment services to individuals in Southern California, including many Aetna enrollees. After thorough intakes and screenings, Counterclaimants provided Aetna enrollees with high quality treatment and services to help them beat addiction.

6.     Counterclaimants are healthcare providers on the front lines. They understand that addicted individuals need lower barriers to treatment and often require multiple episodes of treatment before they can consistently maintain their sobriety.

7.     Counterclaimants employ treating doctors, nurses, and therapists—licensed professionals sworn to protect and to treat people suffering with mental health illness and substance use disorder (hereinafter "MH/SUD"). Counterclaimants provide only medically necessary treatment to their clients.

8.     In late 2022, Aetna decided that instead of paying Counterclaimants for the MH/SUD treatment they provide, Aetna could delay paying indefinitely by implementing a sham "prepayment review" audit. While Counterclaimants continued to dutifully treat addicted individuals, Aetna's scheme allowed the insurance company to effectively avoid Counterclaimants' claims for reimbursement—exceeding $16.4 million—without any care for medical necessity standards, medicine, plan documents, or industry standards. Aetna could wear down Counterclaimants with endless and repetitive audit processes leading nowhere.

9.     Aetna lacked any good faith basis for a systematic audit. Its audit notices placed Counterclaimants in an indefinite "prepayment review," justified only by unspecified "concerns" Aetna had after a "review of data." That's it. The notices violate applicable law requiring Aetna to notify Counterclaimants with specifics if there is any concern with fraud (Aetna mentioned none) or with a particular patient file. Instead of complying with the law, Aetna sent the same template notice for all of Counterclaimants'

COHEN WILLIAMS LLP

1  reimbursement requests.  On information and belief, Aetna never engaged in any good faith

2  prepayment review.  The insurance company proceeded to indefinitely and systematically

3  ignore thousands of Counterclaimants' reimbursement claims.

4       10.    In Aetna's eventual lawsuit (this case), filed only after Counterclaimants

5  threatened legal action for Aetna's violations of multiple state and federal laws, Aetna

6  disclosed to Counterclaimants for the first time its vague and conclusory allegations about

7  fraud.  It asserted that Counterclaimants somehow participated in "body brokering" at

8  facilities when those facilities had different owners.  (ECF 39 ¶110.)  Aetna also referenced

9  another baseless lawsuit that settled favorably for the provider and was dismissed.  (*Id.* ¶19

10  (Rodeo Recovery).)  Aetna asserted Counterclaimants used a "body brokering kickback

11  model" without evidence, let alone evidence of a widespread problem warranting a

12  systematic halt in payment for all reimbursement claims.  (*Id.* ¶113, ¶115.)

13       11.    Aside from these thin allegations, Aetna admits its real gripe against

14  Counterclaimants.  They were providing—in Aetna's judgment—too much healthcare to

15  too many addicted Aetna enrollees.  Aetna cynically and unscientifically equates

16  "recovery" with halting treatment—i.e., halting Aetna's reimbursement for healthcare

17  services.  (*Id.* ¶¶94-95.)  Aetna even makes the outrageous and self-serving claim that

18  prolonged or repeated treatment episodes are inherently wrong or even harmful to addicts.

19  (*Id.*)  It conflates multiple treatment episodes, which are common in the addiction and

20  recovery process, with fraud.  (*Id.* ¶¶105(a)-(c).)

21       12.    Aetna's assumptions are dangerous and wrong.  Recovery is a continuous,

22  nonlinear process for most.  Recovering addicts often require life-long support to stay

23  sober.  Aetna does not want to deal with such complexity and its cost.  It would prefer if

24  someone else paid to keep addicted individuals safe and sober.  It is that simple.

25       13.    Aetna's sham audit was a transparent attempt to rip off Counterclaimants by

26  indefinitely delaying payment for services rendered.  The sham audit violates state and

27  federal law and is a gross abuse of normal claims processing and audit procedures.  It is

28

COHEN WILLIAMS LLP

fundamentally premised on blaming providers for doing their job: offering services to addicts for as long and as many times as medically necessary for them to get sober.

14.    This counterclaim seeks redress for Aetna's fraudulent and unlawful business practices, breaches of express and implied contracts, and failure to comply with state and federal mandates protecting those suffering from SUD, which wrongful conduct Aetna has unleashed to unjustly enrich itself to the tune of millions of dollars in unpaid claims, causing Counterclaimants yet millions more in damages, as they continued to provide medically necessary treatment to Aetna enrollees throughout Aetna's perpetual sham audit. Counterclaimants seek restitutionary, compensatory, and punitive damages, as well as injunctive relief, as set forth herein.

## **PARTIES**

15.    <u>Counterclaimant Get Real Recovery</u> is a corporation formed under the laws of the State of California with its principal place of business in San Juan Capistrano, California.  Get Real Recovery is a provider authorized to do business in California and was at all relevant times doing business as a MH/SUD treatment facility.  Get Real Recovery is certified by the California Department of Health Care Services ("DHCS") and by the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission").

16.    <u>Counterclaimant Healing Path</u> is a limited liability company formed under the laws of the State of California with its principal place of business in Huntington Beach, California.  Healing Path is a provider authorized to do business in California and was at all relevant times doing business as a MH/SUD treatment facility.  Healing Path is licensed by DHCS and by the Joint Commission.

17.    <u>Counterclaimant Ocean Valley</u> is a limited liability company formed under the laws of the State of California with its principal place of business in Santa Ana, California.  Ocean Valley is a provider authorized to do business in California and was at all relevant times doing business as a MH/SUD treatment facility.  Ocean Valley is licensed by DHCS and by the Joint Commission.

COHEN WILLIAMS LLP

18.    <u>Counterclaimant Sunset Rehab</u> is a limited liability company formed under the laws of the State of California with its principal place of business in West Hollywood, California.  Sunset Rehab is a provider authorized to do in California and was at all relevant times doing business as a non-residential MH/SUD treatment facility.

19.    <u>Counterclaimant Helping Hands</u> is a corporation formed under the laws of the State of California with its principal place of business in Los Angeles, California.  Helping Hands is a provider authorized to do business in California and was at all relevant times doing business as an outpatient MH/SUD treatment facility.  Helping Hands is certified by DHCS.

20.    <u>Counterclaimant Joser Forever</u> is a limited liability company formed under the laws of the State of California with its principal place of business in Los Angeles, California.  Joser Forever is a provider authorized to do in California and was at all relevant times doing business as an outpatient MH/SUD treatment facility.  Joser Forever is certified by DHCS.

21.    Counterclaimants Get Real Recovery, Healing Path, Ocean Valley, Sunset Rehab, Helping Hands, and Joser Forever are collectively referred to as "Providers."

22.    Providers' mission is to assist addicted individuals in reclaiming their lives and their futures, by providing high quality treatment for mental health conditions and for MH/SUD in a caring and patient-oriented atmosphere.

23.    Providers have offered their treatment and recovery services to individuals with coverage from most major insurances, including but not limited to Aetna, Anthem, Blue Cross Blue Shield, Optima Health, United Health Care, and Cigna.

24.    Unlike many other treatment facilities in the industry, Providers are willing to treat and do treat all people with active insurance, including enrollees that other "fancier" providers may turn away due to stigmas against the unhoused.

25.    Providers also treat persons who may be turned away from other facilities because of poor behavior, prior convictions, or other law enforcement history.  Providers are willing to work with troubled clients that other centers will not help.

COHEN WILLIAMS LLP

26.     Providers thus distinguish themselves in the treatment community by their diverse client base and philosophy of love and acceptance, not judgment.  Providers understand that the path to sobriety and healing is not always linear.  Providers are part of a crucial safety net in the community because they give people opportunities to get sober consistent with the realities of addiction and relapse.

27.     Thanks to their unique approach, Providers' clients maintain their sobriety at a rate higher than that prevailing in the MH/SUD industry in general.

28.     Counterdefendant Aetna Life Insurance Company is a citizen of the State of Connecticut with its principal place of business in Hartford, Connecticut, and is an insurance company subject to the California Insurance Code and regulated by the Department of Insurance.

29.     Counterdefendant Aetna Health of California, Inc. is a citizen of the State of California with its principal place of business in California and is a healthcare service plan licensed and regulated by the State of California's Department of Managed Health Care.

30.     Counterdefendant David Erickson is an individual and, on information and belief, a citizen of the State of Connecticut.  Erickson was at all relevant times employed by Aetna's "Special Investigations Unit."  Providers are informed and believe and on that basis allege that Erickson oversaw and directed Aetna's sham audit.  Erickson is a proper additional party to the counterclaims, pursuant to Federal Rule of Civil Procedure 13.

31.     Since 2001, the Department of Managed Health Care has taken 191 enforcement actions against Aetna Health of California, which had more than 1.4 billion dollars in revenue in 2023.[1]  In the past few years, Aetna has been assessed fines for its failure to provide coverage for medically necessary treatment of mental illnesses, failure

---

[1] Dep't Managed Health Care, *Aetna Health of California, Health Plan Detail*, available at https://wpso.dmhc.ca.gov/dashboard/Default.aspx?HealthPlanID=79; Dep't Managed Health Care, *Aetna Health of California Inc. Enforcement Actions*, available at https://wpso.dmhc.ca.gov/enfactions/actionListing.aspx?OrgType=0&Org=Aetna%20Health%20of%20California%20Inc.

to provide accurate and clear written explanation of specific reasons for denying, adjusting, or contesting a claim within required time frames, failure to provide compliant grievance systems, and failure to issue decisions within five days on provider requests regarding medical necessity, among other violations.[2]

32.    Aetna has also been criticized for excessive health insurance rate hikes, coupled with high rates of denial of requests for authorization, as well as questionable procedures for managing medical coverage decisions.

33.    Aetna is an insurer and/or third-party claims administrator for group health plans sponsored by employers ("subscribers") that provide health benefits to their covered employees and dependents ("enrollees").

34.    Aetna enrollees serviced by Providers have various health benefit plans. Providers are informed and believe that some of these plans are employer-sponsored and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA").   Other people serviced by Providers are enrolled in Aetna plans not governed by ERISA.

35.    The true names of Counterdefendants ROES 1-10 are unknown to Counterclaimants.  Counterclaimants allege that each counterdefendant sued as ROE took part in the unlawful conduct alleged herein and is responsible for the damages alleged herein.  Counterclaimants will seek leave to amend their counterclaims when the names of each ROE counterdefendant are ascertained.

## **JURISDICTION AND VENUE**

36.    This Court has subject matter jurisdiction under 28 USC § 1331, 29 USC § 1001 *et seq.*, and 28 USC § 1367(a).

37.    By choosing this forum court to commence the action, Aetna has waived any venue objection as to the originally named defendants, including Providers.

---

[2] *Id.*

# FACTUAL ALLEGATIONS

**I.    Access to Prolonged Treatment for Addiction Is Crucial for Recovery, Yet Has Long Plagued U.S. Health Systems.**

38.    Drug addiction or SUD is a complex illness, and treatment is not simple.  To be effective, treatment must be readily available because drug-addicted individuals may be hesitant or uncertain about treatment.  Potential patients can lose the opportunity to get care if treatment is not immediately available or easy to access.

39.    Remaining in treatment for an adequate period is also crucial to the recovery process.  After an initial treatment phase, most addicted individuals need at least three months in treatment to significantly reduce or stop their drug use, and research shows that the best outcomes occur with longer durations of treatment.[3]

40.    Recovery from drug addiction is thus a long-term process and frequently requires multiple episodes of treatment.  Relapses can and do occur and signal a need for treatment to be reinstated or adjusted.  Treating providers—the healthcare professionals who actually assist drug-addicted persons every day in this country—understand it is important to engage patients and keep them in treatment as long as necessary to get patients sober for good.

41.    In 2008, the Mental Health Parity and Addiction Reduction Act responded to private health insurers' reluctance to cover substance use and mental health treatment by

---

[3] *See generally* Steven L Proctor & Philip Herschman, *The Continuing Care Model of Substance Use Treatment: What Works, and When Is "Enough," "Enough?"* J. PSYCHIATRY (Mar. 27, 2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4007701 (observing "longer length of stays were associated with better follow-up outcomes," and "the data clearly indicate that the duration of continuing care should extend for a minimum of 3 to 6 months if individual patients and all relevant stakeholders hope to achieve a reasonable expectation of robust recovery.  Ideally, some contact over a 12-month continuum yields a rational balance between investment and outcome."); Nick Hayes, *For Addiction Treatment, Longer is Better.  But Insurance Companies Usually Cut It Short*, Nat'l Ass'n of Addiction Treatment Providers (Jan. 13, 2023), https://www.naatp.org/membership/member-news/addiction-treatment-longer-better-insurance-companies-usually-cut-it-short.

requiring expanded coverage options.  And in 2010 the Affordable Care Act ("ACA") increased options for people with low incomes or without steady employment to obtain coverage.

42.    These changes made it easier for addicted individuals to access and afford treatment, and the number of providers in the field expanded significantly to meet the demand.  State parity laws also made it harder for insurance companies to deny or limit coverage for MH/SUD treatment.

43.    Before passage of the ACA, many private insurance plans required higher cost sharing and imposed special annual service caps on the number of visits or length of treatment available.  Parity laws required insurance plans covering behavioral health to cover them at a rate equivalent to comparable medical treatments.

44.    In practice, however, insurers continued to resist equal coverage of SUD treatment.  Spending on and access to mental healthcare increased, but largely stayed flat for SUD treatment.  Some research found that insurers imposed non-quantitative limits more frequently on SUD care than care for other health conditions.[4]  SUD treatment cut into insurance company profits, and they began to allege excessive utilization of SUD services.

45.    In part in response to insurer opposition to expanded SUD coverage requirements, and following lobbying efforts from large private insurers, in 2018, Congress passed the Eliminating Kickbacks in Recovery Act ("EKRA"), 18 U.S.C. § 220, to limit how treatment facilities could market their services.  The law was extremely vague, and its passage was irregular, leaving many questions unanswered.  But EKRA expressly allows payment to patient marketers for referrals under several "safe harbors," which are exceptions to the general prohibitions in the statute.  *See, e.g.*, 18 U.S.C. § 220(b).

---

[4] *See generally*, Julia Dickson-Gomez, et al., *Insurance Barriers to Substance Use Disorder Treatment After Passage of Mental Health and Addiction Parity Laws and the Affordable Care Act: A Qualitative Analysis*, Drug Alcohol Depend. Rep. (Mar. 31, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9948907/#bib0021.

46.    In the one-year period from May 2021 to May 2022 alone, more than 100,000 Americans died from drug overdoses, significantly surpassing the number of U.S. service members who died in the Vietnam war.[5]  All the while, provider complaints about private insurance billing difficulties remain ubiquitous in the industry.  A sense of having to fight to get paid fuels burnout among providers.  Providers feel stigmatized for treating a stigmatized disease.  Most providers understand that insurance companies will fight hard not to pay, or to underpay.  Many have stopped accepting insurance at all.[6]

47.    Even as the need and demand for SUD treatment skyrockets and state legislatures and Congress require provision of adequate and equitable treatment for SUD disorders, payers like Aetna still deny coverage for well-established treatment protocols and find ways to add unnecessary hurdles to treatment.  The American Medical Association released a scathing indictment of the insurance industry, noting widespread plan failure to document and apply federal standards for parity in treatment.[7]

---

[5] *See Provisional Drug Overdose Death Counts*, National Center for Health Statistics, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[6] *See*, Annie Waldman, et al., *Finding a Therapist Who Takes Your Insurance Can Be Nearly Impossible. Here's Why*, NPR (Aug. 25, 2024), https://www.npr.org/sections/shots-health-news/2024/08/24/nx-s1-5028551/insurance-therapy-therapist-mental-health-coverage (discussing phenomenon in context of mental health care); Julia Dickson-Gomez, et al., *Insurance Barriers To Substance Use Disorder Treatment After Passage of Mental Health and Addiction Parity Laws and the Affordable Care Act*, Drug Alcohol Depend Rep. (March 31, 2022),  https://pmc.ncbi.nlm.nih.gov/articles/PMC9948907 (discussing billing frustrations and burdens in Medicaid and other insurance generally).

[7] AMA Letter of February 2, 2022 to House Committee on Ways and Means, https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2022-2-2-Letter-to-Congress-re-MHPAEA-v2.pdf (noting "insurers' failures and parity violations have harmed millions"); *see also* 2022 MHPAE Report to Congress, https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf.

COHEN WILLIAMS LLP

48.     Despite widespread understanding that SUD disorders are chronic, complex conditions, insurers like Aetna maintain—against the evidence—that addiction is an episodic, acute condition requiring a one-time, quick fix.  One and done, nothing more.

**II.     Counterclaimants Are "Out-of-Network" Providers for Aetna and Verified Out-of-Network Benefits for Aetna Enrollees Before Providing Treatment.**

49.     Aetna offers its enrollees access to a network of providers that have contracted to accept established fees in exchange for being in Aetna's provider network.  Aetna does not have rate agreements with providers that are not part of its network but will also pay for enrollees' out-of-network services and treatments, typically at a different rate.

50.     At all relevant times, Providers were "out of network" vis-à-vis Aetna and had no in-network contract with Aetna.

51.     Before admitting or providing treatment to a prospective patient covered by a policy issued or administered by Aetna, Providers contacted Aetna, usually by phone, to confirm that the individual seeking treatment had an active Aetna policy, that the prospective client's policy provided out-of-network benefits, and that the policy was active and would remain active for the dates of anticipated treatment.

52.     During these verification of benefits ("VOB") calls, Aetna also provided Providers with additional information, including individual enrollee responsibility amounts (such as co-payments, co-insurance, and deductibles) and rate type and rate percentage (for example, 125% of Medicare rates), which, on information and belief, reflect the rates in Aetna enrollees' plan documents, including the applicable Evidence of Coverage.

53.     With respect to all claims for which Counterclaimants seek recovery in this counterclaim, Aetna advised Providers during VOB calls that the Aetna enrollees' policies covered Providers' out-of-network treatment.

54.     The types of treatment covered depended on the individual enrollee's policy and included non-residential SUD treatment at the intensive outpatient ("IOP") and outpatient ("OP") levels of care; and sub-acute detox ("detox"), partial hospitalization program ("PHP"), and residential treatment center levels of care.

COHEN WILLIAMS LLP

55.     Aetna informed Providers that there was *no authorization required* for initial admission to IOP or OP levels of treatment.  Under this policy and practice, Providers could treat clients at the IOP and OP levels for as long as necessary, without prior or ongoing authorization by Aetna.

56.     If a client needed a higher level of care, such as PHP or detox, Providers' clinical staff would complete a biopsychosocial assessment, conduct a urinalysis, have the client fill out various consent and history forms, conduct a Columbia assessment to measure potential suicidality, among other assessments, and request authorization from Aetna for the appropriate level of care.  In response, Aetna would provide authorization for a certain number of days and at a certain level of care.

**III.     Providers Sent Weekly Bills to Aetna to Apprise Aetna of the Services Provided to Aetna Enrollees.**

57.     Providers sent Aetna a weekly statement of the treatment Aetna enrollees received from Providers, keeping Aetna regularly apprised regarding the Aetna enrollees in treatment, the treatments provided, the dates of treatments provided, and intended upcoming treatments.

58.     Aetna never told Providers to stop treating Aetna enrollees.

59.     To the contrary, from July 2020 and even during the sham audit beginning in or around November 2022, Aetna always permitted Providers to continue treating its enrollees, and Aetna benefited from the treatment Counterclaimants provided to Aetna enrollees.

60.     Among other benefits, Aetna did not have to pay for Aetna enrollees to be treated at different facilities, and did not have to pay for emergency care and lawsuits that would have resulted if the Aetna enrollees received no treatment and then relapsed or overdosed.

**IV.     Initially, Aetna Paid Most Claims without Incident.**

61.     Prior to the sham audit, Aetna responded to Providers' weekly billing statements either by paying all or a portion of the bill or by asking for additional medical

COHEN **WILLIAMS** LLP

records for an enrollee, and then paying all or a portion of the bill after the requested records were received and reviewed. Payment was typically made within around twenty to sixty days following submission of the bill or requested records. In some cases, Aetna determined that certain treatment minimums or requirements were not satisfied. In those cases, Aetna provided written notice of the reason it was denying payment (in whole or in part) in an explanation of benefits.

62. The VOB calls and Providers' weekly billing practice, combined with Aetna's "no authorization required" policy and practice of paying claims, clearly manifested Aetna's and Providers' mutual agreement and understanding that Aetna would pay with reasonable speed some or all of the billed amount for medically necessary services provided to Aetna enrollees.

63. From in or around July 2020 until it instituted the sham audits in or around November 2022, Aetna habitually paid Providers at consistent rates per day of treatment, depending on the services provided and the decision of Aetna claims processors. These reimbursement rates were commercially reasonable in the industry for the services provided.

64. Upon information and belief, the rates Aetna paid were also consistent with the amounts or rates reflected in the Evidence of Coverage for the respective enrollees.

**V.   After Paying Claims Regularly, Aetna Abruptly and Systematically Used a Sham Audit to Avoid Payment on All Claims.**

65. Beginning in or around November and December 2022, and without warning, Aetna, *en masse*, placed Providers' reimbursement claims in a vague and facially unjustified "pre-payment" audit, which was a sham. Aetna started the audit for each Counterclaimant, one at a time, and employed the same boilerplate audit notice ("Notices") in each instance. The Notices stated, *inter alia*, that:

> "*all* claims that you submit for reimbursement will be reviewed prior to payment. Going forward, when submitting claims, please attach the required medical records in support of those services billed. The medical

COHEN WILLIAMS LLP

records that are needed to properly review these claims include the following: client's complete chart including daily notes by the attending physician[,] Medical and social history[,] Daily treatment or progress notes."

66.    Aetna further represented to Providers that:

"Claims received with the required medical records attached will be sent for review as necessary.  Claims received without the required medical records attached will be denied pending receipt of those required records unless prohibited by law or statute.  Should the required medical records be received subsequently, in accordance with timely filing requirements applicable to the plan, the claim will be sent for review upon receipt of the required records.  Should you disagree with any individual claim determination after this review, as always, you or the member may pursue the claim further though the Aetna appeal process." *Id.*

67.    Providers did not understand—and the Notices did not explain, as required under state and federal law—why they needed to attach medical records to each claim or how Aetna would use such records in connection with any "review" of the claims "as necessary" "prior to payment."  The Notices merely referenced vague and unsubstantiated "concerns" Aetna had after a "review of data related to claims [Providers] submitted."

68.    Despite the murky nature of the Notices' purported "concerns," the Notices assured Providers that Aetna would "sen[d] for review as necessary" claims with the "required medical records."  The Notices explained that all claims submitted would be "reviewed prior to payment," thus acknowledging that Aetna would continue to pay Providers, as it had in the past, pending Aetna's review of the claims and medical records.

69.    The Notices did nothing to change the parties' mutual understanding up until that point: Aetna's policy and practice had been and continued to be to consider and pay documented claims, without any pre-authorization.

70.    In reasonable reliance on Aetna's pattern of payments before the audit, Aetna's "no-authorization required" policy and practice, and Aetna's subsequent requests

COHEN WILLIAMS LLP

for medical records manifesting an intention and willingness to "review prior to payment" Providers' documented claims, Providers continued to treat Aetna plan enrollees and continued submitting claims for payment. Providers also sent the requested documentation for past and current claims, to be sure to comply with Aetna's requests and address the insurance company's unspecified "concerns."

71. After placing Providers in the pre-payment audit, Aetna continued to verify benefits when Providers called during VOB calls. Aetna also continued its no-authorization policy. Aetna never requested that Providers stop providing services to Aetna plan enrollees, and Aetna continued to benefit from Providers' treatment of Aetna enrollees.

72. Providers reasonably believed that if they documented claims as Aetna was requesting, they would receive the "payment" required by Aetna's plans and mentioned in the Notices.

## VI.  Compliance with Aetna's Audit Turns Out to Be a Fool's Errand.

73. The prepayment audit and accompanying Notices were a sham. Aetna was abusing its Special Investigative Unit ("SIU") and audit powers to make repeated and burdensome demands of Providers, while never ultimately making any determination as to claims, thereby succeeding in indefinitely delaying and effectively avoiding payment *en masse* to Providers for treatment provided to Aetna enrollees.

74. Aetna lacked any good faith basis to systematically audit Providers or otherwise globally delay payment. Instead, Aetna placed Providers in a sham audit for other, improper, reasons including:

   a.   Paying for MH/SUD is required by law but is costly for Aetna and/or for the employers whose plans Aetna administers. Aetna thus faced internal and external pressures to decrease or deny claims for MH/SUD.

   b.   Aetna's "no authorization required" policy and practice is intended to quickly obtain services for Aetna enrollees on the frontend and permit

COHEN WILLIAMS LLP

Aetna to effectively avoid its payment obligations by delaying and obstructing reimbursement on the backend.

c.    Aetna's resort to a sham audit was premised on Aetna's medically unfounded, victim-blaming, and ultimately health-destroying assumption that addicted individuals can have only a linear and immediate path to recovery—or else the provider and blameworthy enrollee are engaging in "fraud."[8]

d.    Aetna makes more money when Aetna enrollees, especially addicted individuals, do not or cannot access healthcare services.

e.    Aetna makes more money when its addicted enrollees lose their Aetna coverage due to relapse (and attendant loss of employment), or death. Aetna is incentivized to dismiss these enrollees from Aetna plans so they are no longer Aetna's "problem."  Systematically denying or delaying reimbursement for MH/SUD providers decreases the chance that those providers will accept Aetna enrollees at all, and more likely that enrollees will not obtain treatment at an unfamiliar facility.

f.    Aetna makes more money and keeps business from plan sponsors when it successfully denies providers reimbursement for services rendered to Aetna enrollees.

---

[8] According to the National Institute on Drug Abuse, "relapse to drug use" does not "mean treatment has failed," because of the chronic nature of addiction.  Drugs, Brains, and Behavior: The Science of Addiction, Nat'l Inst. Drug Abuse (Sept. 25, 2023) https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/treatment-recovery.  Other publications explain that relapse is "a highly prevalent phenomenon in addiction," and "[f]or 1-year outcomes across alcohol, nicotine, weight, and illicit drug abuse, studies show that more than 85% of individuals relapse and return to drug use within 1 year of treatment."  Sinha, Rajita, New Findings on Biological Factors Predicting Addiction Relapse Vulnerability, 13 Curr. Psychiatry Rep. 398-405 (Oct. 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3674771.  Similarly, two thirds of individuals return to drug use *within weeks* of initiating addiction treatment.  *Id.*

g.    Lengthy audits are effective at shutting down small providers who provide (in Aetna's view) Aetna enrollees with too much healthcare. Aetna knows that lengthy audits delay providers payment for months, putting those clinics in financial straits and even pushing some providers out of business.

75.    Aetna should never have subjected Providers to the sham audit, because:

a.    Aetna enrollees received Providers' standard-of-care treatment, which was an out-of-network benefit covered by Aetna plans.

b.    Enrollees with multiple treatment episodes, and the Providers who assist them, are not contributing to fraud, abuse, or waste. Relapse is a common reality and is even one of the criteria utilized to diagnose SUD.[9]

76.    Despite the unjustified nature of Aetna's sham audit, Providers complied in good faith with Aetna's demands and promptly provided the requested medical records. In many cases, Providers provided the requested medical records *multiple times for the same claim*. Providers patiently and consistently performed all conditions, covenants, and promises they were required to perform in accordance with the Notices.

77.    Providers received and continued to receive regular and prompt payment by other insurance plans/administrators for identical in- and out-of-network services provided.

78.    Providers also continued to offer their treatment services in good faith to Aetna's enrollees, reasonably believing that once Aetna received the requested documentation, Aetna would pay Providers, as required by law, industry practice, the parties' historical course of dealing, and a shared desire to help addicted individuals receive needed care.

_____

[9] *See* APA Diagnostic and Statistical Manual of Mental Disorders (Fifth Edition) (DSM-IV-TR, 2022). Relapse to old behaviors including restarting the use of the problematic substance is often part of the illness. Any level of behavioral change takes time to solidify.

COHEN WILLIAMS LLP

79.     Unfortunately, Aetna fraudulently delayed reimbursement, while attempting to drive Providers out of business and entangling them in futile audit procedures.

80.     Aetna kept Providers in a systematic sham audit, by deploying a combination of the following in individual cases:

a.      Claiming falsely that Aetna did not receive the requested medical records;

b.      Requesting the same medical records repeatedly, even after Providers sent them and Aetna received them;

c.      Requiring hours of follow-up-calls by Providers, just to check the status of claims;

d.      Requesting additional unnecessary information;

e.      Missing deadlines or unilaterally purporting to extend deadlines for Aetna's response;

f.      Failing to respond to Providers' inquiries;

g.      Violating statutory requirements for claims processing and audits; and

h.      Avoiding or delaying paying Providers by any other means Aetna could devise.

81.     At some point, Aetna realized that Providers were making a concerted effort to comply with the audit and could substantiate their claims.  Aetna was failing in driving Providers completely out of business, and Providers were not giving up.

82.     Aetna realized the audit could not continue forever, and Aetna would eventually be required to reimburse Providers.

83.     Most audits reach some result or conclusion.  Not Aetna's.  Aetna never notified providers whether its "concerns" were substantiated, never issued formal reimbursement denials, and never gave Providers a chance to respond to any conclusions Aetna might have reached.

84.     To the extent Aetna conducted any audit or review at all or kept track of the medical records Providers diligently sent and resent to Aetna, the audit showed that

1    Providers documented and substantiated their claims and were providing necessary
2    MH/SUD treatment to Aetna enrollees.

3        85.    Instead of paying for the MH/SUD treatment that Providers rendered for
4    Aetna's enrollees, Aetna gambled that it would better to distract with a baseless lawsuit
5    against Providers (the Complaint filed in this action).  But the Notices never mentioned
6    anything even approaching the allegations in Aetna's underlying lawsuit.

7        86.    Aetna never identified or attempted to discuss its "concerns."  It only
8    requested the same medical records, again and again.  After Providers documented their
9    claims and provided the requested records again and again, Aetna continued to refuse to
10   make any formal determination on the claims that would trigger statutory rights to appeal.
11   Aetna cares only about withholding payment from Providers, by any means necessary.

12   **VII.  Aetna's Sham Audit Has Devastated Providers and Harmed Aetna Enrollees.**

13       87.    Providers employ doctors, nurses, and therapists who are bound by applicable
14   codes of ethics and of medical professionalism.  Providers and their employees are in the
15   business of helping people.

16       88.    As a result of Aetna's sham audit, however, Providers were forced to lower
17   pay, lay off employees, and reduce overhead.  Within three months of the commencement
18   of the audit, Providers were forced to reduce overhead per person significantly and employ
19   a less effective employee-to-patient ratio.  Providers were also forced to cut back on
20   discretionary programs that assist clients.  Providers required financial assistance to keep
21   their businesses operating and struggled to break even because of Aetna's audit.

22       89.    The California legislature has recognized the negative impact of excessive
23   audits, which can "increase costs for health care providers and health plans, and thus
24   ultimately increase costs for the purchaser and the consumer, and result in the direction of
25   limited health care resources to administrative costs instead of to patient care."  Health &
26   Safety Code § 1380.1(a)(1) (discussing medical quality audits of providers, calling for a
27   single medical quality audit per year and standards for those audits).  Aetna's sham audit
28   is a case in point.

90.    Aetna's sham audit has also severely damaged Providers' goodwill in the community of patients, providers, and insurers, and has attracted unwarranted scrutiny from other insurers.

91.    As of the time of filing the present counterclaim, some of Providers have closed down entirely, including Helping Hands.

92.    The true victims of Aetna's abuse, however, are Aetna enrollees, their family members, and the public at large.  Enrollees suffering from MH/SUD have had Aetna aggressively attack their treatment regimens with Providers.

93.    Instead of eliminating fraud, abuse, or unnecessary "waste" in healthcare, Aetna's practices, including its sham audit, have deterred Providers and other MH/SUD clinics in the community from accepting Aetna enrollees, limiting those enrollees' treatment options, and causing them to delay or forego treatment entirely.  Aetna's practices likely contribute to increased and prolonged suffering, and even death, of enrollees suffering from addiction.

94.    Because the Aetna plans at issue likely provide that Aetna enrollees remain liable to Providers for any amount Providers have billed and that Aetna refuses to pay, Aetna's sham audit has another shameful result.  It aims to shift the financial burden for the payments that Aetna is withholding from Providers on the shoulders of Aetna's most vulnerable and sick enrollees.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Fraud)

### (Against Aetna Life Insurance Company,

### Aetna Health of California, Inc., David Erickson, and ROES 1-10)

95.    Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

96.    Providers offered California DHCS-specified MH/SUD treatment and recovery services to Aetna plan enrollees, which benefited Aetna.  Aetna informed

Providers the services were covered by active Aetna policies.  Other insurance companies accepted these services and paid accordingly, as did Aetna before November 2022.

97.    In or about November and December 2022, Aetna began representing in Notices, typically from an "investigator" named David Erickson, that all of Providers' claims would be "reviewed for payment" and would need to be submitted with the patient's complete chart with daily notes from the doctor, medical and social history, and daily treatment or progress notes.

98.    In fact, the Notices were Aetna's first step in implementing a systematic sham audit to fraudulently delay and effectively avoid paying Providers' claims.

99.    Aetna engaged in the following misrepresentations in its Notices, all of which were substantially the same for each patient and claim listed on Exhibits 1 and 2[10] hereto:

a.    Aetna misrepresented the nature of the audit.  Aetna stated it had "concerns with claims you submit for reimbursement" after a "review of data."  Aetna, in fact, had no concerns that warranted a review of data and knew that Providers could not understand or access Aetna's "review of data" independently; nor could they understand or access information regarding Aetna's purported "concerns."

b.    Aetna falsely promised that "all claims that you submit for reimbursement will be reviewed prior *to payment*." (Emphasis added.)

c.    Aetna also misrepresented the audit procedures that would be used.  It stated medical records were needed to "properly review" claims and directed Providers to send Aetna certain documentation.  It stated

_____

[10] During the relevant time period, Providers utilized two billing companies, each with different claims-tracking systems, hence the need for two spreadsheets (Exhibits 1 and 2). To protect patient privacy and confidentiality, Providers have redacted personal identifying information of patients from the public filing.  Providers will, upon request from Aetna, share unredacted versions of Exhibits 1 and 2, in compliance with applicable laws and regulations.  The information provided in Exhibits 1 and 2 is sufficient to identify the specific claims for which Counterclaimants seek redress for Aetna's fraud.

claims received with the records would be "sent for review as necessary" and "the claim will be sent for review upon receipt of the required records."

100.  All of these statements were purportedly based on Aetna's unilateral knowledge of its concerns and review of data.  They were purportedly based on Aetna's special knowledge about what information Aetna "needed" and Aetna's special knowledge of how the audit would progress.  Providers did not have access to any of this information independently.

101.  All of Aetna's statements and representations were in formal Notices purporting to be accurate and reliable and could not be understood as mere casual expressions of belief about the need for an audit or about the audit's nature or procedures.

102.  In this context, Aetna had reason to expect that Providers would rely on Aetna's statements.  In particular, Aetna knew Providers would invest significant administrative resources and time to comply with the purported audit.

103.  In each instance Aetna made these statements and representations, they were false, misleading, and/or incomplete and Aetna knew they were false, misleading, and/or incomplete:

> a.    The real nature and purpose of the audit was to delay, obstruct, and wear down Providers, and to allow Aetna to avoid paying claims, even after Providers complied in good faith with Aetna's demands for medical records and additional information.
>
> b.    Aetna had no legitimate "concerns" warranting a systematic pre-payment audit of all claims *en masse* at the time the statements were made, or at any time, and Aetna had not conducted a bona fide review of Providers' claims data.
>
> c.    Aetna would not review all claims submitted and had no intention of doing so.  Aetna also had no intention of paying documented claims.

COHEN WILLIAMS LLP

      d.    Aetna did not need the requested medical records to address its purported "concerns." Aetna did not follow and did not intend to follow the procedures it outlined in the Notices.

104. Instead, Aetna knew it was imposing a systematic audit to send Providers on a wild goose chase, for the improper purposes described above.

105. Aetna knew with respect to each claim and with each Notice that its representations about the audit were false, misleading, and/or incomplete.

106. After receiving the Notices, Providers called Aetna to follow up and to provide the records Aetna was demanding. However, Aetna continued to make false and misleading statements regarding the status of the claims, Aetna's receipt of medical records, and Aetna's intentions with respect to the claims.

107. Aetna caused Providers to continue to believe they needed to resend paperwork and continue to follow up with Aetna, in the hopes of being paid for the MH/SUD treatment provided to Aetna enrollees.

108. Aetna actually intended to deceive and did deceive Providers about the bad-faith nature of the audit and Aetna's futile procedures for clearing the audit.

109. Aetna's fraudulent intent is apparent from its general pattern of conduct and from the Notices and subsequent communications regarding the claims, in which Aetna representatives pretended Aetna did not receive required records, refused to give concrete follow-up dates, pushed back against paying claims by finding any excuse necessary to delay or deflect Providers, and failing to make final determinations as to the claims.

110. Providers reasonably and detrimentally relied on Aetna's representations and disclosures, for instance by continuing to treat Aetna enrollees and continuing to submit claims in good faith.

111. Providers also continued to engage with Aetna's pre-payment audit procedures in good faith by devoting significant staff time to collecting and sending the requested records and information and conducting other follow-up that was ultimately fruitless, due to the fraudulent nature of the audits.

112.   In each case, Providers were gravely harmed, and Aetna's fraud was a substantial factor in causing this harm.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation)

### (Against Aetna Life Insurance Company,

### Aetna Health of California, Inc., David Erickson, and ROES 1-10)

113.   Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

114.   In perpetuating their sham audit, Aetna sent false and misleading audit Notices, as described under the First Claim for Relief.

115.   In each instance, Aetna had no reasonable basis for believing its assertions to be true.

116.   Aetna made these misrepresentations to induce Providers' reliance, so Providers would continue to provide treatment to Aetna plan enrollees.

117.   Providers justifiably and reasonably believed that Aetna would process and pay documented claims.  Providers justifiably and reasonably continued to resend records and invested significant resources in claims recovery efforts, which was costly and injurious to Providers.

118.   Providers were harmed by Aetna's negligent misrepresentations both in expending the costs associated with complying with the sham audit's purported records production requirements and in Aetna's fraudulent withholding of payments on thousands of claims.

## THIRD CLAIM FOR RELIEF

### (Breach of Express Contract – Non-ERISA Claims)

### (Against Aetna Life Insurance Company,

### Aetna Health of California, Inc., and ROES 1-10)

119.   Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

COHEN WILLIAMS LLP

120.   Of the claims on Exhibits 1 and 2, all of which were placed in Aetna's sham audit, Counterclaimants are ignorant as to which arise under an employer-sponsored Aetna health plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq*.  Counterdefendants are in possession of all of the information necessary to determine which claims on Exhibits 1 and 2 are ERISA-governed and which are not.  Counterclaimants are informed and believe, and based thereon allege, that many of the claims on Exhibits 1 and 2 relate to health insurance policies that were not employer-sponsored and as to which ERISA does not apply (the "Non-ERISA Claims").

121.   Aetna representatives and investigators were capable of contracting and had ostensible authority to contract on Aetna's behalf with respect to the Non-ERISA Claims.

122.   Aetna and Providers mutually consented and agreed that Aetna would reimburse Providers for services provided to Aetna plan enrollees after a fair procedure for claims-processing.  This agreement is evidenced in:

      a.   Verification of benefits (VOB) calls;

      b.   Prior course of dealing as described above;

      c.   Aetna's "no authorization required" policy and practice for IOP and OP, or Aetna's authorizations for more intensive services;

      d.   Aetna's Notices demanding from Providers additional action and documentation, which stated that Providers would ultimately receive "payment" for documented claims.

123.   These communications with Aetna went far beyond merely providing information about prospective patient's healthcare plans on VOB calls—the communications manifested in words Aetna's willingness to reimburse Providers as treatment facilities for the treatment they provided to Aetna's enrollees.

124.   Aetna's words, written policies and procedures, and the Notices thus objectively manifested, first, an offer to engage in a fair, transparent, claims process that, second, could and would result in payment for services provided and documented in accordance with Aetna plan rules.

COHEN WILLIAMS LLP

125.    In other words: provide and document out-of-network services to Aetna enrollees, according to Aetna policies, and you will be reimbursed according to plan terms.

126.    Aetna made this promise because it knew that in so doing, Providers would assist and treat Aetna plan enrollees.

127.    Providers accepted Aetna's offer by screening and admitting Aetna enrollees in need of MH/SUD treatment at the appropriate level of care, by providing treatment, and by submitting documented claims, pursuant to Aetna's policies and the subsequent Notices.

128.    Aetna was therefore under an enforceable legal duty (1) to process Providers' claims fairly, in good faith, and in accordance with plan documents and the law, and (2) ultimately to pay amounts owed on substantiated claims.

129.    Instead of fulfilling its side of the bargain and genuinely processing and considering Providers' claims, Aetna imposed a systematic sham audit that was neither undertaken nor implemented in good faith and has failed to pay the Non-ERISA Claims set forth on Exhibits 1 and 2 all of which are due and owing.

130.    The sham audit breached the parties' agreement, to participate in a fair procedure for claims-processing. This breach directly inflicted billing, administrative, and personnel costs on Providers.

131.    Aetna lacked a good faith basis for imposing its systematic sham audit, and induced Providers to continue treating Aetna plan enrollees.

132.    Aetna's sham audit resulted in indefinite non-payment and thus breached the parties' agreement that Providers would receive some compensation for the services provided, in accordance with Aetna's "no authorization required" policy, applicable Aetna plan documents, the parties' course of dealing, and the audit Notices.

133.    Providers satisfactorily performed the terms of the agreement, including by providing services, submitting claims, and providing additional documentation as requested in Aetna's audit Notices.

134.    To the extent any condition was not met, Aetna waived that condition by accepting the performance of Providers or by paying similarly situated claims.

COHEN WILLIAMS LLP

135.   As a direct and proximate result of Aetna's breaches, Providers have not recovered the amounts owed on each Aetna enrollee Non-ERISA Claim, in an amount to be determined, have sunk costs into pursuing futile claims processing and appeals, and have lost actual and potential patients.

### FOURTH CLAIM FOR RELIEF

**(Breach of Implied Contract - Non-ERISA Claims)**

**(Against Aetna Life Insurance Company**

**Aetna Health of California, Inc., and ROES 1-10)**

136.   Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

137.   Aetna's promise to provide a fair claims process and provide reimbursement of documented claims, as described in the Third Claim for Relief, was not only stated expressly in Aetna's words and written policies.  The agreement was also implied from and manifested by Aetna's and Providers' conduct.

138.   The course of dealing and outward conduct described above manifested mutual assent between Aetna and Providers that if Providers verified a patient's benefits, provided the above services, and submitted documented claims, then Aetna would use a fair claims process to consider those claims and ultimately pay for the services provided, the same as it had paid previous claims.

139.   Providers offered their treatment services and engaged in good faith with Aetna's claims processing demands, pursuant to this implied agreement.

140.   The services Providers rendered were intended to benefit and did benefit Aetna.

141.   Aetna breached both its obligations to engage in a fair claims process and to pay legitimate claims by instituting a sham audit and refusing and failing to pay amounts owed on each Aetna enrollee Non-ERISA Claim.

142.   Providers suffered injury as a direct and proximate result of Aetna's breach.

**FIFTH CLAIM FOR RELIEF**

**(Breach of Implied Covenant of Good Faith and Fair Dealing - Non-ERISA Claims)**

**(Against Aetna Life Insurance Company,**

**Aetna Health of California, Inc., and ROES 1-10)**

143.    Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

144.    As alleged in the Third and Fourth Claims for Relief, Aetna and Providers entered express and implied contracts for Providers to provide MH/SUD treatment services and for Providers to be reimbursed after a fair claims process.

145.    Providers fulfilled their obligations by providing services and by submitting documentation Aetna demanded for their claims.

146.    Aetna unfairly interfered with Providers' rights to a good faith claims procedure and to receive compensation for the services provided by imposing a systematic sham audit as described above.

147.    Providers were harmed by Aetna's sham audit.

**SIXTH CLAIM FOR RELIEF**

**(Promissory Estoppel – Non-ERISA Claims)**

**(Against Aetna Life Insurance Company and Aetna Health of California, Inc.)**

148.    Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

149.    Aetna made clear and unambiguous requests for additional documentation as part of its sham audit.  Aetna's audit Notices represented that all claims submitted would be "reviewed prior to payment" and "claims received with the required medical records attached will be sent for review as necessary."

150.    Aetna made a clear promise that its claims processing procedures and "pre-payment" audit would be bona fide and that it would reimburse documented claims.

151.   Providers reasonably, foreseeably, and detrimentally relied in good faith on these promises and engaged with Aetna's sham audit, investing significant resources in billing and claims processing in the hopes of recovering payment of the sums due.

152.   Enforcing Aetna's promise to reimburse documented claims is necessary to avoid the injustice that would result if Aetna could abuse audit procedures, as it has in this case, to harm providers and, by extension, patients.

## SEVENTH CLAIM FOR RELIEF

### (ERISA Section 502(a)(1)(B))

**(Against Aetna Life Insurance Company and Aetna Health of California, Inc.)**

153.   Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

154.   For this claim, Providers are suing Aetna as the assignees of those Aetna enrollees enrolled in benefit plans governed by ERISA (the "Aetna ERISA Plan Enrollees").

155.   Of the claims on Exhibits 1 and 2, all of which were placed in Aetna's sham audit, Counterclaimants are ignorant as to which arise under an employer-sponsored Aetna health plan covered by ERISA.   Counterdefendants are in possession of all of the information necessary to determine which claims relate to an ERISA-governed health plan (the "ERISA Claims").

156.   Counterclaimants are informed and believed that many of the claims on Exhibits 1 and 2 are ERISA Claims.

157.   ERISA Section 502(a)(1)(B), permits a plan participant, beneficiary, or assignee to "recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his right to future benefits under the terms of the plan." 29 U.S.C. § 1104(a)(1)(B).

158.   The Aetna ERISA Plan Enrollees validly assigned their ERISA Claims to Providers.   Upon admittance to Providers' facilities, Aetna ERISA Plan Enrollees assigned

COHEN **WILLIAMS** LLP

direct payment of their insurance benefits to Providers and executed a standard assignment of benefit contracts.

159. To the extent Aetna's plan documents purport to limit the assignability of enrollees' claims, those limitations are not valid or enforceable and/or Aetna waived the right to enforce those provisions by failing to raise such anti-assignment provisions during claims processing.

160. At all times Aetna was aware or should have been aware during claims processing that Providers were acting as the Aetna ERISA Plan Enrollees' assignees. Aetna regularly paid Providers claims prior to the sham audit and, Providers are informed and believe, would not have paid Providers if Aetna was unsure whether Providers were entitled to reimbursement as assignees.

161. Prior to the sham audit, Aetna consistently treated Providers as having obtained the right to insurance benefits of its enrollees and never objected to Providers submitting claims directly seeking benefits for covered services rendered. When it was paying claims prior to the sham audit, Aetna paid Providers directly.

162. Aetna is an ERISA plan fiduciary and appropriate defendant under ERISA because it exercises complete control over claims processing.

163. Providers bring a claim under Section 502(a)(1)(B) for all ERISA-governed claims to recover MH/SUD benefits that are covered under the plan, but which were wrongly denied with no notice to Providers or as to which no determination was ever made and which remain unpaid by Aetna as a result of Aetna's sham audit.

164. The terms of Aetna ERISA Plan Enrollees' plans clearly covered the MH/SUD and mental health treatment provided to each enrollee. The Aetna ERISA Plan Enrollees had out-of-network coverage, which extended to the services provided as confirmed in each individual case by a VOB call or communication.

165. Each Aetna ERISA Plan Enrollee's plan stated the enrollee was entitled to benefits for medically necessary MH/SUD and mental health benefits like those provided by Providers.

COHEN WILLIAMS LLP

166.    For each ERISA Claim, Aetna had either authorized or pre-certified services or had referred Providers to Aetna's no-authorization policy, in all cases affirming that the services in question were medically necessary (or deferring to Providers' determination in that regard) and further affirming that the services were covered for each enrollee during the time period in which the services were provided.  For each Aetna ERISA Plan Enrollee on whose behalf the ERISA Claims were submitted, the treatment programs that Providers offered and provided were therefore covered.

167.    For each Aetna ERISA Plan Enrollee for whom Providers submitted ERISA Claims, the services Provider provided were medically necessary.

168.    For each Aetna ERISA Plan Enrollee, Aetna's plan documents promised Aetna would pay for those services at a particular rate, typically 125% of Medicare.  Aetna has knowledge of the rates it was required to pay for each enrollee because Aetna has access to all the relevant plan documents, including the Evidence of Coverage.

169.    Despite Providers' good faith provision of medically necessary services to Aetna ERISA Plan Enrollees and good faith engagement with Aetna's claims procedures and audit requests, for each ERISA Claim, Aetna would either wrongfully deny without notice or indefinitely and unreasonably delay the claims or claim determinations, without plan-based or legal justification.

170.    Aetna's claims processing was riddled with irregularities and delays.  And in Aetna's audit Notices it asserted only unspecified "concerns" to justify a systematic sham audit, with the purpose of avoiding payment obligations indefinitely and financially hamstringing Providers.

171.    The definition of "adverse benefit determination" included in the ERISA Claims Procedure includes not only "a denial, reduction, or termination of" benefits, but also a "failure to provide or make payment (in whole or in part) for" a benefit.  29 C.F.R. § 2560.503-1(m)(4).  The sham audit is an indefinite denial of payment, without a decision or right to appeal, and constitutes an adverse benefit determination.

COHEN WILLIAMS LLP

172.    Because Aetna failed to provide benefits without a legal or plan-based justification for adverse benefit determinations, it failed its statutory obligation to afford claimants a "full and fair" review.  29 U.S.C. § 1133.

173.    In order to remove Providers' claims from Aetna's plan-required and ERISA-required claims review process, Aetna came up with the following strategy: implement a systematic and fraudulent sham audit, to move all of Providers' claims into pre-payment review and avoid paying Providers indefinitely and in some cases to deny the claims.  The sham audit was a scheme to remove each enrollee's claim from the normal claim review procedures, to circumvent statutory deadlines for claims review and for audits, and to wrongfully deny consideration of each claim on the merits, which would have resulted in payment of claims.

174.    Aetna did not reveal to Providers what its purported "concerns" were, did not disclose to Providers the facts, reports, or investigations upon which Aetna relied, and did not permit Providers to meaningfully respond.  Denying a claimant the ability to see or respond to evidence resulting in a claim delay or claim denial is inconsistent with a "full and fair review."  29 U.S.C. § 1133.

175.    Aetna's months-long failures to review medical records that Providers diligently provided in response to Aetna's requests and to notify Providers how the records were deficient and/or why it took issue with any of the ERISA Claims purportedly of "concern," and its failure ever to notify Providers of any final determination on any of the purportedly disputed ERISA Claims illustrates why any attempt to exhaust Aetna's internal claim processes would be futile.

176.    Aetna also utterly failed to comply with the ERISA Claims Procedures, so any administrative remedies are "deemed" exhausted pursuant to 29 C.F.R § 2560.503-1(l).

177.    Aetna's sham audit lacked any legal or plan-based justification, and for each claim, Aetna has waived any claims exhaustion requirement, because of the futility of Aetna's claims process, the inadequacy of remedies provided under that process, and/or the unreasonableness of Aetna's claims process.

COHEN WILLIAMS LLP

178.    Aetna's flagrant abuse of claims processing and standard audit procedures denied Providers reimbursement of millions of dollars of claims.  Providers will suffer irreparable harm if the ERISA Claims are not considered expeditiously.

## EIGHTH CLAIM FOR RELIEF

### (Injunctive Relief - ERISA Section 502(a)(3))

### (Against Aetna Life Insurance Company and Aetna Health of California, Inc.)

179.    Providers incorporate, as if stated herein in full, all of the foregoing paragraphs.

180.    For this claim, Providers are suing Aetna as the assignees of Aetna enrollees' ERISA-covered benefits.

181.    ERISA Section 502(a)(3), permits injunctive relief for violations of ERISA's substantive standards of conduct.  29 U.S.C. § 1104(a)(3).

182.    Aetna systematically violates and violated the terms of the Aetna plans and ERISA by failing to cause those plans to pay benefits for covered services, pursuant to its sham audit.

183.    Aetna's sham audit also violates ERISA parity rules.   29 U.S.C.A. § 1185(a)(3)(A)(ii) (Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act).  Under applicable parity laws with which Aetna plans cannot conflict, Aetna is required to provide MH/SUD benefits in parity with medical and surgical benefits.

184.    Aetna's ERISA-governed plans covered MH/SUD benefits but, as a result of the sham audit, failed to do so in a manner that is in parity with medical and surgical benefits.  Financial requirements and treatment limitations imposed by Aetna on MH/SUD benefits cannot be "more restrictive" than those applicable to medical and surgical benefits. 29 U.S.C. §§ 1185a(a)(3)(A)(i)-(ii); *see also* 29 C.F.R. §§ 2590.712(a), (c)(2)(i).  Separate treatment limitations are also prohibited.

185.    Aetna's sham audit suggests that Aetna cynically defines "recovery" as no longer seeking recovery services that could cost Aetna or its plan sponsors any money.

Aetna used quantitative (numbers of visits) and non-quantitative (scope, duration) treatment limitations to trigger its fraudulent and systematic "pre-payment review" of Providers.

186. In other words, without generating a formally appealable "denial" or "decision" regarding treatment—Aetna has hit upon a method for limiting MH/SUD coverage and benefits on the backend, by indefinitely refusing reimbursement. The sham audit is a transparent end-run around parity requirements. With the sham audit, Aetna's medical necessity criteria for addicted individuals is: place all claims in indefinite review, never issue a decision, and never pay.

187. Aetna's use of a systematic sham audit targeted Providers and their patients because of the MH/SUD treatment that Providers offered Aetna enrollees. In particular, Aetna's policies and practices (1) stigmatize and blame the victim and assisting provider, (2) mischaracterize relapse as inherently fraudulent, (3) mischaracterize repeated treatments or "prolonged" treatments as inherently fraudulent, (4) mischaracterize courses of treatment in excess of a week or two as inherently fraudulent, and (5) mischaracterize Providers' lawful actions facilitating access to treatment for addicted individuals as inherently fraudulent or illegal.

188. In violation of parity requirements, Aetna's sham audit singled out MH/SUD treatment facilities like Providers' for discriminatory treatment and systematic and effective denials of reimbursement.

189. The sham audit results from or is an expression of Aetna's more stringent and discriminatory review processes for claims for MH/SUD treatment.

190. Aetna is less likely to impose systematic pre-payment audits on providers and patients *not* claiming MH/SUD benefits. In other words, the pre-payment audits Aetna used here single out Providers because of the MH/SUD treatments they provide.

191. Aetna's victim-blaming and medically inaccurate assumptions about relapse and the length of treatment do not apply to patients and providers making claims for covered non-MH/non-SUD benefits. To the extent Aetna's sham audit is premised on the

54

COHEN WILLIAMS LLP

1    purported review of "data," that review did not happen, or was premised on a more

2    stringent analytical process that incorporates Aetna's false assumptions about relapse and

3    length of treatment, triggering fraud red flags more easily than for other outpatient

4    treatment claims.

5        192.   Aetna should be enjoined from continuing to engage in this illegal conduct.

6                            **NINTH CLAIM FOR RELIEF**

7        **(Unfair Competition, Business and Professions Code §§ 17200 *et seq.*)**

8                        **(Against Aetna Life Insurance Company,**

9                    **Aetna Health of California, Inc. and ROES 1-10)**

10       193.   Providers incorporate, as if stated herein in full, all of the foregoing

11   paragraphs.

12       194.   As to the Non-ERISA Claims, Aetna has violated California's Unfair

13   Competition Law ("UCL") by engaging in unlawful conduct, including flagrant violations

14   of (1) limitations on what information audits can request, (2) notice requirements,

15   (3) timeliness limitations, and (4) MH/SUD parity requirements.  Taken together these

16   unlawful practices are unfair because they are a systematic and indefinite refusal to pay

17   that is purposefully injurious to Providers and disproportionate to the supposed purpose of

18   the audits.

19       195.   Aetna's sham audit circumvented laws allowing them to request only what is

20   actually necessary to make a claim determination.  Under the California Knox Keene

21   Health Care Service Plan Act, Health & Safety Code §§ 1340 *et seq.*, if a "health care

22   service plan" like those provided or administered by Aetna, "requests medical information

23   from providers in order to determine whether to approve, modify, or deny requests for

24   authorization, the plan shall request only the information reasonably necessary to make the

25   determination."  Health & Safety Code § 1367.01; *see also* Cal. Ins. Code §§ 10123.135(h)

26   (reasonable necessity standard); 10123.131(b) (same).

27       196.   In violation of these provisions, Aetna's sham audit used the same template

28   Notices to systematically request the same medical records.  It is evident the Notices were

COHEN WILLIAMS LLP

not tailored to any particular patient or claim.  Even when Providers sent Aetna the requested information, Aetna continued to repeatedly and needlessly request redundant information, unnecessary information, or information that had in fact already been provided.  Such information is not reasonably necessary to make a claim determination, and requesting it repeatedly was a transparent, and illegal, evasion tactic.

197.  Aetna's sham audit violated legal notice requirements.  Health & Safety Code Section 1371 requires plans to provide written notice if there is suspected fraud, including, at minimum, a "clear description of the . . . plan's statistically reliable methodology," a "clear description of the universe of claims from which the statistical random sample was drawn," and other clear explanations.  Health & Safety Code §1371; *see also* Cal. Ins. Code §§ 10123.135(f), (h), 10 C.C.R. § 2695.11(d) (requiring written reason for delays); 45 C.F.R. § 147.136(b)(3) (generally requiring health insurance issuers offering individual coverage to comply with ERISA claims procedures including the notice requirements set forth at 29 C.F.R. § 2560.503-1(g)).

198.  Health & Safety Code Section 1371.35(g) is clear that a "plan shall not delay payment on a claim . . . without citing a *specific rationale* as to why the delay was necessary and providing a monthly update regarding the status of the claim, and the plan's actions to resolve the claim, to the provider that submitted the claim."  Health & Safety Code § 1371.35(g) (emphasis added); *see also* Cal. Ins. Code § 10123.13(a).

199.  In violation of these provisions, Aetna did not provide any specific rationales or explanations for delays and denials, and did not provide notices with sufficient detail. Aetna delayed indefinitely and required Providers to call repeatedly in the hopes of getting an update.  It failed to provide any meaningful detail as to the reason for these delays, and no opportunity to resolve outstanding issues.  Aetna failed to provide the required written explanations and notices, even when Providers requested.

200.  The Notices' vague reference to a data review does not clarify what comprehensible or intelligible "concern" could justify delay.  Providers do not know and have no way to verify that Aetna conducted any data review consistent with audit sampling

1  methodologies.  The sham audit Notices included no mention of fraud, body brokering, or

2  any of the other baseless allegations mentioned for the first time in Aetna's lawsuit.

3      201.  Because Providers did not have the notice to which they were entitled, they

4  had no opportunity to address Aetna's purported concerns, to attempt to resolve any issues

5  that may have existed with any particular patient or claim, or any opportunity to establish

6  the claims were generally issued in good faith and in compliance with the law.

7      202.  Aetna's sham audit also trampled on timeliness requirements.  Health &

8  Safety Code Sections 1371.4 and 1371.35 require Aetna to reimburse Providers for services

9  rendered to Aetna enrollees and imposes a specific time limitation (30 days) on deciding

10  claims that are uncontested, or claims that are contested (30 days to reconsider).  Health &

11  Safety Code §§ 1371.4, 1371.35; *see also* Cal. Ins. Code § 10123.13(a) (30 working days,

12  or provide specific reasons for contesting claim); 29 C.F.R. § 2560.503-1(f)(2)(iii)(B)

13  (under ERISA, 30 days, or 15 days extra if timely notice of circumstances requiring

14  extension and date by which plan will render decision"); 45 C.F.R. § 147.136(b)(3)

15  (requiring individual coverage plans to comply with ERISA); 10 C.C.R. § 2695.11(d)

16  (requiring, if there is a delay, estimate as to when determination will be made).

17      203.  Aetna deployed its sham audit to indefinitely avoid paying anything for the

18  services Providers rendered to Aetna enrollees in violation of these provisions.  Aetna

19  violated the time limitations for deciding claims, whether contested or uncontested, by

20  failing to act on completed or resubmitted claims, even after many months.  In most cases

21  the claim has remained pending with Aetna longer than a year.  Aetna failed to provide

22  estimates as to when determinations would be made, and failed to provide notice that would

23  justify extensions.

24      204.  Aetna's systematic sham audit was based on formal and informal policies and

25  practices that violate California's Mental Health Parity Act ("Parity Act"), as substantially

26  revised in 2020, *see* Health & Safety Code 1374.72, repealed and reenacted in 2020, Health

27  & Safety Code § 1374.721, added in 2020; *see also* 29 U.S.C.A. § 1185(a)(3)(A)(ii) (Paul

28  Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act).

COHEN WILLIAMS LLP

205.   Under applicable parity laws, Aetna is prohibited from limiting benefits or coverage for SUD to short-term or acute treatment, Health & Safety Code § 1374.72(a)(6), and must base medical necessity determinations and utilization review criteria on current generally accepted standards for SUD care, Health & Safety Code § 1374.721(a).   Aetna is prohibited from applying different, additional, or conflicting criteria to SUD.   Health & Safety Code § 1374.721(b).

206.   Aetna's use of a systematic sham audit targeted Providers and their patients because of the MH/SUD treatment Providers offered Aetna enrollees.   Aetna's allegations in its lawsuit against Providers illustrate how Aetna based the audit in part or in whole on outdated and not generally accepted standards of SUD care.

207.   In particular, Aetna's policies and practices (1) stigmatize and blame the victim and assisting provider, (2) mischaracterize relapse as inherently fraudulent, (3) mischaracterize repeated treatments or "prolonged" treatments as inherently fraudulent, (4) mischaracterize courses of treatment in excess of a week or two as inherently fraudulent, and (5) mischaracterize Providers' lawful actions facilitating access to treatment for addicted individuals as inherently fraudulent or illegal.

208.   In violation of these parity requirements, Aetna's sham audit singled out MH/SUD treatment facilities like Providers' for discriminatory treatment and systematic and effective denials of reimbursement.

209.   The sham audit results from or is an expression of Aetna's more stringent and discriminatory review processes for claims for MH/SUD treatment.

210.   Aetna is less likely to impose systematic pre-payment audits on providers and patients *not* claiming MH/SUD benefits.   In other words, the sham audit Aetna used here singled out Providers because of the MH/SUD treatments they provide.   Aetna's medically inaccurate assumptions about fraud, relapse, and the length of treatment do not apply to patients and providers making claims for covered non-MH/non-SUD benefits.   To the extent Aetna's sham audit is premised on the purported review of "data," that review was

premised on a more stringent analysis that triggers fraud red flags more easily than for other outpatient treatment claims.

211.  This conduct also violates parallel provisions of the Knox Keene Act Section 1363.5(b), which require criteria or guidelines for the authorization, modification, or denial of healthcare service to be consistent with sound clinical principles and processes, and for those criteria to be disclosed to the provider in the event they are used as a basis of a decision to modify, delay, or deny services.

212.  Aetna's sham audit also violates the parity law rules prohibiting insurers from "rescind[ing] or modify[ing] the authorization after the provider renders the health care service in good faith and pursuant to this authorization for any reason, including . . . the plan's subsequent determination that it did not make an accurate determination of the enrollee's or subscriber's eligibility."  Health & Safety Code § 1374.72(a)(8).  Aetna's allegations in this lawsuit, ECF No. 39 ¶¶105(a)-(c), suggest that Aetna concluded (incorrectly) that the individuals Providers treated were ineligible for treatment solely because they relapsed or were treated at multiple facilities.

213.  Aetna has further violated the UCL, because the sham audit it implemented is not only unlawful, it is "unfair" as defined in the UCL.  The sham audit is purposefully injurious to MH/SUD providers, and had an impact on MH/SUD providers that far exceeded the purported justifications or motives for the audit.  Even if Aetna had cause to believe one or more claims had problems (it did not), Aetna lacked any good faith basis to systematically and unilaterally block reimbursement, in some cases for years.

214.  Aetna engaged in illegal self-help that violated the law and circumvented the regulatory regime for contesting provider claims and conducting legitimate audits. Nothing gave Aetna the right to systematically and indefinitely delay reimbursement, in the manner of the sham audit.

215.  Health & Safety Code Section 1371.37 prohibits unfair payment patterns. Aetna's sham audit satisfies the statutory definition of an unfair payment pattern.

216.   A legal remedy, such as requiring Aetna to pay the claims held in Aetna's sham audit, would be inadequate, because it would not prevent Aetna from imposing a sham audit on Providers for future claims.

217.   Providers have been injured by the sham audit because they have invested significant resources in unfruitful claim collection efforts and have been denied payments they are owed.  They have been directly injured by Aetna's unfair competition and are entitled to restitutionary relief for the value of the services they provided to Aetna enrollees.

218.   Aetna plans provide that enrollees remain liable for any out-of-network billed amount that Aetna refuses to pay Providers.  Aetna's unfair and illegal business practices hope to impose financial liability on Aetna enrollees for treatment that Aetna acknowledges to be covered services, which is a breach of Aetna's duties to its enrollees.  However, Providers are not likely to be able to recover the amounts owed from many of the enrollees.

WHEREFORE, Counterclaimants pray for judgment against Counterdefendants as follows:

1.   For general, special, restitutionary and compensatory damages according to proof;

2.   For restitutionary monetary relief under the UCL;

3.   For prejudgment interest on amounts benefits wrongfully withheld;

4.   For expenses incurred, including attorneys' fees and other costs, according to proof;

5.   For punitive damages according to proof;

6.   For recovery of benefits, declaratory relief, and injunctive relief pursuant to ERISA;

7.   For an award of attorneys' fees and costs under ERISA, 29 U.S.C § 1132(g);

8.   For equitable and injunctive relief; and

9.   For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Counterclaimants demand trial by jury for all matters so triable.

Dated:  November 27, 2024          **COHEN WILLIAMS LLP**


By:     _/S/ Marc S. Williams_
        Marc S. Williams
        Reuven L. Cohen
        Kathleen M. Erskine
        Joseph E. Saei

        Attorneys for Defendants and
        Counterclaimants Nathan Young, David
        Young, Get Real Recovery, Inc., Healing Path
        Detox LLC, Ocean Valley Behavioral Health,
        LLC, Rodeo Recovery LLC, Sunset Rehab
        LLC, Natural Rest House, Inc., 55 Silver
        LLC, 9 Silver LLC, Helping Hands
        Rehabilitation Clinic Inc., and Joser Forever
        LLC