DAVID D. PIPER (CASB No. 179889)
DPiper@Stradley.com
STRADLEY RONON STEVENS & YOUNG, LLP
1 World Trade Center, Suite 2575
Long Beach, CA 90831
Telephone: (562) 366-1653
Facsimile: (562) 366-1646

BENJAMIN H. MCCOY (*Pro Hac Vice*)
BMcCoy@Stradley.com
JORDANN R. CONABOY (*Pro Hac Vice*)
JConaboy@Stradley.com
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Telephone: (215) 564-8108
Facsimile: (215) 564-8120

Attorneys for Plaintiffs
AETNA LIFE INSURANCE COMPANY and
AETNA HEALTH OF CALIFORNIA, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF CALIFORNIA, INC.,<br><br>Plaintiffs,<br>v.<br><br>NATHAN SAMUEL YOUNG, et al.<br><br>Defendants. | Case No. 2:23-cv-09654-MCS-JPR<br><br>**MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF AETNA'S MOTION FOR SANCTIONS**<br><br>Hearing Date: November 24, 2025<br>Time: 9:00 AM<br>Courtroom: 7C<br>Judge: Hon. Mark C. Scarsi<br><br>Complaint Filed: November 14, 2023<br>Trial Date: May 5, 2026 |

# TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. The Fraud Scheme Shaping the Scope of Discovery ........ 3

II. Partial Productions Relating to Just Three Body Brokers Demonstrate the Immense Discovery Relevant to this Case ........ 4

III. Judge Rosenbluth's Orders and Findings of Noncompliance ........ 7

IV. Defendants Have Not Complied with the Order Requiring Document Productions ........ 8

V. Defendants' Interrogatory Responses Are Still Not in Compliance with the Court Order ........ 10

VI. Defendants' Last-Minute Discovery "Scoping" and Preservation Issues ........ 11

LEGAL STANDARD ........ 14

ARGUMENT ........ 15

I. Sanctions Are Necessary ........ 15

A. Defendants' Violation of the Court's Order Alone Justifies Sanctions ........ 15

B. The Prejudice Suffered by Aetna Is Another Ground for Sanctions ........ 15

II. Aetna Seeks Appropriate Sanctions Tailored to the Conduct and Harm ........ 18

III. There is No Substantial Justification for Violating the Court's Order or Waiting So Long to Identify or Collect Documents ........ 20

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adriana Intern. Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990) .......... 14

*Am. Career Coll. Inc. v. Medina*,
673 F. Supp. 3d 1139 (C.D. Cal. 2023) .......... 20

*Avago Techs., Inc. v. IPtronics Inc.*,
No. 10-02863, 2015 WL 2395941 (N.D. Cal. May 19, 2015) .......... 22

*Brislane v. Brown*,
No. 16-6002, 2017 WL 4712076 (C.D. Cal. Oct. 13, 2017) .......... 16

*Carrillo v. Schneider Logistics, Inc.*,
No. 11-8557, 2012 WL 4791614 (C.D. Cal. Oct. 5, 2012) .......... 14, 15, 16

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .......... 18

*Colonies Partners, L.P. v. Cnty. of San Bernardino*,
No. 18-00420, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) .......... 13

*Computer Task Group, Inc. v. Brotby*,
364 F.3d 1112 (9th Cir. 2004) .......... 15

*Ear Charms, Inc. v. Bling Jewelry, Inc.*,
No. 16-02091, 2019 WL 2902507 (C.D. Cal. May 23, 2019) .......... 20

*Estakhrian v. Obenstine*,
No. 11-3480, 2016 WL 6868178 (C.D. Cal. Feb. 29, 2016) .......... 20

*G-K Props. v. Redevelopment Agency of San Jose*,
577 F.2d 645 (9th Cir. 1978) .......... 16

*Henry v. Gill Indus., Inc.*,
983 F.2d 943 (9th Cir. 1993) .......... 15

*Jerry Beeman & Pharmacy Servs., Inc. v. Caremark Inc.*,
322 F. Supp. 3d 1027 (C.D. Cal. 2018) .......... 14

*Lew v. Kona Hospital*,
754 F.2d 1420 (9th Cir. 1985) ........ 14

*PeerMusic, III, Ltd. v. LiveUniverse, Inc.*,
No. 09-6160, 2011 WL 672585 (C.D. Cal. Jan. 26, 2011) ........ 20

*In re Phenylpropanolamine (PPA) Products Liab. Litig.*,
460 F.3d 1217 (9th Cir. 2006) ........ 15, 21

*Pineda v. City & County of San Francisco*,
280 F.R.D. 517 (N.D. Cal. 2012) ........ 22

*T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.*,
843 F.2d 683 (3d Cir. 1988) ........ 19

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
982 F.2d 363 (9th Cir.1992) ........ 14

*United States v. McGill*,
128 F. Supp. 3d 863 (E.D. Pa. 2015) ........ 3

*Zone Sports Ctr., LLC v. Nat'l Sur. Corp.*,
No. 11-845, 2012 WL 1969048 (E.D. Cal. May 31, 2012) ........ 19

**Rules**

Fed. R. Civ. P. 34 ........ 21

Fed. R. Civ. P. 37 ........ *passim*

Plaintiffs Aetna Life Insurance Company and Aetna Health of California, Inc. (collectively, "Aetna") submit this memorandum of law in support of their Motion for Sanctions against the following "Defendants": Nathan Young; David Young; Helping Hands Rehabilitation Clinic, Inc.; Joser Forever LLC; Get Real Recovery LLC; Healing Path Detox LLC; Ocean Valley Behavioral Health, LLC; Rodeo Recovery, LLC; Sunset Rehab LLC; and Natural Rest House, Inc.

## INTRODUCTION

On August 14, 2025, Magistrate Judge Rosenbluth ordered Defendants to produce documents and respond to interrogatories by September 18, 2025. Dkt. No. 114. Defendants failed to do so. In a follow-up hearing on September 29, 2025, Judge Rosenbluth confirmed that Defendants "fail[ed] to comply with a Court Order." Dkt. No. 115 at 7:24-25. Still today, Defendants have not complied.

This sprawling, $40-million-dollar RICO case has now reached the point where it will be virtually impossible for Aetna's experts to complete their analyses by the current December 8, 2025 deadline for initial expert disclosures. There also is no way that Aetna can complete fact discovery by the current December 22, 2025 deadline since, *inter alia*, Aetna still does have the documents necessary to identify which ten witnesses to depose, let alone digest all the evidence and take depositions.

But that's just the start. Defendants recently told Aetna that they are no longer affiliated with most of their body brokers and that they apparently lack access to the brokers' communications. Aetna will now have to subpoena these body brokers to a degree far beyond the initially estimated scope of third-party discovery. Even worse, all indications are that Defendants did not instruct their body brokers to preserve evidence, and that they did not collect or preserve the body brokers' communications either. Enforcing subpoenas to Defendants' former workers will also likely be burdensome because, as Aetna has worked to find these individuals, it has come to light that some of them are in jail or facing criminal charges, and some have expressed their intent to invoke the Fifth Amendment or otherwise try to avoid compliance.

On top of all that, Defendants just provided Aetna with information that raises serious spoliation concerns—including that they allegedly lack access to one of the main email accounts used during the relevant period by the ringleader of the scheme, Nathan Young. That is a big problem because the account is on scores of relevant emails, including hundreds sent since this case began. Further, after Judge Rosenbluth ordered Defendants to detail their discovery efforts, they revealed that they waited until about ten months after the case started to collect and preserve emails from Nathan Young's other primary account, and that they are just now collecting and preserving emails from at least one of Defendant David Young's accounts. Aetna does not yet seek spoliation sanctions, but the problems that persist with respect to the Youngs' emails are emblematic of how Defendants' unjustifiably late discovery efforts led to their violation of Judge Rosenbluth's Order and other issues.

Aetna recognizes that defense counsel has been working to gather discovery since Judge Rosenbluth's Order issued on August 14, 2025. But that does not justify Defendants' violation of the Order. Defendants made a purposeful decision to force Aetna to file a Motion to Compel—and to further wait until Judge Rosenbluth issued an Order—before they seriously began engaging in discovery or even identifying custodians. Such inaction is indefensible in a vast RICO case where the overwhelming majority of relevant evidence is in Defendants' possession.

The Court should take the following actions to sanction Defendants' violations: (a) unilaterally extend Aetna's discovery and expert deadlines by the number of tardy days it takes Defendants to comply with the Court's Order, which can be done without moving the trial date; (b) issue a preclusionary sanction barring Defendants from relying on materials they produced after the Court imposed deadline; and (c) deem Aetna to have met its burdens relating to the categories of materials that were covered by the Court's Order but not produced in compliance with it. The Court should also instruct Defendants to comply with the Court's Order immediately, with a directive that failure to do so will result in more severe sanctions, including judgment.

# BACKGROUND

## I. THE FRAUD SCHEME SHAPING THE SCOPE OF DISCOVERY

Healthcare fraud is a "serious problem" because it "is a well-known contributor to increased costs for healthcare services" and it drains Americans of "tens of billions of dollars each year." *United States v. McGill*, 128 F. Supp. 3d 863, 872 (E.D. Pa. 2015). Healthcare fraud litigation is typically resource intensive because fraudsters go to great lengths to mask their illegal conduct, including by creating webs of entities, masking their kickbacks, maintaining multiple accounts, and hiding their ill-gotten gains. This case has all that and much worse. In addition to massive financial fraud, there are also widespread reports of deaths and serious patient harm at Defendants' facilities, and the state of California reportedly closed several of the facilities based on Defendants' falsification of records, among other things. *See*, *e.g.*, Zucha Elinson and Juli Wemau, *Drug Rehabs Lure In Patients for Insurance Money—Then Leave Them on the Street*, Wall Street Journal (Oct. 8, 2025).

As alleged in the First Amended Complaint ("FAC"), Defendants' scheme hinged on kickbacks and fraudulent claims for payments. Defendants bribed patients to come to their facilities and stay there—as long as they had good health benefits or Defendants could help fraudulently sign them up for coverage. FAC ¶ 17. These kickbacks took many forms, including alleged employment that Defendants used to funnel money to patients under the guise of wages. *Id.* Defendants also paid kickbacks to recruiters, or "body brokers," to induce them to find more patients. *Id.* And Defendants' records show that these body-broker kickbacks had to be approved by Defendant Nathan Young, or "Pablo." Declaration of Benjamin H. McCoy ("Dec.") ¶ 2. Further, Aetna anticipates showing that Defendants paid kickbacks to doctors and other medical providers to benefit from their medical licenses and to obtain referrals.

Defendants then flooded Aetna and other health plans and insurers with fraudulent claims for alleged rehab services. They illegally obtained over $40 million from Aetna and its plan sponsors alone, not counting what they took from other

private entities and government health plans, and this Court upheld all of Aetna's claims when denying Defendants' Motion to Dismiss. Dkt. No. 63.

## II. PARTIAL PRODUCTIONS RELATING TO JUST THREE BODY BROKERS DEMONSTRATE THE IMMENSE DISCOVERY RELEVANT TO THIS CASE

To illustrate how Defendants' scheme worked in practice and the scope of the necessary discovery relating to just part of the scheme, consider three examples of Defendants' kickbacks and fraudulent billing, as well as the resulting harm.

### 1. *Example No. 1 – Aetna Member/Body Broker N.S.*

Aetna member N.S. is an individual who experienced the kickback gamut as both a patient and a body broker. N.S. was extremely valuable to Defendants because he had coverage under an Aetna health plan that Defendants successfully defrauded out of nearly $800,000 for services they allegedly provided to N.S. in his purported capacity as their patient. Dkt. No. 39 ¶ 81. During that same time, Defendants sent N.S. dozens of CashApp payments for thousands of dollars. Dec. ¶ 3. They also made over 70 wire payments to N.S. for roughly $215,000. *Id*. Amazingly, Defendants—who were supposedly treating N.S.—did this after recording in internal notes that N.S. regularly had financial problems because he used his money on drugs. *Id.*

The illegal purpose of Defendants' payments to N.S. is obvious based on the circumstances. But there is no need to rely on circumstantial evidence here because N.S.'s communications and records make clear exactly what these payments were: kickbacks. Some were kickbacks to get N.S. to remain at Defendants' facilities so they could bill Aetna, and others were kickbacks to get N.S. to recruit more people to sign up to be alleged patients for Defendants' financial gain.

Indeed, N.S. was open about the kickback arrangement. For example, when trying to recruit someone to come to Defendants' facilities, N.S. reportedly boasted about how he and others got "a kickback for each client" from "[P]ablo" (Defendant Nathan Young) and how "you can make so much f*****g money off these junkies":




Some of Defendants' internal records are just as clear on these points. For instance, in a damning piece of evidence, the memo line of some of Defendants' pay statements for N.S. explicitly reference the patients underlying the monetary kickbacks Defendants gave him:[1]



gusto Payment Statement

55 Silver
1800 Vine St
STE 216
Los Angeles, CA 90028
206-531-2757

Paid to
N[redacted] S[redacted]
[redacted]

Payment
Date: **May 31, 2023**
Method: Direct Deposit
Account: [redacted]

**Memo:** $150 for J[redacted] M[redacted] $150 for E[redacted] M[redacted] /$5000 for R[redacted] C[redacted]
**Invoice:** 53123-2

Payment Details

| Description | Total |
|---|---|
| Amount | $0.00 |
| Reimbursements | $5,300.00 |
| Total Payment | $5,300.00 |

[1] As with N.S., relevant patients' names are redacted to show only their initials.

Other kickbacks were more subtle. For example, Defendants' records indicate that they provided N.S. with housing for free or based on nominal payments, and they appear to have paid for things like N.S.'s gym memberships while also waiving his co-insurance obligations. *See* Dec. ¶ 3. Patients at Defendants' facilities "were even offered drugs, including black tar heroin and methamphetamine." Dkt. No. 63 at 3.

**2. *Example No. 2 – Patient/Body Broker S.S.***

S.S. is a twice convicted felon in his mid-twenties who simultaneously served as a body broker and an alleged patient for whom Defendants billed another insurer (Anthem), and Defendants paid S.S. at least several hundred thousand dollars. Dec. ¶ 4.[2] By contrast, Defendants' records indicate that they paid their nurses and others who allegedly provided care about $30 per hour or less. *Id.* ¶ 4.

During the same period when S.S. received kickbacks from Defendants, he also followed their pattern of destroying lives and communities. According to court records, while working for Defendants, S.S. was convicted of assault with a deadly weapon, and he admitted to being high on methamphetamine when he drove his car into a firefighter. Dec. ¶ 4. Court records also indicate that, at least as of July 2025, S.S. was incarcerated on a felony robbery charge. *Id.* And his own public profile shows no qualifications or experience that would justify getting paid such exorbitant amounts for a legitimate healthcare reason.

**3. *Example 3 – Patient/Body Broker N.M.***

N.M. was recently indicted by a grand jury in the Central District of California on charges of body brokering and accepting kickbacks. *See* Crim. No. 25-672 (C.D. Cal. Aug. 15, 2025). That includes payments through electronic apps in March 2021, when Defendants' records show that they also made the same types of payments to

[2] Defendants' records show payments of more than $500,000.00 to S.S. in about 15 months. *Id.* However, some records show multiple payments on the same day, and it is unclear if those relate to the same payments.

N.M. *Id.*; *see also* Dec. ¶ 5. As with N.S. and S.S., Defendants also appear to have billed Anthem for allegedly providing services to N.S., or someone who shares his name. Dec. ¶ 5. During the same period, Defendants paid N.M. at least $1.5 million. *Id*. And N.S., S.S., and N.M. were all allegedly treated by a physician who Defendants paid on a "per visit" basis (in addition to a monthly medical-director fee), a suspect volume-based payment system indicative of yet more kickbacks. *Id.* ¶ 6.

* * *

Defendants paid these patients and body brokers through dozens of entities (both Defendants and non-defendants), and they did so in various ways, including cash, CashApp and other payment apps, free rent, wire payments, pre-paid credits cards, and gifts. The entity Defendants also took in tens of millions of dollars, and the money flowed through their many related businesses—including a hotel, dozens of alleged treatment facilities, and marketing companies. Then the individual Defendants pulled millions of dollars out of these entities. All this created an intricate financial web designed to hide Defendants' fraud. As relevant to this Motion, most of the evidence discussed above has only recently been produced, and more is to come.

## III. JUDGE ROSENBLUTH'S ORDERS AND FINDINGS OF NONCOMPLIANCE

The examples of N.S., S.S., and N.M. required Aetna to extensively examine recent productions and other evidence to make certain connections. And these represent just a sliver of the true scope of Defendants' operations. Suffice to say, presenting Aetna's case will require a lot of time and resources to adequately comb through and analyze significant volumes of documents and data. Financial assessments involve analyzing all of Defendants' ledgers, financial statements, billing and payment records, real estate documents, and federal and state tax returns, among other things. Similarly, Aetna's analysis of Defendants' claims for payment involve extensive medical records, billing and payment records relating to health plans and patients, housing records, communications with alleged patients, communications with insurers and health plans, and census information.

On August 14, 2025, Judge Rosenbluth ordered Defendants to produce this information and more by September 18, 2025. Dkt. No. 114. Judge Rosenbluth further ordered Defendants to provide supplemental interrogatory responses by the same date. *Id.* As of the deadline imposed by the Court, Defendants had provided ***no*** supplemental interrogatory responses, and they did not produce most of the documents the Court ordered them to turn over. Thus, Judge Rosenbluth held that Defendants "***fail[ed] to comply with a Court Order[.]***" Dkt. No. 115 at 7:24-25.

Judge Rosenbluth also ordered Defendants to: (a) "produce their previously ordered [] supplemental interrogatory responses by no later than September 29, 2025[;]" and (b) to produce "[t]heir previously ordered and now overdue document production . . . as quickly as possible[.]" Dkt. No. 121. In addition, Judge Rosenbluth held that "[Aetna] is entitled to general ledger and subledger information." *Id.* When issuing this Order, Judge Rosenbluth noted that "the speed with which [Defendants] comply with that order will likely factor into how the Court receives any subsequent request for sanctions of any kind that Plaintiff may file." *Id.* A few days later, on September 30, 2025, Judge Rosenbluth ordered Defendants to produce all their federal and state tax returns from 2020 through 2024. Dkt. No. 126.

## IV. DEFENDANTS HAVE NOT COMPLIED WITH THE ORDER REQUIRING DOCUMENT PRODUCTIONS

Since Judge Rosenbluth found that Defendants violated the Court's Order, Defendants have produced documents, including their most substantial production on October 21, 2025. But they have not provided key information, and they remain in violation of the Order and its September 18, 2025 deadline. Specifically, Defendants have not fully complied with the following requests, some of which they have produced ***no*** documents for:

- Communications with body brokers (RFP. No. 1);
- Communications with each other (RFP Nos. 2 and 8);

- Documents and communications relating to agreements regarding marketing and referrals (RFP No. 4);
- Documents and communications relating to enrolling patients in Aetna health plans (RFP No. 5);
- Documents and communications relating to electronic medical record vendors (RFP No. 6);
- Documents and communications relating to complaints or grievances by patients (RFP. No. 9);
- Communications with Amazon—a defrauded health plan sponsor—relating to employment of Aetna members (RFP No. 13);[3]
- Documents and communications relating to alleged collections of patients' co-insurance and co-pay obligations (or lack thereof) (RFP Nos. 3 and 12);
- Documents and communications relating to Defendants' claims submissions for the Aetna members at issue (RFP No. 10);
- Documents and communications relating to lease agreements with patients and landlords (RFP No. 14);[4] and

---

[3] Defendants agreed to produce bank records following Judge Rosenbluth's Order granting Aetna's Motion to Compel. Dec. ¶ 7. To date, Defendants have not produced them, but they have informed Aetna that they are working on doing so. *Id.* There are also other outstanding issues relating to Defendants' bank accounts, including that they told Aetna for the first time in September 2025 that they allegedly lack access to multiple accounts that they utilized during the relevant period. *Id.*

[4] Defendants' productions contain many documents and pages. That is not surprising for a case involving medical records, which are voluminous. But even the production of medical records is deficient. For example, Defendants produced records for N.S. only relating to about 18 relevant claims that resulted in Aetna paying Defendants roughly $27,000 in May and June of 2021. As far as Aetna can tell, Defendants have not produced similar records relating to more than 300 other claims that they used to defraud Aetna out of more than $750,000. Dec. ¶ 8.

- Documents and communications relating to lease agreements with patients and landlords (RFP No. 14).

*See* Dkt. No. 114 (Ordering Defendants to comply with all these requests).

## V. <u>DEFENDANTS' INTERROGATORY RESPONSES ARE STILL NOT IN COMPLIANCE WITH THE COURT ORDER</u>

As of the September 25, 2025 hearing, Defendants had also failed to comply with Judge Rosenbluth's Order to provide supplemental interrogatory responses by September 18, 2025. Judge Rosenbluth therefore ordered Defendants to comply with the Court's prior Order by September 29, 2025. *See* Dkt. No. 121. While Defendants provided documents by that date titled "Supplemental Responses to First Set of Interrogatories," it is becoming clearer by the day that they have yet to comply with the September 29, 2025 deadline. Defendants' defiance is perplexing given the ease with which they could have provided accurate information at their fingertips.

Take, for example, Judge Rosenbluth's Order directing Defendants to identify "anyone who had marketing among their job responsibilities." Dkt. No. 114 at 3. Defendants maintained and regularly updated spreadsheets listing their marketers, but they failed to identify dozens of people from those spreadsheets in their supplemental interrogatory response. Dec. ¶ 9. Instead, they claimed that, as of May 2024, they had only about nine people other than Nathan Young whose duties may have included marketing or something relating to marketing. *Id*. But Aetna's quick review of materials that Defendants produced last week shows that as recently as 2024, Defendants created spreadsheets that identified dozens of undisclosed people who they internally described as marketers or being responsible for marketing. *Id*.

Similarly, Judge Rosenbluth ordered Defendants to identify all the bank accounts that they used during the relevant period, Dkt. No. 114 at 2 (directing compliance with Interrogatory No. 5), but Aetna believes it has already identified at least a dozen accounts that Defendants failed to disclose, Dec. ¶ 10. When Aetna raised this issue, Defendants accused Aetna of unfairly "chastising" them before

stating that they are working to supplement their interrogatory responses again to include updated banking information. *Id.* But that does not change the fact that the non-compliance that Judge Rosenbluth found over a month ago continues today.

## VI. DEFENDANTS' LAST-MINUTE DISCOVERY "SCOPING" AND PRESERVATION ISSUES

In addition to ordering Defendants to comply with Aetna's discovery requests, Judge Rosenbluth also directed them to "provide to [Aetna] a declaration laying out in detail how and when, and by whom, they have searched for information and documents responsive to [Aetna's] first sets of interrogatories and requests for production." Dkt. No. 121. Defendants served a Declaration on October 2, 2025. Dec. ¶ 12, Ex. A.

As Aetna reads the Declaration, it confirms Aetna's suspicion that Defendants did very little to begin identifying and gathering discovery before the Court ordered them to do so. Indeed, Defendants state that they gathered and preserved communications for just ***two people***—David and Nathan Young—before the Court granted Aetna's Motion to Compel. Dec. at Ex. A, ¶ 7. And there are serious problems even with that alleged email collection, which appears to have included only two of David and Nathan Young's ten or more email accounts.

To begin, Defendants' declaration states that they did not collect emails from the Youngs until "early October 2024[,]" *id.*, roughly 11 months after Aetna filed its initial Complaint on November 14, 2023, Dkt. No. 1. Even more concerning, on October 20, 2025, Defendants told Aetna for the first time that they allegedly no longer have access to substantive emails—or any emails at all—from one or more of Defendant Nathan Young's accounts. *Id.* ¶ 12.

Defendants depicted one of the accounts, n*********2@yahoo.com ("the Second Nathan Young Yahoo Account"), as a receipt-only account that "has little if any material relevant to the lawsuit[,]" though they have since acknowledged that they are still in the "process of collecting data" and "confirm[ing] the nature of those

emails." *Id*. Defendants also just asserted last week that they have no access at all to one of the primary accounts that Nathan Young used during the relevant period, p**********z@gmail.com ("the Nathan Young Gmail Account"). *Id*. According to Defendants, they cannot regain access to the account because it is tied to a cell phone that Nathan Young can no longer access either. *Id.* Significantly, Defendants made these disclosures only after Aetna asked them about the Nathan Young Gmail Account. *Id.*

Aetna has serious reservations about what happened to the Nathan Young Gmail Account because Aetna has already identified many relevant emails involving the account. *Id.* This includes emails from after the case began, as well as emails regarding substantial invoices that would be nonsensical to send to a closed account. *Id.* Nathan Young himself even sent post-litigation emails from his primary Yahoo account to the Nathan Young Gmail Account, and he received many post-litigation emails on his primary Yahoo account that also copied the Nathan Young Gmail Account. *Id.* Again, there would be no good reason to do that with an inactive account.

And those are not the only Young-related email issues. In total, Aetna has identified at least seven email accounts that Nathan Young used during the relevant period. *Id.* The status of each remains unclear, and there are also lingering questions about at least one of David Young's email accounts, d***********7@gmail.com ("the David Young Gmail Account"), which Defendants have said their vendor is currently "running searches for" and "in the process of preserving," actions that should have been taken a long time ago. *Id.*[5]

With respect to other people's email accounts, Defendants' Declaration states that they did not start "scoping" their "Microsoft 'tenant' environment" or identifying additional custodians until August 2025 or later. *See*, *e.g.*, Dec. at Ex. A, ¶ 63 ("On

[5] Aetna will continue to meet and confer with Defendants. But the relevant point for now is that it is inexcusable for there to be so many unresolved issues.

August 20, 2025, CDS had begun scoping the Young Defendants' Microsoft 'tenant' environment and working with CW attorneys to identify the total number of custodians within the Microsoft tenant environment."); ¶ 33 (acknowledging that, as of July 2025, Defendants had only collected documents from the two core custodians, Nathan Young and David Young, as well as various centrally stored corporate files (referencing material the Young Defendants maintained on Dropbox); ¶ 64 (stating that Defendants "completed research into custodians of interest" on September 4, 2025). In other words, it appears that Defendants did not even identify custodians other than David and Nathan Young before the Court ordered them to produce documents in August 2025, much less begin collecting their documents.

Not only did that approach lead to Defendants missing the Court-imposed deadline for document productions, but it raises serious questions concerning Defendants' preservation efforts. Indeed, Defendants' Supplemental Interrogatory Responses state that they were no longer affiliated with most of their body brokers by the time they apparently started identifying custodians in August 2025. Dec. ¶ 9. And they only recently indicated that they neither acted to preserve the body brokers' documents and communications nor instructed them to do so. *See*, *e.g.*, *Colonies Partners, L.P. v. Cnty. of San Bernardino*, No. 18-00420, 2020 WL 1496444, at *10 (C.D. Cal. Feb. 27, 2020) (employers must instruct employees to preserve evidence, and employers can be culpable if they fail to do so even if the employers are not "directly responsible for the destruction of evidence.").

Aetna does not know for sure whether or to what degree Defendants violated their preservation obligations because Defendants have mainly refused to provide any specific information on that topic. Dec. ¶ 13. The Court is authorized to probe Defendants' preservation efforts, although it is irrelevant whether any failures resulted from "inadvertence, lack of investigation, incompetence, or bad faith[.]" *Carrillo v. Schneider Logistics, Inc.*, No. 11-8557, 2012 WL 4791614, at *9 (C.D. Cal. Oct. 5, 2012) (issuing sanctions where a defendant employer failed to preserve

employee email accounts that were not issued or maintained by the defendant).[6]

## LEGAL STANDARD

Rule 37 authorizes a court to issue sanctions against a party who "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). As relevant here, these sanctions may include "directing that the matters embraced in the order or other designated facts be taken as established; prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; striking pleadings in whole or in part; . . . rendering default judgment against the disobedient party; or treating as contempt of court the failure to obey any order[.]" Fed. R. Civ. P. 37(b)(2)(A)(i)-(iii), (vi). A "district court has great latitude in imposing sanctions under Fed. R. Civ. P. 37[,]" *Lew v. Kona Hospital*, 754 F.2d 1420, 1425 (9th Cir. 1985), and the appropriate sanctions should be fashioned to address the conduct and harm that results, *Adriana Intern. Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990).

District courts also possess inherent powers arising out of the control needed "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992) (*quoting Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). That includes authority to sanction a party for violating a discovery order and for more general discovery abuses, such as when a party that fails to preserve its own evidence, *Jerry Beeman & Pharmacy Servs., Inc. v. Caremark Inc.*, 322 F. Supp. 3d 1027, 1036 (C.D. Cal. 2018), or when it fails to direct employees not to delete relevant materials or otherwise "fails to comply with its discovery obligations[,]" *Carrillo*, 2012 WL 4791614, at *9. Such sanctions for discovery-obligation failures are warranted unless

[6] Defendants knew that their marketers and employees were using Gmail and similar email accounts for business, and Defendants regularly communicated with them on those accounts. Defendants also maintained contact lists with employees' Yahoo and Gmail accounts. Dec. ¶ 14.

"circumstances outside [the violating party's] control cause [its] transgressions[,]" which is not the case here. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 949 (9th Cir. 1993).

## ARGUMENT

### I. SANCTIONS ARE NECESSARY

#### A. Defendants' Violation of the Court's Order Alone Justifies Sanctions

Sanctions are appropriate here based on Defendants' failure to comply with Judge Rosenbluth's Order for Defendants to produce documents by September 18, 2025. Dkt. No. 114. In fact, the Court should "presume[] prejudice" since "[f]ailing to produce documents as ordered is considered sufficient prejudice" and "late tender is no excuse." *In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 460 F.3d 1217, 1227 (9th Cir. 2006); *see also Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1116 (9th Cir. 2004) ("failure to produce documents as ordered . . . is considered sufficient prejudice" to justify up to a case terminating sanction).

As noted above, Defendants failed to comply with many of the document requests as ordered. Even the productions they have made are incomplete as to many categories. Similarly, Defendants violated Judge Rosenbluth's Order to fully respond to Aetna's interrogatories—first by not providing timely responses, then by providing incomplete and incorrect answers when they did finally respond. *See*, *e.g.*, Dkt. No. 121 at 1 (directing Defendants to comply with the Court's previous Order on interrogatories). These violations, by themselves, are sufficient to justify sanctions.

#### B. The Prejudice Suffered by Aetna Is Another Ground for Sanctions

To the extent that violating the Court's Order is not sufficient (it is), sanctions are also warranted based on the specific, identifiable harms Aetna has suffered. For starters, Aetna has "been and continue[s] to be denied access to documents that the

Court has already ordered produced."[7] *Carrillo*, 2012 WL 4791614, at *10. That, in turn, "has significantly prejudiced [Aetna] in [its] effort to advance the [prosecution] of this case." *Brislane v. Brown*, No. 16-6002, 2017 WL 4712076, at *2 (C.D. Cal. Oct. 13, 2017), *R&R adopted*, 2017 WL 4785058. There are several reasons why:

***Experts.*** Aetna's potential clinical, financial, industry, and coding experts still do not have the relevant information to conduct their analyses, and it would be extremely unfair to require them to attempt to complete their reviews and prepare their reports by the current December 8, 2025 deadline for initial expert disclosures. For example, the clinical expert lacks the full universe of medical records, like those underlying the nearly $1 million in claims for alleged patient and confirmed body broker N.S. The financial expert lacks bank records, sub ledgers, and multiple tax returns. The industry and coding experts lack contracts, communications, and claim-related materials that are relevant to the legitimacy of Defendants' claims and billing practices. Even if Defendants completed their production immediately, that would not undo the prejudice already suffered. As the Ninth Circuit has made clear, a "last-minute tender of relevant documents" does not cure the effects of discovery misconduct. *G-K Props. v. Redevelopment Agency of San Jose*, 577 F.2d 645, 647-48 (9th Cir. 1978).

***Follow-Up Discovery.*** When Judge Rosenbluth granted Aetna's Motion to Compel, she envisioned the current, ongoing productions as an "initial round of discovery" and stated that Aetna could then conduct follow-up discovery and, if necessary, "ask [the Corut] for more[.]" Dkt. No. 115 at 21:4-19. Judge Rosenbluth

---

[7] In addition, Aetna has "been forced to incur substantial attorneys' fees and costs as a result of [Defendants'] failure to comply with [their] discovery obligations and the Court's discovery Order[,]" and Defendants' breaches will continue to drive up costs by forcing Aetna's legal and expert teams to unnecessarily cram their work. *Id.* But, at this juncture, Aetna seeks only non-monetary sanctions sufficient to remedy the harms to its prosecution of this case.

was correct, as Defendants' productions so far have created new issues and necessitated additional discovery. The Court should not permit Defendants to run out the clock.

***Spoliation Discovery.*** For months, Defendants have refused to provide information about their preservation efforts, despite Aetna's requests for such information. While Judge Rosenbluth originally denied Aetna's Motion on this issue, she also said that Aetna can raise it again if Aetna has "a nonspeculative reason for believing that Defendants have not met their discovery obligations in good faith." Dkt. No. 114 at 2. Because of Defendants' delayed productions and responses, the specifics of the preservation and potential spoliation issues are only now coming to light. For example, Aetna just learned last week that Defendants allegedly have not been able to access at least one of Nathan Young's email accounts and that Defendants made no effort to collect or preserve information from several key witnesses, including many (if not all) body brokers. Aetna needs sufficient time to conduct discovery into these concerns, including potentially through a further conference with a Magistrate, document discovery, and depositions.[8]

***Witnesses and Depositions.*** Defendants' non-compliance with Judge Rosenbluth's Order has also hindered Aetna's ability to take depositions or even identify which witnesses to depose within the limits of the Federal Rules. For example, Aetna is just starting to discover which of Defendants' employees were involved with tracking and processing kickback payments. But Aetna still lacks

---

[8] Presumably, Defendants will suggest that their body brokers' use of "personal" phones or email accounts precludes them from having "control" over such communications. That is specious. As shown in the example of N.S., Defendants essentially controlled his ***<u>entire life</u>***. They housed him, gave him kickbacks so he could continue buying drugs, and even paid for expenses such as gym memberships. This is a level of interconnectedness and control beyond any normal employer-employee relationship. Again, Aetna reserves all rights to seek appropriate sanctions if destruction has occurred.

sufficient information to determine who played other key roles within Defendants' RICO enterprise. And these problems are compounded by Defendants' demonstrably deficient interrogatory responses—like their failure to identify all their marketers and bank accounts as ordered. Aetna should not have to decide who to use its limited depositions on, much less take depositions, before being given a chance to receive and review the documents that Judge Rosenbluth ordered Defendants to produce.

***Third-Party Subpoenas.*** By failing to preserve and collect materials from their former body brokers and other employees, Defendants have created a situation where Aetna must subpoena them for records. Thus, Defendants' recent responses and disclosures have shown that third-party discovery will be far broader than initially estimated, encompassing not only potential depositions, but now communications and documents from former body-brokers, ***none*** of whom it appears were even told to preserve communications. It would be highly prejudicial to force Aetna to issue and enforce these subpoenas between when it learned about the need for them (October 20, 2025) and the current discovery deadline (December 22, 2025).

## II. AETNA SEEKS APPROPRIATE SANCTIONS TAILORED TO THE CONDUCT AND HARM

Aetna seeks sanctions that are specifically tailored to the harm and misconduct at play. *See*, *e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (a federal court has "the ability to fashion an appropriate sanction for conduct which abuses the judicial process."). Notably, despite a potential basis for case-terminating sanctions, Aetna is currently only seeking the types of lesser sanctions that Courts often turn to before entering judgment.

***First***, Aetna seeks a unilateral extension of the fact and expert deadlines, calculated from the Court's original compliance deadline to the date when Defendants fully comply with the Order. This will partially cure the harm from the production delay, and the length is tied directly to Defendants' violation of Judge Rosenbluth's Order. *See*, *e.g.*, Curtis *T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.*, 843 F.2d 683,

695 (3d Cir. 1988) (noting prior imposition of "lesser sanction" of "unilateral extension of [one party's] discovery deadline[.]"). This can be done without moving the current trial date, even if it affects other deadlines. *See*, *e.g.*, *Zone Sports Ctr., LLC v. Nat'l Sur. Corp.*, No. 11-845, 2012 WL 1969048, at *3 (E.D. Cal. May 31, 2012) ("Given the required extension of expert discovery to address the harm caused, the Court finds a sanction of precluding summary judgment is appropriate.").

***Second***, Defendants should be barred from relying upon any documents produced after the Court's September 18, 2025 deadline. This sanction is based specifically on Defendants' dilatory conduct and tied to the violation of the Order, and Judge Rosenbluth raised the specter of preclusive sanctions multiple times. Dkt. No. 124 at 9:21-10:8 (requiring Defendants to produce a declaration so Aetna could determine whether to "seek either evidentiary sanctions, terminating sanctions, contempt[,]" or other relief); *id.* at 22:18-22 ("it's going to be up to [Aetna] to move for any sanctions or whatever [Aetna] think[s] is appropriate, whether it's evidentiary sanctions, terminating sanctions, contempt, whatever"). Such sanctions are also expressly recognized as available under Rule 37. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) ("[P]rohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.").

***Third***, any factual burden that Aetna has related to documents or information that Defendants produced after the Court's deadline (or did not produce at all) should be deemed met in Aetna's favor. Here again, this sanction is targeted at Defendants' violations and is an expressly-recognized sanction under the relevant Rule. Fed. R. Civ. P. 37(b)(2)(A)(i) ("directing that matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"); *see also, e.g.*, *Estakhrian v. Obenstine*, No. 11-3480, 2016 WL 6868178, at *12 (C.D. Cal. Feb. 29, 2016) (striking defenses, barring violating party from relying on certain evidence, and ordering an adverse-inference jury instruction), *R&R adopted*, 2016 WL 6275599 (C.D. Cal. May 17, 2016); *PeerMusic, III, Ltd. v.*

*LiveUniverse, Inc*., No. 09-6160, 2011 WL 672585, at *9 (C.D. Cal. Jan. 26, 2011) (striking defenses and holding that "a party's failure to comply with discovery orders directly inhibits the opposing party's ability to discover evidence concerning the alleged defense."), *R&R adopted*, 2011 WL 684610 (C.D. Cal. Feb. 17, 2011).

***Fourth***, the Court should require immediate compliance with Judge Rosenbluth's Order. In doing so, the Court should issue a clear warning that further violations will result in a case-terminating sanction.[9] *See Am. Career Coll. Inc. v. Medina*, 673 F. Supp. 3d 1139, 1147 (C.D. Cal. 2023) (issuing case terminating sanction and noting that a prior order contained similar types of warnings).

## III. THERE IS NO SUBSTANTIAL JUSTIFICATION FOR VIOLATING THE COURT'S ORDER OR WAITING SO LONG TO IDENTIFY OR COLLECT DOCUMENTS

To obtain lesser sanctions, Defendants have the burden to show that their violation of the Court's Order is substantially justified. "Substantial justification" requires a showing that the failure to comply with an order was "outside [Defendants''] control." *Ear Charms, Inc. v. Bling Jewelry, Inc.*, No. 16-02091, 2019 WL 2902507, at *4 (C.D. Cal. May 23, 2019). Defendants cannot meet that burden.

It is a near certainty that Defendants will peddle the same tired refrain they always rely upon: blame Aetna. Defendants have cried wolf far too many times. It is not Aetna's fault that so many people died under Defendants' care.[10] It is not Aetna's fault that Defendants' operations ruined neighborhoods[11] and people's lives.[12] And it is not Aetna's fault that Defendants have violated the Court's Order.

---

[9] An improper document dump should not be deemed compliance.

[10] https://www.ocregister.com/2024/11/10/addicts-came-to-southern-california-fromafar-to-get-sober-they-wound-up-dead/

[11] https://www.latimes.com/california/story/2024-05-21/los-angeles-residents-sayillegal-hostels-are-disrupting-their-quality-of-life

[12] https://www.wsj.com/us-news/drug-rehabs-insurance-curbing-6c56ded6

This is a sprawling RICO and healthcare fraud case in which ***the overwhelming majority*** of the evidence is in Defendants' possession, especially since the Court dismissed Defendants' Counterclaims. There was little dispute that Defendants would have to produce most of the information that they allegedly started gathering after Judge Rosenbluth granted Aetna's Motion to Compel, such as marketing agreements, internal communications, financials, and medical records—all of which was identified as necessary discovery in the Rule 26 report and initial disclosures.[13] That is particularly true since this is a "complex case[,]" meaning that "[e]arly preparation and participation are essential." *In re Phenylpropanolamine Products Liab. Litig.*, 460 F.3d at 1228 (dismissing MDL actions for failure to comply with discovery orders).

Despite this, Defendants forced Aetna to obtain a Court Order covering nearly all its requests before seriously engaging in discovery. Dkt. 114. According to Defendants, this was for the strategic purpose of avoiding piecemeal reviews and productions. Dec. at Ex. A, ¶ 32. But the Federal Rules contemplate such discovery and require a party to respond to the unobjectionable portions of requests. *See* Fed. R. Civ. P. 34(b)(2)(C) ("An objection to part of a request must specify the part and permit inspection of the rest."). And federal courts are clear that "poor case management and lack of care and due diligence" are not substantial justifications for discovery breaches. *Pineda v. City & County of San Francisco*, 280 F.R.D. 517, 521 (N.D. Cal. 2012); *see also Avago Techs., Inc. v. IPtronics Inc.*, No. 10-02863, 2015 WL 2395941, at *4 n. 38 (N.D. Cal. May 19, 2015) ("disobedient conduct not shown to be outside the litigant's control also prevent findings of substantial justification.").

[13] Most of the discovery that Judge Rosenbluth ordered concerned evidence that Defendants never even objected to producing. The overarching dispute in the Motion to Compel proceedings was whether Defendants could limit discovery to just the Aetna members identified in Exhibit A to the FAC, and Judge Rosenbluth largely agreed to preliminarily limit discovery to those members for many document requests. *See* Dkt. No. 114 at 1. There was no need to wait for the Order to start collections.

## CONCLUSION

Aetna respectfully requests that the Court sanction Defendants for their continued violation of Judge Rosenbluth's Order and their failures to meet their discovery obligations.

Respectfully submitted,

Dated: October 27, 2025

STRADLEY RONON STEVENS & YOUNG, LLP

By: *Benjamin H. McCoy*
Benjamin H. McCoy (*Pro Hac Vice*)
bmccoy@stradley.com
Jordann R. Conaboy (*Pro Hac Vice*)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiffs*
*Aetna Life Insurance Company and*
*Aetna Health of California, Inc.*

# CERTIFICATE OF SERVICE

The undersigned, counsel of record served the foregoing and associated papers on all counsel of record on October 27, 2025 via the Court's e-filing system.

Dated: October 27, 2025

STRADLEY RONON STEVENS & YOUNG, LLP

By: *Benjamin H. McCoy*
Benjamin H. McCoy (*Pro Hac Vice*)
bmccoy@stradley.com
Jordann R. Conaboy (*Pro Hac Vice*)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiffs*
*Aetna Life Insurance Company and*
*Aetna Health of California, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,589 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 27, 2025

STRADLEY RONON STEVENS & YOUNG, LLP

By: *Benjamin H. McCoy*

Benjamin H. McCoy (*Pro Hac Vice*)
bmccoy@stradley.com
Jordann R. Conaboy (*Pro Hac Vice*)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiffs*
*Aetna Life Insurance Company and*
*Aetna Health of California, Inc.*